1  **MUSICK, PEELER & GARRETT LLP**
       ATTORNEYS AT LAW
2      ONE WILSHIRE BOULEVARD, SUITE 2000
       LOS ANGELES, CALIFORNIA  90017-3383
           TELEPHONE 213-629-7768
3          FACSIMILE 213-624-1376

4  Gilbert D. Jensen (State Bar No. 061620)
   *g.jensen@mpglaw.com*
   Cheryl A. Orr (State Bar No. 132379)
5  *c.orr@mpglaw.com*

6  Attorneys for Plaintiff
   ALLIED WORLD ASSURANCE COMPANY (U.S.) INC.
7



8                **UNITED STATES DISTRICT COURT**

9            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11  ALLIED WORLD ASSURANCE
    COMPANY (U.S.) INC,                    Case No. SACV13 889- CJC (RNBx)
12
                   Plaintiff,
13                                         **COMPLAINT FOR DECLARATORY
                                           RELIEF AND REIMBURSEMENT**
14          vs.

15  SENTINEL OFFENDER SERVICES, LLC, a
    California limited liability partnership; AND
16  DOES 1-10
                   Defendant.
17

18        Plaintiff ALLIED WORLD ASSURANCE COMPANY (U.S.) INC. (hereinafter "Plaintiff

19  or ALLIED WORLD") alleges as follows:

20  **I.    THE PARTIES**

21        1.    Plaintiff ALLIED WORLD is and, at all relevant times, was an insurance company

22  duly organized under the laws of the State of Delaware with its principal pace of business in New

23  York, New York.

24        2.    Defendant SENTINEL OFFENDER SERVICES, LLC is and, at all relevant times,

25  was, a limited liability company organized under the laws of the State of California, and which is

26  authorized to transact and is transacting business in Irvine, California.  Defendant SENTINEL has

27  been named as a defendant in multiple lawsuits in the State of Georgia arising out of its operations

28  as a private probation entity in that State.

---

846190.1

## II.      JURISDICTION AND VENUE

3.      Diversity of citizenship is established because Plaintiff's principal place of business is in New York, New York and its state of incorporation is Delaware.  Defendant SENTINEL is a limited liability company organized under the laws of the State of California with its principal place of business in Irvine, California.  The amount in controversy exceeds $75,000.  The Court therefore has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332.

4.      Defendant SENTINEL does business in Irvine, California in Orange County and is subject to personal jurisdiction in this judicial district.  In addition, the policy of insurance which is the subject of this lawsuit was issued to SENTINEL at its Irvine business location.  Venue is therefore proper in this Court under 28 U.S.C. § 1391, subd. (a).

## III.     OVERVIEW OF THE DISPUTE

5.      This lawsuit is an insurance coverage dispute.   ALLIED WORLD issued a claims made policy of insurance to SENTINEL affording Directors & Officers insurance coverage for the period October 11, 2012 to October 11, 2013.  Beginning in the fall of 2012, SENTINEL gave notice to ALLIED WORLD of a series of lawsuits and legal actions against SENTINEL and/or SENTINEL employees and sought coverage for the lawsuits and actions from ALLIED WORLD.  ALLIED WORLD denied coverage for the claims, but subsequently agreed to reimburse SENTINEL's defense costs in connection with the claims subject to a full reservation of rights, including the right to seek reimbursement of such defense costs.   ALLIED WORLD has brought this suit seeking a determination of no coverage for the claims against SENTINEL and reimbursement of all defense costs advanced to SENTINEL subject to its reservation of rights. All of the lawsuits and legal actions are related to a prior lawsuit and legal action first commenced against SENTINEL in or about January, 2010 by Hills McGee (referred to herein as the "MCGEE CLAIMS") .  SENTINEL previously provided notice of the MCGEE CLAIMS to the insurance carrier which afforded SENTINEL Directors & Officers insurance coverage in 2010.   The most recent spate of claims are therefore all related to the MCGEE CLAIMS first made in 2010 and are therefore not within the scope of the coverage of the ALLIED WORLD policy for the 2012-2013 policy period for the reasons discussed in more detail below.

## IV.   **FACTUAL BACKGROUND AND THE UNDERLYING LAWSUITS**

6.     In October, 2012, SENTINEL began giving notice to ALLIED WORLD of claims against SENTINEL arising from SENTINEL's operations as a private probation entity in the State of Georgia  (the "SENTINEL LITIGATION CLAIMS").   The SENTINEL LITIGATION CLAIMS include the following proceedings initiated in Georgia State Courts:

(a)     *Hucks v. Sentinel Offender Services, LLC, et al.*, No. 2012-RCCV-578 (Superior Court, Richmond County, GA):  This claim is a civil Complaint naming SENTINEL and two individual employees of SENTINEL, Barbara Johnson, a probation agent, and Gina Childs, the Manager of SENTINEL's office in Augusta, Richmond County, Georgia as Defendants.   Plaintiff Hucks alleges she was falsely imprisoned as a result of a warrant that was improperly issued for alleged non-payment to SENTINEL of probation fees imposed as part of her sentence on a misdemeanor.  Plaintiff Hucks alleges that SENTINEL is operating as a private probation company acting under the provisions of O.C.G.A. § 42-8-100(g) (the "Private Probation Act"), which allows Counties in Georgia to contract with private companies for the performance of probation services.  Hucks also alleges that SENTINEL improperly extended the term of her probation for the purpose of collecting additional fees.  The *Hucks* Complaint alleges that the Private Probation Act is unconstitutional because (i) it is an illegal delegation of judicial power to a private for-profit company and (ii) it violates the due process clause of the Georgia Constitution. Plaintiff Hucks attaches to the Complaint, the transcript of a hearing in *Harrelson v. Harold Vernon Jones,* Case No. 2008RCMC6 (the "HARRELSON CLAIM"), of December 2, 2008 (the "*Harrelson* Transcript") and alleges that SENTINEL has an economic incentive to increase supervisory fees, awards employees bonuses based on SENTINEL's profitability and implies that SENTINEL improperly uses the judicial system to increase its profits.  Plaintiff Hucks also alleges that SENTINEL and its employees were acting without a valid contract approved by the Board of Commissioners of Columbia County, the governing authority of Columbia County, Georgia, as required under the Private Probation Act.  Plaintiff Hucks seeks compensatory damages for her false imprisonment, return of all funds wrongfully collected by SENTINEL from Hucks, punitive damages and attorneys' fees.  Counsel for Hucks is John B. Long, Esq., Tucker, Everitt, Long,

1  Brewton & Lanier.  The action was assigned to the Hon. Daniel J. Craig, Judge of the Superior

2  Court of Richmond County, State of Georgia.

3        (b)     *Glover, et al. v. Sentinel Offender Services, LLC,* No. 2012-CV-0811 (Superior

4  Court, Columbia County, GA).  This is a class action Complaint lawsuit against SENTINEL also

5  arising out of SENTINEL's operations as a private probation company in the State of Georgia.

6  Like the *Hucks* Complaint, the Amended *Glover* Complaint alleges that SENTINEL is operating

7  illegally in Columbia County, Georgia because it does not satisfy the requirements of the Private

8  Probation Act without a valid contract approved by the Board of Commissioners of Columbia

9  County.   In addition, like *Hucks,* the Amended Complaint seeks a determination that the Private

10 Probation Act is unconstitutional under the due process clause of the Georgia Constitution.   The

11 Amended Complaint also alleges that SENTINEL employees are incentivized and receive bonuses

12 based on the profitability of the company and that allowing private probation companies to profit

13 taints the judiciary.   The Amended Complaint attaches a copy of the *Harrelson* Transcript as an

14 Exhibit.  The proposed class consists of all individuals who have been convicted of misdemeanor

15 convictions in Columbia County, Georgia, whose convictions and sentences required them to pay

16 supervision fees as part of the terms of probation and whose monthly probation fees were

17 collected by SENTINEL, excluding any individuals who have been incarcerated as a result of

18 arrest warrants or probation warrants sworn out by SENTINEL.  Like the *Hucks* Complaint, the

19 Amended Complaint in *Glover* seeks to recover all funds improperly collected by SENTINEL as a

20 private probation entity from the class members, with interest, and attorneys' fees.   Counsel for

21 Glover is John B. Long, Esq., Tucker, Everitt, Long, Brewton & Lanier, the same counsel who

22 filed the *Hucks* action.  ALLIED WORLD is informed and believes that the *Glover* action was

23 assigned to the Hon. Daniel J. Craig, Judge of the Superior Court of Richmond County, State of

24 Georgia, the judge presiding over the *Hucks* action.  The Amended Complaint in *Glover* identifies

25 the case as being related to *Hucks* and several later-filed actions including *Gilyard, Tennille,* and

26 *Osborne.*

27        (c)     *Gilyard v. Sentinel Offender Services, LLC, et al*., No. 2012-CV-0850 (Superior

28 Court, Columbia County, GA):  This is another civil Complaint filed in the same County as the

1  *Glover* Class Action.  The *Gilyard* Complaint alleges that it is related to the *Glover* Class Action.

2  The Complaint names SENTINEL as a defendant, along with Gina Childs and Barbara Johnson,

3  the two SENTINEL employees named in the *Hucks* Complaint filed in Richmond County.  Like

4  the *Glover* and *Hucks* Complaints, the *Gilyard* Complaint alleges that SENTINEL is not operating

5  as an authorized private probation company under the Private Probation Act because it does not

6  have a contract approved by the Columbia County Board of Commissioners.  Like the original

7  Complaint in *Glover*, the *Gilyard* Complaint alleges SENTINEL has converted money from

8  Gilyard to which SENTINEL is not legally entitled.  Like Hucks, Gilyard alleges that his prior

9  felony and misdemeanor probations expired on October 16, 2008, but SENTINEL, acting through

10  Defendant Childs, extended his probation in order to collect additional probation fees and that

11  SENTINEL has a financial incentive to increase probation fees.  The Complaint alleges that

12  Childs then sought an order revoking Gilyard's probation for non-payment of fees to SENTINEL,

13  and swore out a false warrant for his arrest.  Plaintiff Gilyard was allegedly arrested and

14  incarcerated twice as a result of SENTINEL's actions.  Plaintiff Gilyard seeks compensatory

15  damages for his false arrests,  including his lost income and the loss of his freedom, return of

16  improperly collected fees by SENTINEL, and attorneys' fees.  Counsel for Gilyard is John B.

17  Long, Esq., Tucker, Everitt, Long, Brewton & Lanier, the same counsel who filed the *Hucks* and

18  *Glover* actions.  ALLIED WORLD is informed and believes that the *Gilyard* action was assigned

19  to the Hon. Daniel J. Craig, Judge of the Superior Court of Richmond County, State of Georgia,

20  the judge presiding over the *Hucks* and *Glover* actions.

21       (d)    *Tennille v. Sentinel Offender Services, LLC, et al.*, No. 2012-CV-0861 (Superior

22  Court, Columbia County, GA):  This is another civil Complaint filed in Columbia County against

23  Defendant SENTINEL and a SENTINEL employee, Christina Kapral.  The Complaint alleges it is

24  related to the *Glover, Gilyard,* and *Hucks* actions.  Again, the Complaint alleges that SENTINEL

25  is not authorized as a private probation company under the Private Probation Act because it does

26  not have a contract approved by the Columbia County Board of Commissioners.  The Complaint

27  alleges that Plaintiff Pamela Tennille was on misdemeanor probation, paid all of her fines and the

28  fees for SENTINEL's services, and should have been released from probation, but that

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT

1  SENTINEL added drug testing as a condition of her probation to increase its fees although it had

2  no authority to impose terms of probation that were not part of Tennille's original sentence.  The

3  Complaint alleges that SENTINEL filed a petition for the revocation of probation and caused her

4  probation to be revoked and threatened her with arrest.  Plaintiff Tennille alleges compensatory

5  damages for the fees and fines she should not have paid to SENTINEL, emotional distress

6  damages, reasonable attorneys' fees and injunctive relief preventing SENTINEL from swearing

7  out a warrant for her arrest.  Counsel for Tennille is John B. Long, Esq., Tucker, Everitt, Long,

8  Brewton & Lanier.  ALLIED WORLD is informed and believes the *Tennille* action was also

9  assigned to the Hon. Daniel J. Craig, Judge of the Superior Court of Richmond County, State of

10  Georgia.

11          (e)     *Osborn v. Sentinel Offender Services, LLC, et al.*, No. 2012-CV-0867 (Superior

12  Court, Columbia County, GA):  This is another civil Complaint filed against SENTINEL and

13  Barbara Johnson, a SENTINEL employee. The Complaint alleges that the case is related to the

14  *Glover* Class Action.  Again, the Complaint alleges, like the *Hucks, Glover* and *Gilyard*

15  Complaints, that SENTINEL does not have a contract approved by the Columbia County Board of

16  Commissioners and thus is not properly authorized to act as a private probation company under

17  The Private Probation Act and was not legally entitled to collect fees from Osborn for

18  SENTINEL's probationary services.   Osborn also alleges that SENTINEL has a financial interest

19  in increasing the probation fees for misdemeanor probationers and improperly uses threats of

20  arrest to collect fees to which SENTINEL is not entitled.   The Complaint also alleges, like in

21  *Hucks* and *Gilyard*, that SENTINEL employee Johnson extended the terms of his probation after

22  the terms of his probation had expired, filed a petition to revoke his probation, swore out an arrest

23  warrant and had Osborn arrested.  Osborn allegedly spent two months in jail for the alleged non-

24  payment of SENTINEL's fees.  Plaintiff Osborn seeks to recover the fees improperly collected

25  from him by SENTINEL, compensatory damages for his false arrest, and attorneys' fees.  Counsel

26  for Plaintiff Osborn is John B. Long, Esq., Tucker, Everitt, Long, Brewton & Lanier.  ALLIED

27  WORLD is informed and believes the *Osborn* action was also assigned to the Hon. Daniel J.

28  Craig, Judge of the Superior Court of Richmond County, State of Georgia.

1      (f)      *Martin v. Sentinel Offender Services, LLC, et al.*, No. 2012-CV-0888 (Superior

2   Court, Columbia County, GA):  This is another civil Complaint against Defendants SENTINEL

3   and SENTINEL employee, Christina Kapral, the same SENTINEL employee named in the

4   *Tennille* action.  The *Martin* Complaint alleges that it is related to the *Glover, Gilyard* and *Hucks*

5   actions, which were allegedly all assigned to Judge Craig.  The Complaint alleges, like the *Hucks,*

6   *Glover, Gilyard, Tennille and Osborn* actions that SENTINEL does not have a contract approved

7   by the Columbia County Board of Commissioners and therefore is not authorized under the

8   Private Probation Act to act as a private probation entity and illegally collected monthly fees for

9   SENTINEL's probation services.  Plaintiff Martin alleges that he was placed on misdemeanor

10  probation for driving with a suspended license.  Like Plaintiff Tennille, Plaintiff Martin alleges

11  that drug testing was added as a term of his probation by SENTINEL to increase SENTINEL fees,

12  even though drug testing was not part of his original sentence.  The Complaint alleges, like the

13  *Hucks* Complaint, that the Plaintiff should have been released from private probation, but

14  SENTINEL caused his probation to be revoked, an arrest warrant to be issued and Plaintiff Martin

15  was arrested and jailed for 34 days.   Like in *Hucks* and the amended Complaint in *Glover,*

16  Plaintiff Martin attaches a copy of the *Harrelson* Transcript to the Complaint and alleges that

17  SENTINEL pays employees bonuses based on SENTINEL's profitability, implying like *Hucks*

18  and several other of the Complaints, that SENTINEL has an improper profit motivation to increase

19  its probation fees.   Plaintiff Martin seeks compensatory damages from his false arrest, including

20  emotional distress damages, a restraining order enjoining SENTINEL and its employees from

21  causing or swearing out a probation revocation warrant against him, recovery of the fees Martin

22  paid for the drug testing services and the monthly probation fees that he should not have had to

23  pay after he had paid all the fines and fees required of his original sentence, and reasonable

24  attorneys' fees.  Counsel for Plaintiff Martin is John B. Long, Esq., Tucker, Everitt, Long,

25  Brewton & Lanier.  ALLIED WORLD is informed and believes the *Martin* action was also

26  assigned to the Hon. Daniel J. Craig, Judge of the Superior Court of Richmond County, State of

27  Georgia.

28

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

846190.1

7

COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT

1        (g)    *Cash v. Sentinel Offender Services, LLC, et al.*, No. 2013-RCHM-00001 (Superior

2 Court, Richmond County, GA);  This is a Petition for Writ of Habeas Corpus by Virginia Cash

3 and the Respondents are Defendant SENTINEL and Kellie McIntyre, the Solicitor of the State

4 Court of Richmond County, Georgia, and Richard Roundtree, the Sheriff of Richmond County,

5 Georgia.  Petitioner Cash seeks to obtain release from confinement in jail.  The *Cash* Petition

6 alleges that it is related to the *Hucks, Glover, Gilyard, Tennille* and *Osborn* actions which the

7 Petition alleges have all been assigned to the Hon. Daniel J. Craig, and which have been

8 denominated as "the *SENTINEL Offender Services, LLC* litigation."  The *Cash* Petition alleges

9 that a petition for revocation of probation was sworn out by SENTINEL employees and Plaintiff

10 was arrested.  The Complaint alleges that SENTINEL improperly computed her probation by

11 rolling previously consecutive sentences forward or tacking one misdemeanor sentence to another

12 to increase the fees collected by SENTINEL.  Petitioner Cash alleges SENTINEL has an

13 economic incentive to increase probations to increase its fees.   Petitioner Cash also attached a

14 copy of the *Harrelson* Transcript to the Petition and alleged SENTINEL's improper profit

15 motivation.   Petitioner Cash also alleges like some of the Plaintiffs in the lawsuits that

16 SENTINEL added electronic monitoring which was not part of her original sentence, thereby

17 imposing an illegal sentence, improperly increasing SENTINEL's fees.   The *Cash* Petition alleges

18 that imposition of electronic monitoring as a term of probation for misdemeanors is not permitted

19 under Georgia law and a private probation company does not have any statutory power to impose

20 electronic monitoring as a term of probation.  Petitioner Cash further alleges that SENTINEL then

21 revoked her probation for a failure to pay for SENTINEL's probation service fees and Petitioner

22 Cash was sentenced to five months in jail because she was indigent and unable to pay the fees

23 charged by SENTINEL for its probation services.   The Petition alleges that imprisoning her

24 because she is poor and unable to pay SENTINEL's fees denies her equal protection of the law

25 under United States and Georgia case law.   In addition, like the *Hucks* Complaint and the

26 amended *Glover* Complaint, Petitioner Cash attacks the constitutionality of the Private Probation

27 Act as violating the due process clause of the Georgia Constitution.  Petitioner Cash further

28 alleges that SENTINEL's financial stake in the terms of the probation and its ability to

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

846190.1

8

COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT

1   recommend the terms of probation, including imposition of electronic monitoring, to increase its

2   fees offends basic notions of fairness and due process.  A copy of the *Harrelson* Transcript is also

3   attached to the *Cash* Petition.  In addition to release from jail, Cash seeks a judicial declaration

4   that the Private Probation Act is unconstitutional on its face and in its application, an order

5   declaring her incarceration and the revocation of her probation as unconstitutional, an order

6   declaration her incarceration unconstitutional and denies her due process of the law, an order

7   declaring that the Richmond County Court does not have the power to require electronic

8   monitoring for misdemeanor violations, an order requiring SENTINEL to pay Petitioner all the

9   monies collected for electronic monitoring or apply them to payment of her fines, for return of all

10  fees collected by SENTINEL from Petitioner, an audit of all electronic monitoring fees collected

11  by SENTINEL and such other appropriate relief.   The attorneys for Petitioner include John B.

12  Long, Esq., Tucker, Everitt, Long, Brewton & Lanier.  Petitioner Cash requested that the case be

13  assigned to Judge Craig, along with the *SENTINEL Offender Services, LLC* litigation.  ALLIED

14  WORLD is informed and believes that the *Cash* Petition was assigned to Judge Craig.

15       (h)     *Ashley v. Sentinel Offender Services, LLC, et al.*, No. 2013-RCHM-00002

16  (Superior Court, Richmond County, GA):  This is another Petition for Writ of Habeas Corpus in

17  which Respondents are SENTINEL, Kellie McIntyre, and Sheriff Roundtree.  Petitioner Ashley

18  alleges, like Petitioner Cash, that he was arrested and confined in Richmond County jail.  The

19  Petition alleges the case is related to the *Cash, Hucks, Glover, Gilyard, Tennille,* and *Osborn*

20  actions and should also be assigned to Judge Craig.  Petitioner Ashley alleges that a requirement

21  of his probation includes SCRAM, an alcohol electronic monitoring system, and, like Cash, he

22  alleges that imposition of electronic monitoring as a condition of probation on a misdemeanor is

23  not authorized under the Georgia probation statutes.  Petitioner Ashley alleges he could not afford

24  to pay for the electronic monitoring and an arrest warrant was issued by SENTINEL.  According

25  to Petitioner, he appeared in Court and was ordered to pay the money for electronic monitoring or

26  serve six months in jail.  When Petitioner could not pay the money, SENTINEL obtained an order

27  revoking his probation and a warrant was sworn out for his arrest and he was incarcerated.  Like in

28  *Cash*, the Ashley Petition alleges that imprisoning him because he is poor and unable to pay

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

846190.1

9

COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT

1  SENTINEL's fees denies him equal protection of the law under United States and Georgia case

2  law.   In addition, like the *Hucks* Complaint, the amended *Glover* Complaint and the *Cash*

3  Petition, Petitioner Ashley attacks the constitutionality of the Private Probation Act as violating

4  the due process clauses of the Georgia Constitution.   Petitioner Ashley likewise alleges that

5  SENTINEL's financial stake in the terms of the probation and its ability to recommend the terms

6  of probation, including imposition of electronic monitoring, to increase its fees offends basic

7  notions of fairness and due process.   A copy of the *Harrelson* Transcript is also attached to the

8  Ashley Petition.   In addition to release from jail, Ashley seeks a judicial declaration that the

9  Private Probation Act is unconstitutional on its face and in its application, an order declaring his

10  incarceration was unconstitutional because he was denied effective assistance of counsel, an order

11  declaring the revocation of his probation as unconstitutional, an order declaring that the Richmond

12  County Court does not have the power to require electronic monitoring for misdemeanor

13  violations, an order requiring SENTINEL to pay Petitioner all the monies collected for electronic

14  monitoring or apply them to payment of his fines, for return of all fees collected by SENTINEL

15  from Petitioner, an audit of all electronic monitoring fees collected by SENTINEL and such other

16  appropriate relief.   The attorneys for Petitioner include John B. Long, Esq., Tucker, Everitt, Long,

17  Brewton & Lanier.   Petitioner Ashley requested that the case be assigned to Judge Craig, along

18  with the *SENTINEL Offender Services, LLC* litigation.   ALLIED WORLD is informed and

19  believes that the *Ashley* Petition was assigned to Judge Craig.

20          (i)     *Hayes v. Sentinel Offender Services, LLC, et al.*, No. 2013-RCHM-00003 (Superior

21  Court, Richmond County, GA):  This is another Petition for Writ of Habeas Corpus in which

22  SENTINEL, Kellie McIntyre, the Solicitor of State Court of Richmond County, Georgia, and

23  Richard Roundtree, the Sheriff of Richmond County, Georgia, are Respondents.   The Petitioner

24  Hayes alleges he was arrested and is confined in Richmond County jail.   The Petition specifically

25  alleges it is related to the *Cash, Hucks, Glover, Gilyard, Tennille* and *Osborn* actions, all of which

26  have been assigned to Hon. Daniel J. Craig, who is handling all of the *Sentinel Offender Services,*

27  *LLC* litigation.   The Petitioner alleges, like virtually all of the other Petitioners and Plaintiffs in the

28  SENTINEL LITIGATION CASES, that SENTINEL filed a petition to revoke his probation and

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

846190.1

COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT

1  then swore out a warrant for his arrest for non-payment of SENTINEL fees.  The Petition alleges

2  that SENTINEL's effort to toll or extend his probation were illegal.  Like Cash, Petitioner Hayes

3  alleges that imposition of electronic monitoring as a condition of probation on a misdemeanor is

4  not authorized under the Georgia probation statutes.  Petitioners alleges that SENTINEL has no

5  authority to request electronic monitoring be imposed under those statutes.  The Petition alleges

6  that SENTINEL is making money off of the imposition of electronic monitoring and pays bonuses

7  to employees based on profitability.  Like in *Cash* and *Ashley*, the *Hayes* Petition alleges that

8  imprisoning him because he is poor and unable to pay SENTINEL's fees denies him equal

9  protection of the law under United States and Georgia case law.   In addition, like the *Hucks*

10  Complaint, the amended *Glover* Complaint and the *Cash* and *Ashley* Petitions, Petitioner Hayes

11  attacks the constitutionality of the Private Probation Act as violating the due process clause of the

12  Georgia Constitution.  Petitioner Hayes likewise alleges that SENTINEL's financial stake in the

13  terms of the probation and its ability to recommend the terms of probation, including imposition of

14  electronic monitoring, to increase its fees offends basic notions of fairness and due process.  A

15  copy of the *Harrelson* Transcript is also attached to the *Hayes* Petition.  In addition to release from

16  jail, Hayes seeks a judicial declaration that the Private Probation Act is unconstitutional on its face

17  and in its application, an order declaring the method of tolling used by SENTINEL was

18  inapplicable to misdemeanor cases, an order declaring that the Richmond County Court does not

19  have the power to require electronic monitoring for misdemeanor violations, for return of all fees

20  collected by SENTINEL from Petitioner, an audit of all electronic monitoring fees collected by

21  SENTINEL and such other appropriate relief.   The attorneys for Petitioner include John B. Long,

22  Esq., Tucker, Everitt, Long, Brewton & Lanier.   Petitioner Hayes also requested that the case be

23  assigned to Judge Craig, along with the *SENTINEL Offender Services, LLC* litigation.  ALLIED

24  WORLD is informed and believes that the *Hayes* Petition was assigned to Judge Craig.

25        (j)    *Stephens v. Sentinel Offender Services, LLC, et al.*, No. 2013-RCHM-00004

26  (Superior Court, Richmond County, GA):  This is another Petition for Writ of Habeas Corpus

27  naming SENTINEL, Ms. McIntrye, and Sheriff Roundtree as Respondents.  The Petition alleges it

28  is related to the *Hucks, Glover, Gilyard, Tennille, and Osborn* actions.  Much like the other

1   Petitions, Petitioner Stephens alleges that she is confined to the Richmond County jail after

2   SENTINEL obtained a tolling order on her probation which she alleges is inapplicable to

3   misdemeanor cases, revoked her probation, and caused a warrant to issue for her arrest.  Petitioner

4   claims that she passed her required drug test, paid all of her required fees and her probation

5   terminated on June 20, 2006.  Petitioner alleges that she was nonetheless ordered to be jailed and

6   released with an electronic leg monitor only after she paid  SENTINEL the $80.00 start up fee for

7   electronic monitoring.  Petitioner alleges she is indigent and cannot pay the fee.  Petitioner alleges

8   that imposition of electronic monitoring as a condition of misdemeanor probation is not authorized

9   under the Georgia probation statutes, but only for felony probation.  Petitioner Stephens, like

10  many of the other Plaintiffs and Petitioners, challenges the Private Probation Act as

11  unconstitutional in violation of the due process clause of the Georgia Constitution and also that it

12  offends basic notions of fairness and due process for a private probation company to have a

13  financial interest in the terms of probation and imposing terms of probation for which they make a

14  profit.  Petitioner seeks a writ of habeas corpus releasing her from jail, an order declaring the

15  Private Probation Act unconstitutional on its face and as applied, an order voiding the order

16  requiring her to be jailed until she pays the electronic monitoring fees, an order declaring that the

17  Richmond Court may not impose electronic monitoring as a condition of misdemeanor probation,

18  for an audit of all electronic monitoring fees collected by SENTINEL, and damages for

19  Petitioner's loss of her freedom.  A copy of the *Harrelson* Transcript is also attached to this

20  Petition and references the profit motivation of SENTINEL in enhancing the fees from probation

21  services.  The attorneys for Petitioner include John B. Long, Esq., Tucker, Everitt, Long, Brewton

22  & Lanier.   Petitioner Stephens also requested that the case be assigned to Judge Craig, along with

23  the *SENTINEL Offender Services, LLC* litigation.  ALLIED WORLD is informed and believes that

24  the *Stephens* Petition was assigned to Judge Craig.

25          (k)     *Barrett v. Sentinel Offender Services, LLC, et al.*, No. 2013-RCHM-00006

26  (Superior Court, Richmond County, GA):  This is another Petition for Writ of Habeas Corpus filed

27  in Richmond County against SENTINEL, Ms. McIntrye, and Sheriff Roundtree as Respondents.

28  Petitioner Barrett seeks to void his original misdemeanor conviction on the grounds that he did not

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

846190.1

12

COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT

1  have the benefit of counsel, was indigent and there was no proper waiver of his rights.  The

2  Petition alleges that it is related to the *Hayes, Ashley, Cash, Stephens* and *Hucks* actions pending

3  in Richmond County and the *Glover, Gilyard, Tennille*, and *Osborne* actions pending in Columbia

4  County and should be assigned to the Hon. Daniel Craig.  In addition, like Cash, Hayes, and

5  Stephens, the Petitioner alleges that SENTINEL was not authorized to impose electronic

6  monitoring as a condition of his probation when it was not ordered by the Court.  Like in *Hucks,*

7  *Glover, Gilyard, Osborn, Tennille,* and *Martin,* Petitioner Barrett challenges SENTINEL's

8  authority to act as a private probation company without the approval of its contract by the County

9  Board of Commissioners as required by the Private Probation Act.  Like Petitioners Cash, Ashley,

10  Hayes and Stephens, Petitioner Barrett alleges that Court cannot impose fees or revoke probation

11  for individuals who cannot afford to pay the fees.  Like the other Petitioners, Petitioner Barrett

12  alleges that SENTINEL presented an order tolling his probation and swore out a warrant for his

13  arrest from his failure to pay fees, including complying with court-ordered SCRAM – even though

14  SCRAM was not part of his original sentence.  Petitioner's probation was reinstated and he was

15  ordered to be hooked up to the SCRAM electronic monitoring, but SENTINEL swore out another

16  warrant for his arrest.  Like the *Hucks, Glover, Gilyard, Osbron, Tennille,* and *Martin* actions,

17  Petitioner Barrett alleges that the SENTINEL contract with the County is invalid because it is not

18  approved by the governing Board.  Petitioner Barrett, like Hucks and Glover and all of the other

19  Petitioners, challenges the Private Probation Act as unconstitutional in violation of the due process

20  clause of the Georgia Constitution and also that it offends basic notions of fairness and due

21  process for a private probation company to have a financial interest in the terms of probation and

22  imposing terms of probation for which it makes a profit.   Petitioner Barrett seeks an order

23  enjoining the enforcement of the arrest warrant.  Like the other Petitions, Petitioner Barrett seeks

24  an order declaring the Private Probation Act as unconstitutional in violation of the due process

25  clause of the Georgia Constitution, an order declaring tolling of probation by private probation

26  companies is not allowable under the Georgia probation statutes, an audit of all funds collected by

27  SENTINEL from electronic monitoring fees and a return of all funds SENTINEL received from

28  him.  Petitioner Barrett also seeks a declaration like Hucks, Glover, Gilyard, Osborn, Tennille and

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

1  Martin, that the contract with Richmond County to act as a private probation entity is void and

2  invalid because of the absence of the Board's approval as required under the Private Probation

3  Act.   The Petition also attaches the *Harrelson* Transcript as an Exhibit and references the profit

4  motivation of SENTINEL in enhancing the fees from probation services.   The attorneys for

5  Petitioner Barrett include John B. Long, Esq., Tucker, Everitt, Long, Brewton & Lanier.

6  Petitioner Barrett also requested that the case be assigned to Judge Craig, along with the

7  *SENTINEL Offender Services, LLC* litigation.   ALLIED WORLD is informed and believes that

8  the *Barrett* Petition was assigned to Judge Craig.

9        (l)     *Carter v. Sentinel Offender Services, LLC, et al.*, No. 2013-RCCV-122 (Superior

10  Court, Richmond County, GA):  This is a civil Complaint filed against SENTINEL and two

11  SENTINEL employees, Martin M. Murray and Cheryl Bryant.  The Complaint alleges that it is

12  related to the *Hucks, Cash, Ashley, Hayes, Stephens* and *Barrett* actions pending in Richmond

13  County and the *Glover, Gilyard, Tennille,* and *Osborn* actions pending in Columbia County and

14  should be assigned to the Hon. Daniel Craig.  The Complaint alleges that Defendants Murray,

15  acting as a notary public, and Defendant Bryan, acting as a probation officer, caused a warrant for

16  his arrest to be sworn out, contending that Carter had failed to report for probation, had absconded

17  from supervision and could not be found, and owed fines and fees totaling $655.00.  Plaintiff was

18  arrested and incarcerated in both the Richmond County and Columbia County jails and was

19  required to pay the $655.00 before his release, even though his probation had allegedly expired on

20  December 8, 2011.  Plaintiff alleges that the Private Probation Act does not authorize tolling or

21  extension of probation and Defendant SENTINEL knew it had no basis for tolling his probation.

22  Like the *Barrett* Petition, Plaintiff alleges the SENTINEL contract with the County is void and

23  invalid because it provides that every sentence of probation provide for a monitoring fee payable

24  directly to SENTINEL for each month of probation or suspension period of the sentence.  Like all

25  of the Petitions for Habeas Corpus relief and *Hucks* and the amended Complaint in *Glover,*

26  Plaintiff also alleges that the Private Probation Act is unconstitutional under the due process

27  clause of the Georgia Constitution.  Plaintiff seeks an order declaring the tolling of his probation is

28  illegal and to set aside any order extending the probation beyond December 8, 2011.  Plaintiff

1    seeks a declaration that his arrest and incarceration were illegal. Plaintiff seeks orders declaring

2    the contract with the County and SENTINEL as illegal as imposing a sentence in advance, and an

3    order declaring the Private Probation Act as unconstitutional in violation of the due process clause

4    of the Georgia Constitution. Plaintiff seeks to recover damages for his illegal arrest and false

5    imprisonment. Plaintiff seeks an order declaring his probation terminated on December 8, 2011.

6    Finally, Plaintiffs seek appropriate injunctive relief protecting Plaintiff and others who may be

7    arrested. The Complaint also attaches the *Harrelson* Transcript as an Exhibit and references the

8    profit motivation of SENTINEL in enhancing the fees from probation services. The attorneys for

9    Plaintiff include John B. Long, Esq., Tucker, Everitt, Long, Brewton & Lanier. Plaintiff Carter

10   also requested that the case be assigned to Judge Craig, along with the *Sentinel Offender Services,*

11   *LLC* litigation. ALLIED WORLD is informed and believes that the *Carter* action was assigned to

12   Judge Craig.

13          (m)    *Mantooth v. Sentinel Offender Services, LLC, et al.*, No. 2013-RCCV-155

14   (Superior Court, Richmond County, GA): This is a class action Complaint against SENTINEL

15   and Kayla White, a SENTINEL employee. The Complaint alleges it is related to the *Carter,*

16   *Barrett, Stephens, Hays, Cash* and *Hucks* actions pending in Richmond County and the *Glover,*

17   *Gilyard, Tennille, Osborne* actions pending in Columbia County and should be assigned to Judge

18   Craig who is handling all of the *SENTINEL Offender Services, LLC* litigation. This Complaint

19   like virtually all of the others alleges that Defendants illegally swore out a warrant for his arrest

20   and caused him to be jailed for alleged non-payment of fees to SENTINEL. The Complaint

21   alleges that the Private Probation Statute is unconstitutional and violates the due process clause of

22   the Georgia Constitution, like in the *Hucks* Complaint and the amended *Glover* Complaint. The

23   Plaintiff brings the action on behalf of himself and the class of persons consisting of all citizens of

24   Georgia who are the subject of arrest warrants issued by the Richmond County Court for alleged

25   probation violations that were issued at the request of SENTINEL. The Complaint seeks to decide

26   a number of issues of law and fact common to the class, including the legality of the procedures by

27   which Defendant SENTINEL accrues probation fees, the legality of the procedures used by

28   SENTINEL to request arrest warrants, the constitutionality of the Private Probation Statute on its

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

846190.1

15

COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT

1  face and as applied, and seeks temporary and permanent injunctive relief enjoining SENTINEL

2  from executing any arrest warrants obtained by Defendant SENTINEL.   A copy of the *Harrelson*

3  Transcript is attached as an Exhibit and the Complaint references the profit motivation of

4  SENTINEL in enhancing the fees from probation services.   The attorneys for Plaintiff  include

5  John B. Long, Esq., Tucker, Everitt, Long, Brewton & Lanier.   Plaintiff Mantooth also requested

6  that the case be assigned to Judge Craig, along with the *Sentinel Offender Services, LLC* litigation.

7  ALLIED WORLD is informed and believes that the *Mantooth* action was assigned to Judge Craig.

8         7.       AON, SENTINEL's insurance broker, reported of each of the SENTINEL

9  LITIGATION CLAIMS to ALLIED WORLD.   AON's notices did not request that ALLIED

10  WORLD assume the defense of the lawsuits on behalf of SENTINEL.   AON merely provided

11  notice of each Claim under the policy issued by ALLIED WORLD to SENTINEL for the October

12  11, 2012 to October 11, 2013 policy period.

13  **V.        THE RELATED MCGEE CLAIMS**

14         8.       The SENTINEL LITIGATION CLAIMS are all related to two prior claims filed in

15  2010 against SENTINEL by Hills McGee, by the same counsel representing the other SENTINEL

16  LITIGATION Claimants, John B. Long, Esq., Tucker, Everitt, Long, Brewton & Lanie (the

17  "MCGEE CLAIMS"):

18         (a)       *McGee v. Sentinel Offender Services, et al.*, Case No. 2010-RCHM-00001

19  (Superior Court, Richmond County, GA) (the "*McGee* Petition"):  On January 22, 2010, McGee

20  filed a Petition for Writ of Habeas Corpus against SENTINEL.   Portland J. Campanaro, the Acting

21  Solicitor for Richmond County Court, and Ronald Strength, the Sheriff of Richmond County at

22  that time.  Petitioner McGee alleged that, in October, 2008, he was arrested on a charge of public

23  drunkenness and appeared in Court.  At the time, he was advised that he could only obtain a public

24  defender if he paid a $50 application fee under O.C.G.A. § 15-21A-6(c).  Petitioner McGee is

25  indigent and could not afford the fee and did not obtain a public defender.  McGee plead guilty

26  and was sentenced to probation.  He was ordered to pay a fine and, later, given credit for the fine

27  assuming he completed community service.  Petitioner McGee alleged he completed his

28  community service in lieu of the fine, but could not pay the monthly probation fee charged by

1   SENTINEL. Petitioner McGee alleged he was confined in Richmond County jail because of an

2   order revoking his probation signed by a Richmond County judge after Respondent SENTINEL

3   filed a motion to revoke his probation because of non-payment of monthly probation fees owing to

4   SENTINEL that Petitioner McGee could not pay because he was indigent. Petitioner McGee

5   alleged that he was unlawfully being incarcerated because he was poor and could not pay the

6   SENTINEL probation fees and therefore was being denied equal protection of the law. Among

7   other things, McGee alleged, like the SENTINEL LITIGATIONS CLAIMANTS described above,

8   that SENTINEL has a financial interest in causing warrants to be issued for individuals who have

9   not paid their fees to SENTINEL. McGee attached to the Petition, like almost all of the other

10  SENTINEL LITIGATION CLAIMANTS, the *Harrelson* Transcript and alleged that SENTINEL

11  and its employees have a financial interest in increasing the fees SENTINEL earns on

12  misdemeanor probationers. McGee alleged he was incarcerated for two months for failure to pay

13  a $186.00 fee owing to SENTINEL. In addition to release from jail, Petitioner McGee also sought

14  to declare the Private Probation Act unconstitutional as an illegal delegation of judicial power to a

15  private company and because it denied individuals, like Petitioner, due process of the law

16  guaranteed by the United States and Georgia Constitutions. The Petition also sought to hold the

17  original statute, O.C.G.A. § 15-21A-6(c), under which he was convicted without the benefit of

18  counsel declared unconstitutional.

19          (b)     *McGee v. Sentinel Offender Services, LLC,* Case No. 2010-RCCV-00299 (Superior

20  Court, Richmond County, GA) (the "*McGee* Class Action"): On or about April 16, 2010, Plaintiff

21  McGee also filed a civil action, denominated "Petition to Hold SENTINEL Offender Services,

22  LLC in Willful Contempt of Court and Petition for Damages" against SENTINEL. That Petition

23  was styled as a Class Action on behalf of McGee and all other persons similarly situated. In that

24  civil action, McGee alleged that his original Habeas Corpus Petition was granted and that his

25  original conviction was set aside as void. Nonetheless, the Petition alleged that, in a subsequent

26  letter dated March 8, 2010, SENTINEL advised McGee that he had failed to comply with the

27  terms of his probation by failure to report to the probation officer and by failure to pay $186.00 for

28  SENTINEL's probation fees. The Petition alleged he received a second letter from SENTINEL

1  threatening a no bond warrant for his arrest.  The first count was for Contempt of the Habeas

2  Corpus order on the grounds that the original conviction was set aside and SENTINEL was

3  allegedly trying to use its position as a probation company to collect a debt that was not owed.

4  The second count of the Petition alleged a class action under Rule 23 of the Georgia Civil

5  Practices Act.  McGee sought certification of a class of all individual who have been convicted of

6  a misdemeanor or ordinance violation in the State of Georgia, who were under probation under the

7  supervision of SENTINEL, and who had paid fees to SENTINEL.  McGee sought to declare the

8  Private Probation Act as an illegal delegation of judicial power and to declare the Private

9  Probation Act unconstitutional.  The *McGee* action sought a temporary restraining order enjoining

10 SENTINEL from taking any action to arrest Plaintiff and to show cause why SENTINEL should

11 not be held in willful contempt of court, to permanently restrain SENTINEL from taking an action

12 against McGee on the void conviction, and for penalties for willful violation of the Court's order.

13 In addition, with respect to the class action issue, McGee sought certification of the proposed

14 class, a ruling that the Private Probation Act is unconstitutional, and an order requiring

15 SENTINEL to reimburse all of the Class Members three times the amount of fees paid to

16 SENTINEL for supervision of their private probation, including all monthly probation fees,

17 electronic monitoring fees or other fees.  The Petition also sought punitive damages, an order

18 requiring SENTINEL to divest itself from any interest in a private probation contract and all

19 personal property acquired as a result of operating as a private probation company in Georgia,

20 restrictions on SENTINEL's future activities, dissolution of SENTINEL, suspension or revocation

21 of any license or permit granted to SENTINEL to act as a private probation company in Georgia

22 and forfeiture of any charter held by SENTINEL.   The McGee Action was removed to  the United

23 States District Court for the Southern District of Georgia, in Augusta.

24       9.       The SENTINEL LITIGATION CLAIMS referenced in Paragraph 4(a) through

25 4(m) are related to the *McGee* Petition and the *McGee* Class Action in that they all allege that

26 SENTINEL imposed misdemeanor probation fees as a private probation entity operating in

27 Georgia under the Private Probation Act, that SENTINEL improperly extended or tolled their

28 probation sentences or added terms to their sentences that increased the fees owing to SENTINEL,

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

846190.1

18

COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT

1  that SENTINEL has a profit motivation in increasing the probation fees charged to misdemeanor

2  probationers and its employees are likewise financially incentivized by bonuses to increase the

3  probation fees collected by SENTINEL, that SENTINEL arrests or threatens arrest to collect its

4  probation fees from misdemeanor probationers, and multiple of the claimants, including McGee,

5  have been jailed for their inability to pay SENTINEL's probation fees.  The *McGee* Petition and

6  *McGee* Class Action and the SENTINEL LITIGATION CLAIMS also allege that SENTINEL's

7  collection of probation fees under the Private Probation Act is illegal for one or more reasons,

8  including the practice is an illegal delegation of judicial power to SENTINEL, the Private

9  Probation Act violates due process of the law under the Georgia and/or United States

10  Constitutions, it is a denial of due process to jail misdemeanor probationers based on their

11  inability to pay SENTINEL's fees, and/or SENTINEL's contract with Columbia County is void or

12  invalid under the Private Probation Act because it is not approved by the Board of Commissioners,

13  the pertinent government authorizing entity, for Columbia County.   Like McGee, the claimants in

14  the SENTINEL LITIGATION CLAIMS seek to recover from SENTINEL all of the fees that they

15  paid SENTINEL that SENTINEL was not entitled to receive and compensatory damages for any

16  emotional distress or other damages they suffered from SENTINEL's wrongful conduct.

17       10.    ALLIED WORLD is informed and believes that the *McGee* Class Action is

18  pending before the Eleventh Circuit Court of Appeal.

19       11.    ALLIED WORLD is informed and believes and, on that basis, alleges that

20  SENTINEL received notice of the *McGee* Petition in or about January, 2010.

21       12.    ALLIED WORLD is informed and believes and, on that basis, alleges that

22  SENTINEL first received notice of the *McGee* Class Action in or about April, 2010.

23       13.    ALLIED WORLD is informed and believes and, on that basis, alleges that, in 2010,

24  SENTINEL gave notice of the *McGee* Petition and the *McGee* Class Action to its prior insurer,

25  Twin City Fire Insurance Company, under Policy No. KB 0259779 in effect for the period

26  October 11, 2009 to October 11, 2010.

27

28

## VI.   THE ALLIED WORLD INSURANCE COVERAGE

14.   ALLIED WORLD first issued an insurance policy, policy no. issued policy no. 0306-0173, a Forcefield Management Liability Package Policy, to SENTINEL for the policy period October 11, 2010 to October 11, 2011.  In connection with its application for that policy, SENTINEL disclosed prior claims against it and provided to ALLIED WORLD loss runs from its prior insurer, Twin Cities Fire Insurance Company, a Hartford Company, which disclosed three open claims under the Twin Cities policy for the 2009-2010 policy period, including the two McGEE CLAIMS and the HARRELSON CLAIM.

15.   In 2011, SENTINEL submitted a renewal application to renew its insurance with ALLIED WORLD.  On that renewal application dated August 22, 2011, under Section XI, CLAIMS HISTORY, SENTINEL affirmatively disclosed in response to a question no. 4 that it was involved in a representative, class action or derivative lawsuit.  Handwritten on the renewal application the action was identified as:  "Hills McGee, Augusta Georgia, unconstitutional provisions."

16.   Directly beneath the handwritten reference to the Hills McGee Class Action, the ALLIED WORLD renewal application states in bold and conspicuous capital letters:

*IT IS AGREED THAT IF SUCH KNOWLEDGE OR INFORMATION EXISTS WITH REGARD TO QUESTIONS 1, 2, 3 OR 4 OF CLAIMS HISTORY,* REGARDLESS OF WHETHER IT IS DISCLOSED IN THIS APPLICATION, *ANY CLAIM BASED ON, ARISING FROM, OR IN ANY WAY RELATING TO SUCH* ERROR, MISSTATEMENT, MISLEADING STATEMENT, ACT, OMISSION, NEGLECT, BREACH OF DUTY OR OTHER *MATTER* OF WHICH THERE IS KNOWLEDGE OR INFORMATION *SHALL BE EXCLUDED FROM COVERAGE UNDER THE INSURANCE BEING APPLIED FOR* AND THE INSURER SHALL NOT BE LIABLE FOR SUCH LOSS AND, TO THE EXTENT THIS POLICY PROVIDES DUTY TO DEFEND COVERAGE, THE INSURER SHALL HAVE NO DUTY TO DEFEND.  (Italics supplied.)

17.   In 2012, SENTINEL also applied to renew its insurance with ALLIED WORLD.  On the renewal application dated August 6, 2012, under Section XI, CLAIMS HISTORY, SENTINEL affirmatively acknowledged in response to question nos. 4.d. and 4.e:  (i) being named as a party in a representative, class action or derivative suit; and (ii) being charged in a civil or criminal action or administrative proceeding with a violation of any federal or state anti-

1   harassment or anti-discrimination law.  Immediately below those questions on the application, in

2   handwriting, the action(s) was (were) identified as:  "Hills McGee, Augusta Georgia."

3          18.    The 2012 renewal application contains the same clear and conspicuous

4   exclusionary language:

5          *IT IS AGREED THAT IF SUCH KNOWLEDGE OR INFORMATION EXISTS
           WITH REGARD TO QUESTIONS* 1, 2, 3 OR *4 OF CLAIMS HISTORY*,
6          REGARDLESS OF WHETHER IT IS DISCLOSED IN THIS APPLICATION,
           *ANY CLAIM BASED ON, ARISING FROM, OR IN ANY WAY RELATING TO*
7          *SUCH* ERROR, MISSTATEMENT, MISLEADING STATEMENT, ACT,
           OMISSION, NEGLECT, BREACH OF DUTY OR *OTHER MATTER OF WHICH*
8          *THERE IS KNOWLEDGE OR INFORMATION SHALL BE EXCLUDED FROM*
           *COVERAGE UNDER THE INSURANCE BEING APPLIED FOR* AND THE
9          INSURER SHALL NOT BE LIABLE FOR SUCH LOSS AND, TO THE
           EXTENT THIS POLICY PROVIDES DUTY TO DEFEND COVERAGE, THE
10         INSURER SHALL HAVE NO DUTY TO DEFEND.  (Italics supplied.)

11   (A true and correct copy of the 2012 renewal application is attached as Exhibit A hereto.)

12   19.    ALLIED WORLD issued policy no. 0306-0173, a Forcefield Management Liability

13   Package Policy, to SENTINEL for the policy period October 11, 2012 to October 11, 2013 (the

14   "ALLIED WORLD POLICY").  (A true and correct copy of the ALLIED WORLD POLICY is

15   attached as Exhibit A.)  The Named Insured under the ALLIED WORLD POLICY is Defendant

16   Sentinel Offender Services, LLC, located in Irvine, California.  (A true and correct copy of the

17   ALLIED WORLD POLICY is attached as Exhibit B hereto.)

18          20.    ALLIED WORLD intended to and did rely upon the answers to the Claims History

19   questions in the two prior renewal applications, in issuance of the ALLIED WORLD POLICY and

20   such renewal applications are incorporated into and made part of the ALLIED WORLD POLICY.

21          21.    Among other things, the ALLIED WORLD POLICY provides D&O Liability

22   Coverage to SENTINEL.

23          22.    The Insuring Agreement of the D&O Liability Coverage Part of the ALLIED

24   WORLD POLICY states in pertinent part as follows:

25          In consideration of the payment of the premium and in reliance upon the
           **Application**, *which shall be deemed to be attached to, incorporated into, and made*
26         *a part of this Policy*, and subject to these General Terms and Conditions and THIS
           Coverage Section, ALLIED WORLD ASSURANCE COMPANY (U.S.) INC. (the
27         "**Insurer**") and the **Named Insured**, on behalf of all **Insureds**, agree as follows:

28

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

846190.1

COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT

I.      INSURING AGREEMENTS

. . .

B.      **Claims Against Insured Persons – Indemnifiable Loss Coverage**

The **insurer** shall pay on behalf of any **Company** the **Loss** arising from a **Claim**, first made during the **Policy Period** (or Discovery Period, if applicable) against any **Insured Person** for any **Wrongful Act**, and reported to the **Insurer** in accordance with Section V. of the General Terms and Conditions, if the **Company** pays such **Loss** to or on behalf of the **Insured Person** as indemnification.

C.      **Company Claims Coverage**

The **Insurer** shall pay on behalf of the **Company** the **Loss** arising from a **Claim**, first made during the **Policy Period** (or Discovery Period, if applicable) against the **Company** for any **Wrongful Act**, and reported to the **Insurer** in accordance with Section V. of the General Terms and Conditions.

23.     An "Insured Person" for purposes of the ALLIED WORLD POLICY includes an employee of SENTINEL.

24.     A "Claim" is defined under the ALLIED WORLD POLICY as follows:

B.      **"Claim"** means any:

(1)     written demand for monetary, non-monetary or injunctive relief made against an **Insured**;

(2)     judicial, administrative or regulatory proceeding, whether civil or criminal, for monetary, non-monetary or injunctive relief commenced against an **Insured**, including any appeal therefrom, which is commenced by:

(a)     service of a complaint or similar pleading;

. . .

A **Claim** shall be deemed first made when any **Insured** first received notice of the **Claim**.

25.     A "Wrongful Act" is defined under the ALLIED WORLD POLICY as follows:

S.      **"Wrongful Act"** means:

(1)     with respect to an Insured Person, any actual or alleged act, error, omission, neglect, breach of duty, breach of trust, misstatement, or misleading statement by an Insured Person in his or her capacity as such, or any matter claimed against an Insured Person by reason of his or her status as such;

. . .

(3)  with respect to the Company, any actual or alleged act, error, omission, neglect, breach of duty, misstatement or misleading statement by the Company.

26.   The ALLIED WORLD POLICY contains the following definition of "Loss":

O.   **"Loss"** means:

(1)  damages, settlements or judgments;

(2)  pre-judgment or post-judgment interest;

(3)  costs or fees awarded in favor of the claimant;

(4)  punitive or exemplary damages, or the multiple portion of any multiplied damages award, subject to any applicable Sublimit of Liability, but only to the extent that such damages are insurable under the applicable law most favorable to the insurability of such damages;

. . .

**"Loss"** does not include:

(a)  amount for which the Insureds are not legally liable;

(b)  amounts which are without legal recourse to the Insureds;

(c)  taxes;

(d)  fines or penalties, except as provided for in Definition O.(4) above;

(e)  amounts deemed uninsurable under applicable law; . . .

27.   The ALLIED WORLD POLICY contains a number of exclusions, including:

**III.   EXCLUSIONS**

This Coverage Section shall not cover any **Loss** in connection with any **Claim**:

A.   arising out of, based upon or attributable to the gaining of any profit or financial advantage or improper or illegal remuneration by an **Insured**, if a final judgment or adjudication establishes that such **Insured** was not legally entitled to such profit or advantage or that such remuneration was improper or illegal;

B.   arising out of, based upon or attributable to any deliberate criminal or deliberate fraudulent act or any willful violation of law by an **Insured**, if a final judgment or adjudication establishes that such act or violation occurred;

. . .

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

846190.1

COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT

In determining the applicability of Exclusions A., B. and C., the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, any **Insured Person** shall not be imputed to any other **Insured Person**; however, the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, an **Insured Person** who is a past or current Chairman of the Board, Chief Executive Officer, President or Chief Financial Officer of the Company shall be imputed to the Company.

D.    based upon, arising from, or in consequence of any actual or alleged liability of any **Insured** under any express contract or agreement; provided however, that this Exclusion shall not apply: (1) to the extent that such **Insured** would have been liable in the absence of such contract or agreement; or (2) to the payment of **Defense Costs** in any such **Claim** against an **Insured Person**.

. . .

F.    *alleging, arising out of, based upon or attributable to the same or essentially the same facts alleged, or to the same or related **Wrongful Acts** alleged or contained, in any **Claim** which has been reported, or in any circumstances of which notice has been given, before the Inception Date of this Policy as set forth in Item 2. Of the Declarations, under any policy, whether excess or underlying, of which this Policy is a renewal or replacement or which it may succeed in time; . . .*[1]

. . .

28.    By endorsement, Exclusion M of the ALLIED WORLD POLICY was replaced with the following exclusion which excludes from coverage all Loss from any Claim:

M.    alleging, arising out of, based upon or attributable to bodily injury, sickness, mental anguish, emotional distress, disease or death of any person, or damage to or destruction of any tangible property; or for libel, slander, oral or written publication of defamatory or disparaging material or violation of any right of privacy; provided, however, that this Exclusion shall not apply to a **Securities Claim**.

29.    The ALLIED WORLD POLICY also contains in Endorsement No. 3 a "Broad Professional Services Exclusion" which states:

No coverage will be available for **Loss** from any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged act, error or omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or failure to render, services to a third party, whether or not a fee for such services has been paid.

---

[1] Italics added.

30.     The ALLIED WORLD POLICY contains the follow provision regarding defense and settlement of claims:

A.     The **Insurer** does *not* assume any duty to defend any **Claim** under this Coverage Section.  However, the **Insurer** shall have the right to fully and effectively associate with the **Insured** in the control, investigation, defense and settlement of any **Claim**.

. . .

E.     **Right to Tender Defense**

(1)   Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of a **Claim** to the **Insurer**.

(2)   This right shall be exercised by the **Named Insured** on behalf of all **Insureds** by providing written notice of the **Insurer**, except in the event that coverage is provided for a **Claim** exclusively against an **Insured Person**.  Such **Insured Person** shall have the right to tender the defense of the **Claim** to the **Insurer** at his or her option. *The **Insured's** right to tender the defense of a **Claim** shall terminate if it is not exercised within thirty (30) days of the date of the **Claim** is first made against an **Insured**.*  Further, from the date the **Claim** is first made against an **Insured** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of any **Insured** or the **Insurer** with respect to such **Claim**.  In the event the **Insureds** have complied with all of the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent.

. . .

(5)   When the **Insurer** has assumed the duty to defend, it shall pay **Defense Costs** excess of the applicable Retention, subject to all other terms and conditions of this Policy.  In the event and to the extent that the **Insureds** shall not be entitled to payment of such **Defense Costs** under the terms and conditions of this Coverage Section, such payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally and according to their respective interests.  (Italics supplied.)

31.     The ALLIED WORLD POLICY contains the following general CONDITIONS and DEFINITIONS, applicable to the D&O Coverage Part of the policy:

In consideration of the payment of the premium and in reliance upon the **Application**, which shall be deemed to be attached to, incorporated into, and made a part of this Policy, and subject to these General Terms and Conditions and any purchase Coverage Sections, as indicated in Item 3. Of the Declarations, ALLIED WORLD ASSURANCE COMPANY (U.S.) INC. (the "**Insurer**") and the **Named Insured**, on behalf of all **Insureds**, agree as follows:

MUSICK, PEELER & GARRETT LLP

ATTORNEYS AT LAW

**I.    TERMS AND CONDITIONS**

The terms and conditions set forth in these General Terms and Conditions shall apply to all purchase Coverage Sections of this Policy, except the Crime and the Kidnap and Ransom/Extortion Coverage Sections. The terms appearing in these General Terms and Conditions, which are defined in a specific Coverage Section, shall have the meaning provided for such terms in such Coverage Section for purposes of determining coverage thereunder. The terms and conditions of each Coverage Section apply only to that particular Coverage Section. If any of the terms or conditions in these General Terms and Conditions are inconsistent or in conflict with the terms and conditions of any specific Coverage Section, the terms and conditions of such Coverage Section shall control.

The policy contains the following General Definitions:

**II.    GENERAL DEFINITIONS**

A.    *"**Application**" means all applications, including any attachments and other materials provided therewith or incorporated therein, submitted in connection with the underwriting of this Policy or for any other policy of which this Policy is a renewal, replacement or which it succeeds in time.*

. . .

F.    *"**Related Claims**" means all **Claims** for **Wrongful Acts** based upon, arising out of, or in consequence of the same or related facts, circumstances, situations, transaction or events of the same or related series of facts, circumstances, situations, transactions or events.* (Italics supplied.)

. . .

**IV.    RETENTION**

A.    Subject to all other terms and conditions of this Policy, the **Insurer** shall only be liable for the amount of **Loss** under a **Claim**, which is in excess of the applicable Retention amount as set forth in Item 4.A. of the Declarations for each Coverage Section. A single Retention amount shall apply to all **Loss** from all **Related Claims**. The Retention amount shall be borne by the Insured and remain uninsured.

**V.    NOTICE OF CLAIM**

A.    The **Insured**(s) shall, as a condition precedent to the obligations of the Insurer under this Policy, give written notice to the **Insurer**, at either the physical or email address indicated in Item 7. Of the Declarations, of a **Claim** made against an **Insured** as soon as practicable after the Company's General Counsel or Risk Manager, or any individual with functionally equivalent responsibilities, becomes aware of the **Claim**.

B.    Notwithstanding the above, in no event shall notice of any **Claim** be provided to the **Insurer** later than ninety (90) days after the end of the **Policy Period** or the Discovery Period if applicable.  If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

C.    If during the Policy Period an Insured shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an Insured and shall, during the **Policy Period**, give written notice that the **Insurer** at either the physical or email address indicated in Item 7. Of the Declarations, of the circumstances, including the **Wrongful Act**, allegations anticipated, and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, any **Claim** that is subsequently made against the Insured alleging, arising out of, based upon or attributable to such circumstances, shall be deemed to have been made at the time written notice of such circumstances was first given to the **Insurer**.

D.    *All **Related Claims** shall be deemed to be a single **Claim** made on the date on which the earliest **Claim** within such **Related Claims** was first made, or when the earliest **Claim** within such **Related Claims** is treated as having been made in accordance with Section V.C. above, whichever is earlier*.  In such event, only one Limit of Liability and one Retention shall apply.[2]

. . .

## VII.    REPRESENTATIONS AND SEVERABILITY

A.    In granting coverage under this Policy, it is agreed that the Insurer has relied upon the statement and representations contained in the Application.  All such statements and representations shall be deemed to be the basis for this Policy and are to be considered as incorporated into this Policy.

## FIRST CAUSE OF ACTION

**(Declaratory Relief re No Duty to Indemnify the SENTINEL LITIGATION CLAIMS)**

32.    ALLIED WORLD refers to and by this reference incorporates the allegations of paragraphs 1 through 31  as though fully set forth herein.

33.    An actual controversy exists between ALLIED WORLD, on the one hand, and the SENTINEL, on the other hand, concerning whether there is any coverage or duty to indemnify the SENTINEL LITIGATION CLAIMS under the ALLIED WORLD POLICY.

---

[2] Italics supplied.

MUSICK, PEELER & GARRETT LLP

ATTORNEYS AT LAW

34.     ALLIED WORLD seeks a judicial declaration that there is no coverage and thus no duty to indemnify SENTINEL or any of its employees for the SENTINEL LITIGATION CLAIMS under the ALLIED WORLD POLICY because, among other things, SENTINEL disclosed the prior MCGEE CLAIMS before the effective date of the ALLIED WORLD POLICY's Policy Period and SENTINEL also admittedly had knowledge of McGEE CLAIMS when it submitted its renewal application for the ALLIED WORLD POLICY in August, 2012. The related SENTINEL LITIGATION CLAIMS are thus excluded from coverage under the ALLIED WORLD POLICY by virtue of the application which is incorporated into the ALLIED WORLD POLICY.

35.     Alternatively, ALLIED WORLD seeks a judicial declaration that there is no coverage or duty to indemnify SENTINEL or any of its employees for the SENTINEL LITIGATION CLAIMS under the ALLIED WORLD POLICY because, among other things, the SENTINEL LITIGATION CLAIMS are related to the MCGEE CLAIMS previously made against SENTINEL in the 2009-2010 policy period when Twin City Fire Insurance Company was on the risk and are thus deemed first made in the 2009-2010 policy period and not within the ALLIED WORLD POLICY.

36.     Alternatively, ALLIED WORLD seeks a judicial declaration that there is no coverage and thus no duty to indemnify SENTINEL or any of its employees for the SENTINEL LITIGATION CLAIMS under the ALLIED WORLD POLICY because, among other things, the SENTINEL LITIGATION CLAIMS are related to the MCGEE CLAIMS previously reported to another insurance company before the effective date of the ALLIED WORLD POLICY's Policy Period.

37.     Alternatively, ALLIED WORLD seeks a judicial declaration that there is no coverage and there is no duty to indemnify SENTINEL or any of its employees for the SENTINEL LITIGATION CLAIMS under the ALLIED WORLD POLICY because the claims arise out of, directly or indirectly, an alleged act, error or omission, misstatement, misleading statement, or breach of duty in the rendering of SENTINEL's professional services to Columbia County, Georgia, and/or Richmond County, Georgia, as a private probation entity.

38.     Alternatively, ALLIED WORLD seeks a judicial declaration that there is no coverage and there is no duty to indemnify SENTINEL or any of its employees for the SENTINEL LITIGATION CLAIMS under the ALLIED WORLD POLICY based on the other terms and conditions contained in the ALLIED WORLD POLICY.

## SECOND CAUSE OF ACTION

**(Declaratory Relief re No Duty to Defend the SENTINEL LITIGATION CLAIMS)**

39.     ALLIED WORLD refers to and by this reference incorporates the allegations of paragraphs 1 through 31 as though fully set forth herein.

40.     An actual controversy exists between ALLIED WORLD, on the one hand, and the SENTINEL, on the other hand, concerning whether there is any duty to defend the SENTINEL LITIGATION CLAIMS under the ALLIED WORLD POLICY.

41.     ALLIED WORLD seeks a judicial declaration that there is no duty to defend SENTINEL or any of its employees for the SENTINEL LITIGATION CLAIMS under the ALLIED WORLD POLICY because, among other things, SENTINEL disclosed the prior MCGEE CLAIMS before  the effective date of the ALLIED WORLD POLICY's Policy Period and SENTINEL also admittedly had knowledge of McGEE CLAIMS when it submitted its renewal application for the ALLIED WORLD POLICY in August, 2012.  The related SENTINEL LITIGATION CLAIMS are thus excluded from coverage under the ALLIED WORLD POLICY by virtue of the application which is incorporated into the ALLIED WORLD POLICY.

42.     Alternatively, ALLIED WORLD seeks a judicial declaration that there is no duty to defend SENTINEL or any of its employees for the SENTINEL LITIGATION CLAIMS under the ALLIED WORLD POLICY because, among other things, the SENTINEL LITIGATION CLAIMS are related to the MCGEE CLAIMS previously made against SENTINEL in the 2009-2010 policy period when Twin City Fire Insurance Company was on the risk and are thus deemed first made in the 2009-2010 policy period and not within the ALLIED WORLD POLICY's policy period.

43.     Alternatively, ALLIED WORLD seeks a judicial declaration that there is no duty to defend SENTINEL or any of its employees for the SENTINEL LITIGATION CLAIMS, among

other things, the SENTINEL LITIGATION CLAIMS are related to the MCGEE CLAIMS previously reported to another insurance company before the effective date of the ALLIED WORLD POLICY.

44.     Alternatively, ALLIED WORLD seeks a judicial declaration that there is no coverage and there is no duty to defend SENTINEL or any of its employees for the SENTINEL LITIGATION CLAIMS under the ALLIED WORLD POLICY because the claims arise out of, directly or indirectly, an alleged act, error or omission, misstatement, misleading statement, or breach of duty in the rendering of SENTINEL's professional services to Columbia County, Georgia, and/or Richmond County, Georgia, as a private probation entity.

45.     Alternatively, ALLIED WORLD seeks a judicial declaration that there is no duty to defend SENTINEL or any of its employees for the SENTINEL LITIGATION CLAIMS, among other things, SENTINEL did not tender the defense of each of the SENTINEL LITIGATION CLAIMS to ALLIED WORLD within thirty (30) days of the date each of such Claims were first made against SENTINEL.

46.     Alternatively, ALLIED WORLD seeks a judicial declaration that there is no duty to defend SENTINEL or any of its employees for the SENTINEL LITIGATION CLAIMS under the ALLIED WORLD POLICY based on the other terms and conditions contained in the ALLIED WORLD POLICY.

## THIRD CAUSE OF ACTION

### (Reimbursement from SENTINEL)

47.     ALLIED WORLD refers to and by this reference incorporates the allegations of paragraphs 1 through 46 as though fully set forth herein.

48.     Beginning in March, 2013, ALLIED WORLD agreed to advance defense expenses on behalf of SENTINEL and its employees named in the SENTINEL LITIGATION CLAIMS.

49.     SENTINEL has already submitted in excess of $200,000 in defense fees and costs to ALLIED WORLD for reimbursement.

50.     In addition, ALLIED WORLD is informed and believes and, on that basis alleges, that SENTINEL will be submitting additional defense fees and costs to ALLIED WORLD for

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

846190.1

COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT

1  reimbursement during the pendency of this proceeding which will also be the subject of ALLIED

2  WORLD's reimbursement claim.

3       51.    The exact amount of fees for which ALLIED WORLD seeks reimbursement will

4  be proven at the time of trial, but will exceed $200,000.

5       52.    As there is no coverage for the SENTINEL LITIGATION CLAIMS under the

6  ALLIED WORLD POLICY, ALLIED WORLD is entitled to reimbursement from SENTINEL for

7  all defense costs and costs paid by ALLIED WORLD in connection with the SENTINEL

8  LITIGATION CLAIMS,  plus prejudgment interest on those amounts, under *Buss v. Superior*

9  *Court* (1977) 16 Cal.4th 35.

10                           **PRAYER**

11      WHEREFORE, ALLIED WORLD prays for judgment as follows:

12               **ON THE FIRST CAUSE OF ACTION**

13                    **(Against SENTINEL)**

14       1.    That the Court declare that the SENTINEL LITIGATION CLAIMS and all other

15  Related Claims or related Potential Claims are not covered under the ALLIED WORLD POLICY

16  and that ALLIED WORLD has no obligation to indemnify SENTINEL or any of its employees for

17  the SENTINEL LITIGATION CLAIMS or any other Related Claims or Potential Claims.

18              **ON THE SECOND CAUSE OF ACTION**

19                    **(Against SENTINEL)**

20       2.    That the Court declare that ALLIED WORLD has no duty to defend SENTINEL or

21  any of its employees in any of the SENTINEL LITIGATION CLAIMS or any other Related

22  Claims or Related Potential Claims;

23              **ON THE SIXTH CAUSE OF ACTION**

24                    **(Against SENTINEL)**

25       3.    For a monetary award in the amount proven at trial which ALLIED WORLD has

26  incurred in advancing defense expenses and costs to SENTINEL for the SENTINEL

27  LITIGATION CLAIMS, including prejudgment interest at the legal rate of 7% on those payments;

28

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

846190.1

COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT

## ON ALL CLAIMS FOR RELIEF

### (Against SENTINEL)

4.     For such other relief and further relief as the Court deems just.

DATED:  June 10, 2013                    MUSICK, PEELER & GARRETT LLP


                                         By: _____
                                             Gilbert D. Jensen
                                             Cheryl A. Orr
                                             Attorneys for Plaintiff ALLIED WORLD
                                             ASSURANCE COMPANY (U.S.) INC.

# EXHIBIT  A



**DARWIN NATIONAL ASSURANCE COMPANY**
(A member company of Allied World Assurance Company Holdings Ltd.)
9 Farms Spring Road, Farmington, CT 06032 ·Tel. (860) 284-1300 · Fax (860) 284-1301

## FORCEFIELD<sup>SM</sup>

### PRIVATE COMPANY

#### INSURANCE APPLICATION FOR
#### MANAGEMENT LIABILITY PACKAGE POLICY

(Inclusive of Directors & Officers Liability, Employment Practices Liability Fiduciary Liability,
Employed Lawyers Liability, Crime and Kidnap and Ransom/ Extortion Insurance)

THE FOLLOWING NOTICES ARE APPLICABLE TO ALL PROPOSED COVERAGE, EXCEPT THE CRIME AND THE KIDNAP AND RANSOM/EXTORTION COVERAGE.

THE INSURANCE FOR WHICH THIS APPLICATION IS SUBMITTED, IS GENERALLY LIMITED TO COVERAGE FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.

THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION AMOUNT.

THE INSURER DOES NOT ASSUME THE DUTY TO DEFEND ANY CLAIM UNDER THE POLICY; HOWEVER, IF THE INSURED TENDERS THE DEFENSE OF ANY CLAIM TO THE INSURER IN ACCORDANCE WITH THE TERMS THEREIN, THE INSURER SHALL ASSUME THE DEFENSE OF SUCH CLAIM.

THIS APPLICATION MUST BE COMPLETED IN FULL.  PLEASE READ THE ENTIRE APPLICATION CAREFULLY, BEFORE SIGNING.

Note: If additional space is required for any response, please provide in a separate attachment, labeled with the question number.

| I. | GENERAL INFORMATION |
|----|---------------------|

1. Name of Applicant: _Sentinel Offender Services_
   Web Site Address of Applicant: _www.sentrak.com_
2. Address of Applicant: _201 Technology DR. Irvine CA 92618_
3. State of Incorporation: _Delaware_
4. Years in Operation: _20_
5. Business Type: ☐ Corporation   ☒ Limited Liability Company   ☐ Sole Proprietorship
   ☐ Joint Venture   ☐ Limited Liability Partnership   ☐ General Partnership
   ☐ Other (please specify): _____
6. NAICS Code(s): _922150_
7. Nature of Operations: _Private Probation_

PP 00025 00 (01/10)                     Page 1 of 13

## II.   COVERAGE REQUESTED BY APPLICANT

Please indicate below which Coverage Sections the Applicant is seeking coverage under for its organization:

- [✓] Directors and Officers
- [✓] Employment Practices Liability
- [✓] Fiduciary Liability
- [ ] Employed Lawyers
- [✓] Crime
- [✓] Kidnap and Ransom/Extortion

PLEASE COMPLETE ONLY THE SECTIONS OF THE APPLICATION WHICH CORRESPOND TO THE COVERAGES YOU HAVE SELECTED ABOVE.

## III.   FINANCIAL INFORMATION

1.  Please provide the following information for the Applicant and all Subsidiaries.

| Based on Financial Statements Dated: | (Year/Month) June 2012 |
|---|---|
| Total Assets | $ 31,824,648 |
| Total Liabilities | $ 29,352,826 |
| Total Revenues/Contributions | $ 5,576,890 |
| [✓] Net Income or [ ] Net Loss | $ 1,800,995 |
| Cashflow from Operations | $ 1,253,035 |

2.  Has the Applicant or any of its Subsidiaries changed auditors in the past year?   [ ] Yes  [✓] No
    *(If "Yes," please provide details in an attachment.)*

## IV.   ORGANIZATIONAL STRUCTURE

1.  Please list all Subsidiaries for which coverage is desired:   *none*

| Name | Nature of Business | Date Acquired or Created | Percentage of Ownership | Incorporated State or Country |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

2.  Has the Applicant or any of its Subsidiaries had any mergers, acquisitions or consolidations in the past twenty four (24) months?   [✓] Yes  [ ] No

3.  Are there any plans for a future merger, acquisition or consolidation of or by the Applicant or any of its Subsidiaries in the next twelve (12) months?   [ ] Yes  [✓] No

4.  Has the Applicant or any of its Subsidiaries had any private placement or other offering of securities within the last twelve (12) months, or anticipate having any private placements or other offering of securities within the next twelve (12) months?   [ ] Yes  [✓] No

PP 00025 00 (01/10)                    Page 2 of 13

## V.    DIRECTORS AND OFFICERS INFORMATION

1.  Total number of common shares outstanding: _____0_____

2.  Total number of common shareholders: _____2_____

3.  Total number of shares held by Directors and Officers: _____100_____

4.  Does any shareholder of the Applicant own five percent (5%) or more of the voting shares directly or beneficially?   ☐ Yes  ☐ No
    *(If "Yes," please provide name and percentage of holdings)*

5.  Does the Applicant or any of its Subsidiaries have a portion of its private company debt purchased by the public?   ☐ Yes  ☒ No
    If "Yes," please provide the amount: $_____
    If "Yes," please provide the Debt Rating:_____

6.  Has the Applicant experienced changes to its Board of Directors or to its Key Executives over the past year?
    ☐ Yes  ☒ No  *(If "Yes," please provide complete details)*

7.  Does the Applicant have any of the following Board Committees?
    (Please check all that apply.)   ☐ Audit   ☐ Compensation   ☐ Nominating


## VI.    EMPLOYMENT PRACTICES INFORMATION

*(Please provide the following information for the Applicant and all Subsidiaries for which coverage is being requested.)*

1.  Enter the **TOTAL (Inclusive of California)** number of employees in the boxes below.
    *Note: Seasonal, Temporary and Leased Employees to be included as Part-Time employees*
    **Number Employees in ALL STATES/JURISDICTIONS:**

| Full Time: | 377 | |
|---|---|---|
| Part Time: | 94 | |
| Total Number of Independent Contractors: | | 0 |

2.  Enter the **TOTAL** number of **California** employees in the boxes below.
    *Note: Seasonal, Temporary and Leased Employees to be included as Part-Time employees*
    **Number Employees in CALIFORNIA ONLY:**

| Full Time: | 151 | |
|---|---|---|
| Part Time: | 21 | |
| Total Number of Independent Contractors: | | 0 |

3.  For the past 3 years, what has been the annual percentage turnover rate of employees (all locations)?
    Year 11 _50_ %   Year 10 _50_ %   Year 09 _50_ %

4.  Does the Applicant have a full-time Human Resources manager or the equivalent?   ☒ Yes  ☐ No

5. Does the Applicant have written procedures in place for the following:

| | | |
|---|---|---|
| Hiring / interviewing? | ☑ Yes | ☐ No |
| Employment at-will statement? | ☑ Yes | ☐ No |
| Discrimination? | ☑ Yes | ☐ No |
| Progressive discipline policies and procedures? | ☑ Yes | ☐ No |
| Employment evaluations? | ☑ Yes | ☐ No |
| Accommodating the disabled? | ☑ Yes | ☐ No |
| Employee grievances or complaints? | ☑ Yes | ☐ No |
| Sexual harassment? | ☑ Yes | ☐ No |
| Workplace harassment? | ☑ Yes | ☐ No |
| Employee terminations? | ☑ Yes | ☐ No |
| Orientation of all new employees? | ☑ Yes | ☐ No |

6. Does the Applicant distribute the above-listed procedures to all employees?  ☑ Yes  ☐ No

7. Does the Applicant use outside counsel for employment advice?  ☑ Yes  ☐ No

8. Is the Applicant or any of its Subsidiaries currently undergoing or does the Applicant or any of its Subsidiaries contemplate undergoing during the next twelve (12) months, any employee layoff or early retirements programs (including ones resulting from any type of company restructuring, or office, plant or store closing)?  ☑ Yes ☐ No
*(If "Yes", please provide details in an attachment.)* ~~Restructure after purchase~~ *G4S Justice Services*

   a. Have there been any structured layoffs in the past twenty four (24) months?  ☑ Yes  ☐ No
   If "Yes," please answer the following: *Result of G4S purchase & redunant positions*

   What percentage of total employees were laid off?  ☐ 1-10%  ☒ 11-25%  ☐ Over 25%

   Did the Applicant or its Subsidiary consult with an outside counsel during the layoff procedure?  ☒ Yes  ☐ No
   *Before purchase was complete*

   Were severance packages offered in exchange for releases not to sue?  ☐ Yes ☒ No
   *(If "No," please attach complete details.)*

   b. Please provide the number of layoffs that have taken place to date (including those which are planned and about to occur): *46*

   c. Does the Applicant and its Subsidiaries have procedures in place to assist terminated or laid off employees find work?  ☐ Yes ☒ No

## VII.  FIDUCIARY LIABILITY INFORMATION

1. Please provide the following information for each Plan to be covered:

| Plan Name and Plan Number | Type of Plan * | Number of Participants | Plan Assets | Plan Status** |
|---|---|---|---|---|
| Sentinel 401K Prft | DC | 282 | 3,200,000 | A |
| G4S Justice Service | DC | 212 | 2,700,000 | A |
| | | | | |
| | | | | |
| | | | | |

   \*   Welfare (W), Defined Benefit (DB), Defined Contribution (DC), ESOP (ESOP), Other (O)
   \*\*  Active (A), Merged (M), Sold (S), Terminated (T), Frozen (F)

2. Are any of the Plans assets invested in the Applicant's own securities?  ☐ Yes ☒ No

PP 00025 00 (01/10)          Page 4 of 13

If "Yes", are the investments 'Company Directed' or invested at the discretion of the employee?

☐ Yes ☐ No

3. Have any Plan benefits been modified within the last two years? ☐ Yes ☒ No

4. Are any Plans managed by an independent third-party administrator? ☒ Yes ☐ No
   If "Yes," how often is the third-party administrator's performance reviewed? *1 Year*

5. Does the Applicant plan on terminating, suspending, merging or dissolving any Plans within the next twelve
   (12) months? *Justice Service Plan rolling into Sentinel Plan 9/12* ☒ Yes ☐ No
   *(If "Yes," please provide complete details in an attachment.)*

6. Please answer the following questions should coverage for an ESOP plan be requested. *N/a*
   What percent of the Company stock does the ESOP own? :_____
   Who votes the shares of the ESOP? :_____
   How often are the shares of the Company valued for purposes of the ESOP? :_____

## VIII.  CRIME INFORMATION

1. Has the Applicant experienced any of the following losses in the past six years, or if in business less than six
   years, since the date of formation (whether insured or not):
   Employee Theft? ☒ Yes ☐ No
   Forgery or Alteration? ☐ Yes ☒ No
   Theft of Money and Securities (Inside/Outside)? ☐ Yes ☒ No
   Any Other Crime or Fidelity related losses? ☐ Yes ☒ No
   (If "Yes" to any of the above please provide complete details in an attachment.)
   *2008 - Dishonest employee total # 26,737   2008 Dishonest employee # 10,158*

2. Please provide the Applicant's (including its Subsidiaries) total number of locations: _____
   State _____ County _____ Number of Locations ____ *Directory*
   State _____ County _____ Number of Locations ____ *Attached*
   (Please provide additional details in an attachment.)

3. Please provide the Applicant's (including its Subsidiaries) total number of employees:_____ *471*
   U.S. : *461*  Canadian: *10*  Foreign: *none*

4. Of the total employees listed above, what percent handles, has access to or maintains records of, money,
   securities or other property of the Applicant or any third party, including, but not limited to, directors, officers,
   trustees or any persons handling or having access to employee welfare or benefit plan assets? *35* %

5. Does the Applicant currently have cash exposures that exceed the lowest deductible amount of its current Crime
   or Fidelity Policy? ☒ Yes ☐ No

6. Does the Applicant have precious metals, precious or semi-precious stones, pearls, furs, or articles containing
   such materials, the total value of which exceeds the lowest deductible amount of the current Crime or Fidelity
   Policy? ☐ Yes ☒ No

7. Are corporate credit, debit, charge or purchasing cards used by the Applicant's employees? ☒ Yes ☐ No
   If "Yes," please indicate the following:
   a. Total number of cards issued: *20*
   b. Maximum credit limit allowed under each card: *5,000*
   c. Briefly describe the controls in place for preventing and identifying unauthorized transactions:____
      *Administrative Review HR, supervisor review*
      *accounting review*

## CHECK HANDLING AND DISBURSEMENT CONTROLS

8. Does the Applicant have access to client's funds or property (including money, securities, inventory, high value property, banking systems, wire transfer systems, computer systems or sensitive data, etc.)?  ☐ Yes ☒ No
   If "Yes," please indicate the following:
   a. Type of funds or property, and dollar amount or value:_____
   b. Number of employees who will be performing work for your client(s):_____
   c. Total number of clients:_____

9. Do all checks issued by the Applicant require a physical (handwritten) signature?  ☐ Yes ☒ No
   If "No," please indicate the maximum amount that a check may be issued for, using an electronic or other "automated" signature: $ _5,000_

10. Do checks issued by the Applicant sometimes require two authorized signatures?  ☒ Yes ☐ No
    a. If "Yes," over what amount is a second signature required? $ _5,000_
    b. If there is no second signature required, who is authorized to sign the Applicant's checks? _____

11. Are checks signed only by the owner(s) of the Company?  ☐ Yes ☒ No

12. How often is blank check stock inventoried? _Semi annual_

13. Are those persons authorized to sign checks instructed to require that all checks be accompanied by properly approved vouchers or invoices?  ☒ Yes ☐ No

14. Are systems designed so that no single person can control a process from beginning to end (i.e. request a check, approve a voucher and sign a check?  ☒ Yes ☐ No

15. Are bank accounts reconciled on a monthly basis?  ☒ Yes ☐ No
    a. If "No," how often are they reconciled? _____

16. Are those who reconcile the Applicant's bank accounts prohibited from:
    a. handling deposits to or withdrawals from the accounts they reconcile?  ☒ Yes ☐ No
    b. signing checks?  ☒ Yes ☐ No

## AUDIT FUNCTIONS AND CONTROLS

17. Does a second person review the reconciliation of an account with supporting documentation and initial their approval of the information?  ☒ Yes ☐ No

18. How often, and by whom, are audits of cash and accounts performed? _Monthly_

19. How often, and by whom, are inventory counts conducted? _Quarterly Finance/Operations_

20. Is there a CPA letter to management relating to internal control weaknesses?  ☐ Yes ☒ No
    (If "Yes," please provide a copy of the most recently issued letter.)

21. If no CPA letter to management was issued, did the CPA make recommendations for improvement in internal control procedures informally?  ☐ Yes ☒ No
    (If "Yes," please provide complete details in an attachment.)

22. Does the Applicant have an internal audit department? _Controls set up_  ☒ Yes ☐ No
    a. Are all of Applicant's locations audited by the internal audit staff?  ☒ Yes ☐ No
       (If "No", please explain in an attachment.)
    b. If "Yes," how often is each location audited? _Monthly Finance audits_
    _Branch location collections by cross referencing_
    _reports. Field Management audits local locations._

**STAFFING AND VENDOR CONTROLS**

23. Are background checks performed on all new hires? (Check all that apply.)
    ☒ Criminal ☒ Prior Employment ☐ Credit History ☐ References ☒ Drug Testing

24. Are mid-employment screenings performed when employees are promoted to sensitive positions?
    ☒ Yes ☐ No

25. Are all employees' building access cards cancelled immediately upon termination and are all procurement, credit cards, etc. cancelled? ☒ Yes ☐ No ☐ N/A

26. Are all employees' credit, debit, charge or purchasing cards cancelled immediately upon termination?
    ☒ Yes ☐ No ☐ N/A

27. Are employees provided with a copy of the organization's Anti-Fraud Policy at least annually? ☐ Yes ☒ No
    a. Is there a system in place that allows for the reporting of suspicious or fraudulent activity or unauthorized transactions confidentially? ☐ Yes ☒ No
    b. If "Yes," describe the procedure for investigating these reports in an attachment.

28. Are employees provided with written guidelines or policies on other prohibited activities or behavior?
    ☒ Yes ☐ No

29. Are employees required to complete Conflict of Interest disclosure forms at least annually? ☒ Yes ☐ No

30. Are background and credit checks performed on vendors in order to determine ownership and financial capability, prior to doing business with them? ☒ Yes ☐ No
    a. If "Yes," is there dual control over this process so a single employee cannot set up a fictitious vendor in the system without it being detected? ☒ Yes ☐ No

    *HR runs credit OPS make recommendation*

31. Is an authorized vendor list utilized by the Applicant and updated annually for all purchases, with competitive bidding required over stated amounts? ☐ Yes ☐ No

    *RFP process used*

32. Are all vendors provided with the Applicant's policy on gifts and entertainment (prohibiting gifts or entertainment of any significant value)? ☒ Yes ☐ No

    *Both ways*

**WIRE TRANSFER AND COMPUTER CONTROLS**

33. What is the <u>daily</u> average number of, and dollar value of, wire transfers to and from the Applicant's accounts?
    # _1_   $ _15,000_

34. What is the maximum dollar value that may be transferred per day? *$500,000*

35. Is approval by more than one authorized person required to initiate a wire transfer? ☒ Yes ☐ No

36. Does the Applicant's financial institution receive authorization from an employee, other than one who requested the wire transfer, before acting on the request? ☒ Yes ☐ No

37. Does the Applicant receive hard copy confirmations on all wire transfers? ☒ Yes ☐ No
    a. If "Yes are confirmations sent directly to a department or individual which is not authorized to initiate a wire transfer? ☐ Yes ☒ No

38. Are computer system access codes and passwords changed at least every sixty (60) days? ☒ Yes ☐ No

39. Do any third parties, other than employees, have access to the Applicant's computer systems? ☐ Yes ☒ No
    (If Yes, please explain in an attachment.)

40. Does the Applicant sponsor any employee welfare or retirement plan(s) for its employees? ☐ Yes ☒ No
    a. If "Yes," please list all sponsored employee welfare or retirement plan(s) that are required to be bonded by ERISA. (Please provide in an attachment.)

41. List all entities for which the Applicant is seeking coverage. (Please provide complete listing in an attachment.)
    a. Are all entities which are listed, owned, controlled or operated by the Applicant, directly or through its Subsidiaries? n/a ☐ Yes ☐ No

    b. Does the information provided in this Application or any attachment include information for all joint ventures proposed to be covered? n/a ☐ Yes ☐ No
    If "No," to questions a. or b. above, please provide details for each listed entity in an attachment.

## IX. EMPLOYED LAWYERS INFORMATION

1. Number of full-time Lawyers employed by the Applicant (including Subsidiaries): _zero_
    Number of part-time Lawyers employed by the Applicant (including Subsidiaries): _zero_

2. Describe the type of work including types of Pro Bono and moonlighting work performed by Employed Lawyers. (Please provide complete details in an attachment.)

3. If the Applicant's (including any subsidiary's) securities are publicly traded or subject to public reporting under the Securities Exchange Act of 1934, please answer the following:

    Does any Employed Lawyer prepare, review, comment on, sign, or approve financial statements, registration statements, prospectuses, annual or quarterly reports, or other reports filed with federal or state agencies or released to shareholders or the public, regarding the Applicant or its Subsidiaries? ☐ Yes ☐ No

4. Does any Employed Lawyer serve on the Board of Directors or the equivalent governing/oversight body of the Applicant or its Subsidiaries? ☐ Yes ☐ No

5. Does the Applicant or its Subsidiaries anticipate any registration of securities under the Securities Act of 1933 (or any similar federal, state or foreign rule or law), or any other offering of securities within the next twelve (12) months? ☐ Yes ☐ No

6. Does the Applicant or its Subsidiaries permit or require any Employed Lawyer to issue any written legal opinion to an outside party, in connection with a sale, acquisition, merger, consolidation or other similar transaction? ☐ Yes ☐ No

7. Does any Employed Lawyer serve on a due diligence committee or perform legal services regarding any proposed sale, merger, acquisition, consolidation or other similar transaction involving the Applicant or its Subsidiaries? ☐ Yes ☐ No
    (If "Yes," please provide a narrative description of the role and process in an attachment.)

8. Does any Employed Lawyer appear in court for or on behalf of the Applicant or its Subsidiaries or any proposed insured person, in the course of his or her employment for the Applicant? ☐ Yes ☐ No

9. Does any Employed Lawyer provide personal legal services, including but not limited to legal services relating to criminal, civil, matrimonial, intellectual property law or estate/financial planning matters, to any proposed insured person or any third party? ☐ Yes ☐ No

10. Does any Employed Lawyer issue written legal opinions to or for the use of, the Board of Directors or the equivalent governing/oversight body, of any entity other than the Applicant or its Subsidiaries, in which the Applicant or any Subsidiary has an equity or other interest in such entity? ☐ Yes ☐ No

11. Has any Employed Lawyer been the subject of any disciplinary proceeding or investigation, or been disciplined by, any state organization or agency charged with the licensing or discipline of attorneys, or been refused admission to practice by any state or federal bar, court or administrative agency? ☐ Yes ☐ No (If "Yes," please provide complete details in an attachment.)

## X.  KIDNAP AND RANSOM/EXTORTION

1.  List total number of proposed insured persons which are based outside the United States or Canada, by country:

| Country | City | Number of Employees | Number of Locations | Operations |
|---------|------|---------------------|---------------------|------------|
|         |      |                     |                     |            |
|         |      |                     |                     |            |
|         |      |                     |                     |            |
|         |      |                     |                     |            |

2.  List any planned travel in the next twelve (12) months outside the United States or Canada, by country:

| Country | City | Number of Insured Persons Traveling | Frequency | Duration |
|---------|------|-------------------------------------|-----------|----------|
| Europe |  | One | Quarterly | 7 days |
| Asia |  | one |  |  |
| South America |  | one |  |  |

3.  Describe any preventative measures taken for employees located or traveling outside the United States or Canada: _____

4.  Has the Applicant or any person proposed for coverage ever been involved in an attempted, threatened or actual kidnapping, extortion, detention or hijacking? ☐ Yes ☒ No

5.  Please list contact information for Director of Security and/or Risk Management (or equivalent position):

Name: Julie Hunt
Title: Director HR
Email Address: Jhunt@sentrak.com
Telephone Number: 949 453 1550

## XI.  CLAIMS HISTORY  *(Renewal Applicants do not need to complete this section.)*

1.  Does any person(s) or entity(ies) for whom coverage is sought under the proposed insurance have any knowledge of any fact, circumstance, situation, or information of any error, misstatement, misleading statement, act, omission, neglect, breach of duty or other matter that may give rise to a Claim which may fall within the scope of coverage under the proposed insurance?

D&O and Private Company Liability ☐ Yes ☒ No ☐ N/A
Employment Practices Liability ☐ Yes ☒ No ☐ N/A
Fiduciary Liability ☐ Yes ☒ No ☐ N/A
Employed Lawyers Liability ☐ Yes ☒ No ☐ N/A

**If "Yes," please provide complete details in an attachment.**

2. Has any Claim been made or legal proceeding been brought against any person or entity for whom coverage is sought under the proposed insurance?

| | | |
|---|---|---|
| D&O and Private Company Liability | ☐ Yes ☒ No ☐ N/A |
| Employment Practices Liability | ☒ Yes ☐ No ☐ N/A |
| Fiduciary Liability | ☐ Yes ☒ No ☐ N/A |
| Employed Lawyers Liability | ☐ Yes ☒ No ☐ N/A |

If "Yes," please provide complete details in an attachment. *2012 Discrimination Claim EEOC Augusta GA under review*

3. Does any person or entity for whom coverage is sought under the proposed insurance have knowledge of any inquiry, investigation or communication that he/she/it has reason to believe might give rise to a Claim that might fall within the scope of the coverage under the proposed insurance?

| | | |
|---|---|---|
| D&O and Private Company Liability | ☐ Yes ☒ No ☐ N/A |
| Employment Practices Liability | ☐ Yes ☒ No ☐ N/A |
| Fiduciary Liability | ☐ Yes ☒ No ☐ N/A |
| Employed Lawyers Liability | ☐ Yes ☒ No ☐ N/A |

If "Yes," please provide complete details in an attachment.

4. Has the Applicant or any of its Subsidiaries, or any director or officer thereof:
   a. Been named as a party in, or otherwise involved in any antitrust, copyright or patent litigation? ☐ Yes ☒ No ☐ N/A
   b. Been charged in any civil or criminal action or administrative proceeding, with a violation of any federal or state antitrust or unfair trade practices law? ☐ Yes ☒ No ☐ N/A
   c. Been charged in any civil or criminal action or administrative proceeding, with a violation of any federal or state securities law or regulation? ☐ Yes ☒ No ☐ N/A
   d. Been named as a party in, or otherwise involved in any representative actions, class actions, or derivative suits? ☒ Yes ☐ No ☐ N/A
   e. Been charged in any civil or criminal action or administrative proceeding with a violation of any federal or state anti-harassment or anti-discrimination law? ☒ Yes ☐ No ☐ N/A

   If "Yes," please provide complete details in an attachment. *Hills McGee, Augusta Georgia*

IT IS AGREED THAT IF SUCH KNOWLEDGE OR INFORMATION EXISTS WITH REGARD TO ANY QUESTIONS IN THIS SECTION XI. CLAIMS HISTORY, REGARDLESS OF WHETHER IT IS DISCLOSED IN THIS APPLICATION, ANY CLAIM BASED ON, ARISING FROM, OR IN ANY WAY RELATING TO SUCH MATTER OF WHICH THERE IS KNOWLEDGE OR INFORMATION SHALL BE EXCLUDED FROM COVERAGE UNDER THE INSURANCE BEING APPLIED FOR, AND THE INSURER SHALL NOT BE LIABLE FOR ANY LOSS OR DEFENSE EXPENSES OR OTHER COSTS RESULTING THEREFROM, AND TO THE EXTENT THIS POLICY PROVIDES DUTY TO DEFEND COVERAGE, THE INSURER SHALL HAVE NO DUTY TO DEFEND ANY CLAIM, SUIT OR OTHER LEGAL PROCEEDING ARISING OUT OF SUCH MATTER.

## XII.   PRIOR INSURANCE COVERAGE

Please provide the following details regarding the Applicant's current Insurance programs:

| Coverage | Limit of Liability | Retention | Premium | Policy Period |
|---|---|---|---|---|
| D&O | | | | |
| EPL | | | | |
| Fiduciary | | | | |
| Employed Lawyers | | | | |
| Crime | | | | |
| Kidnap Ransom/Extortion | | | | |

If Applicant does not currently have such coverage in place, please indicate "N/A."

PP 00025 00 (01/10)                    Page 10 of 13

Have any of the Applicant's prior carriers cancelled coverage or indicated an intent to not offer renewal terms?
*(If "Yes," please provide complete details in an attachment.)*  ☐ Yes ☐ No

## XIII.  REPRESENTATIONS OF AND NOTICES TO THE APPLICANT

The undersigned authorized representative of the Applicant declares that the statements set forth herein are true, and reasonable effort has been made to obtain sufficient information from all persons proposed for this insurance to facilitate the accurate completion of the Application.

The undersigned authorized representative agrees that if the information supplied on this Application changes between the date of this Application and the effective date of the insurance, he/she will, in order for the information to be accurate on the effective date of the insurance, immediately notify the Insurer of such changes, and the Insurer may withdraw or modify any outstanding quotations or agreement to bind insurance.

The submission of this Application by the Applicant to the Insurer or signing of this Application by or on behalf of the Applicant does not obligate the Insurer to issue the insurance requested.  It is agreed that this Application shall be the basis of the contract if a policy is issued and shall be deemed to be attached to, incorporated into and become a part of, the policy.

ALL WRITTEN STATEMENTS AND MATERIALS FURNISHED TO THE INSURER IN CONJUNCTION WITH THIS APPLICATION ARE HEREBY INCORPORATED BY REFERENCE INTO THIS APPLICATION AND MADE A PART HEREOF.  NOTHING CONTAINED HEREIN OR INCORPORATED HEREIN BY REFERENCE SHALL CONSTITUTE NOTICE OF A CLAIM OR POTENTIAL CLAIM SO AS TO TRIGGER COVERAGE UNDER ANY CONTRACT OF INSURANCE.

**NOTICE TO ARKANSAS APPLICANTS:**  "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT, OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**NOTICE TO COLORADO APPLICANTS:**  "IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY.  PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES.  ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES."

**NOTICE TO DISTRICT OF COLUMBIA APPLICANTS:**  "WARNING: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT."

**NOTICE TO FLORIDA APPLICANTS:**  "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE."

**NOTICE TO HAWAII APPLICANTS:**  "FOR YOUR PROTECTION, HAWAII LAW REQUIRES YOU TO BE INFORMED THAT PRESENTING A FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT IS A CRIME PUNISHABLE BY FINES OR IMPRISONMENT, OR BOTH."

43

**NOTICE TO KENTUCKY APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

**NOTICE TO LOUISIANA APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT, OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**NOTICE TO MAINE APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

**NOTICE TO NEW JERSEY APPLICANTS:** "ANY PERSON WHO INCLUDES ANY FALSE OR  MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

**NOTICE TO NEW MEXICO APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES."

**NOTICE TO NEW YORK APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION."

**NOTICE TO OHIO APPLICANTS:** "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

**NOTICE TO OKLAHOMA APPLICANTS:** "WARNING: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY" (365:15-1-10, 36 §3613.1).

**NOTICE TO PENNSYLVANIA APPLICANTS:** "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

**NOTICE TO TENNESSEE APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

**NOTICE TO TEXAS APPLICANTS:** "ANY PERSON WHO KNOWLINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR THE PAYMENT OF A LOSS IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN STATE PRISON."

44

**NOTICE TO VERMONT APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE STATEMENT IN AN APPLICATION FOR INSURANCE MAY BE GUILTY OF A CRIMINAL OFFENSE AND SUBJECT TO PENALTIES UNDER STATE LAW."

**NOTICE TO VIRGINIA APPLICANTS:**   "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES  AND DENIAL OF INSURANCE BENEFITS."

**NOTICE TO WASHINGTON APPLICANTS:**   "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY.  PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

**NOTICE TO WEST VIRGINIA APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR THE PAYMENT OF A LOSS OR THE BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**NOTICE TO ALL OTHER APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

## XIV.   DECLARATION AND SIGNATURE

THE UNDERSIGNED AUTHORIZED REPRESENTATIVE HEREBY ACKNOWEDGES THAT HE OR SHE IS MAKING THE REPRESENTATIONS IN THIS APPLICATION ON BEHALF OF THE APPLICANT AND ALL ENTITIES OR PERSONS PROPOSED FOR COVERAGE UNDER THE POLICY.

Signed:         _____

Print Name:    Hans Kintsch_____

Title:          CFO_____
                (President, CEO or CFO)

Date:           8|6|12_____

⊘SENTINEL   COMPANY DIRECTORY

**SENTINEL CORPORATE**

| | Name | Ext. | Title | Email |
|---|---|---|---|---|
| 201 Technology Dr | **Executive** | | | |
| Irvine, CA 92618 | Constanbile, Bob | x2225 | CIO/President | bconstanbile@sentnsk.com |
| | Martin, Darryl | x1001 | COO | darryl.martin@sentmnsk.com |
| (949) 453-1550 Office | | | | |
| (800) 929-8201 Office | **Accounting** | | | |
| (909) 589-6003 Office | **Finance** | | | |
| (949) 453-1554 Fax | Kintsch, Hans | x2232 | Corporate Controller | hkintsch@sentmsk.com |
| (949) 453-1287 Accounting Fax | Hagstrom, Steve | x2239 | Asset Manager | shagstrom@sentnsk.com |
| | Williams, Marcie | x2228 | Billing Manager | **m.williams@sentnsk.com** |
| **National Service Center** | Shimoda, Lisa | x2214 | Accounts Payable | lshimoda@sentmsk.com |
| (800) 551-4911 Phone | | | | |
| (800) 929-8304 (949) 453-1286 Fax | **HR Department** | | | |
| | Hunt, Julie | x2223 | Director Human Resources | jhunt@sentisl.com |
| | Verdusco, Sarah | x2210 | HR/Administrative Assistant | s.verdusco@sentnsk.com |
| | Lavigne, Kim | x1402 | Benefits Administrator | **Kim.lavigne@sentnsk.com** |
| | | | | |
| | **Information Technology** | | | |
| | Williams, Jonathan | x1568 | IT Manager/Support Services | jonathan.williams@sentnsk.com |
| | | | | |
| | **Engineering** | | | |
| | Darens, Steve | x2211 | CTO | darens@sentnsk.com |
| | | | | |
| | **Monitoring Center and Help Desk** | | | |
| | Fredricks, Debbie | x1008 | Manager, Monitoring Center | debbie.fredricks@sentnsk.com |
| | Mack, Jimmy | x2260 | Manager, Monitoring Center | jmack@sentnsk.com |
| | Pownaant, Makalii | x1005 | Manager, Customer Support | makalii.pownaant@sentnsk.com |
| | | | | |
| | **Operations** | | | |
| | Avalos, Noe | x2138 | Director of Internal Operations | navalos@sentnsk.com |
| | | | | |
| | **Sales and Marketing** | | | |
| | Velasquez, Alan | x2136 | Vice President, Marketing | avelasquez@sentnsk.com |
| | Wyrick-Kelley, Audry | x2232 | Proposal Manager | audry.wyrick@sentnsk.com |
| | Dang, Don | x2254 | Marketing & Sales Assistant | don.dang@sentnsk.com |

**SENTINEL NATIONAL WAREHOUSE**

| | | | |
|---|---|---|---|
| 201 Technology Dr | Barragan, Carlos | | |
| Irvine, CA 92618 | Davison, Ron | | |
| (800) 589-6003 x1720 | Garcia, Jose | | |
| | Guerra, Martin | Perez, Hugo | |
| | McQuoid, Darren | Uy, Lester | |

**GEORGIA REGIONAL OFFICE**

| | | |
|---|---|---|
| SENTINEL | Constanbile, Mark | |
| | | |
| **REGIONAL OFFICE** | Cush, Chris | |
| 5 Concourse Pkwy NE | Hood, Cyndi | |
| Suite 775 | Lewis, Tim | |
| Atlanta, GA 30328 | Queen, Steve | |
| (678) 443-9525 Office | Wood, Jason | |
| (678) 443-9530 Fax | | |

**ARIZONA BRANCH–PHOENIX**

| | |
|---|---|
| 132 South Central Ave Ste H | Branch Manager - Wood, Tambrie |
| Phoenix, AZ 85004 | |
| (602) 252-9800 Office | |
| (602) 258-0506 Fax | |

**CALIFORNIA BRANCHES**

**SENTINEL/-BUTTE COUNTY SHERIFF**

| | |
|---|---|
| 51 County Center Dr | Asher, Amy - Program Admin |
| Oroville, CA 95965 | |
| (530) 538-2034 Office | |
| (530) 228-9274 Fax | |

**SENTINEL/-COMPTON**

| | |
|---|---|
| 353 W. Compton Blvd | Regional Operations Manager - Martinez, Lupe  x222 |
| Compton, CA 90220 | Branch Manager - Graves, Aida |
| (310) 603-5700 Office | |
| (310) 603-5720 Fax | |

fieldcovers@sentnsk.com

**ENROLLMENT: 888-220-0737     ENROLLMENT FAX: 310-603-5721**

**SENTINEL/-FRESNO**

| | |
|---|---|
| 1206 G Street | |
| Suite 103 | |
| Fresno, CA 93706 | Clow Waterman, Heide |
| (559) 497-0228 Office | |
| (559) 497-9928 Fax | |
| Fresno@sentnsk.com | |

08/07/2012                                    1

SENTINEL   COMPANY DIRECTORY

**SENTINEL/-DOWNTOWN LOS ANGELES**
305 S Broadway
#720
Los Angeles, CA 90012          Branch Manager - Guardado, Paula
**(213)-613-1729 Office**
213-613-1740 Fax

**SENTINEL/-LA COUNTY JAIL**
Inmate Reception Center
450 Bauchet Street
Los Angeles, CA 90012          Guzman, Marco
**(213) 617-1691 Office**
(213) 617-1571 Fax
LAjail@vensnk.com

**SENTINEL/-ORANGE COUNTY**
960 West 17th Street Ste C     Branch Manager - Valdiva, Zahira
Santa Ana, CA 92706
**(714) 541-4393 Office**
(714) 541-4394 Fax
OrangeCounty@sentinek.com

**SENTINEL/-LANCASTER**
Michael D. Antonovich Antelope Valley Courthouse
42011 4th Street West
4th Floor, Suite 4300          Florez, Ana
Lancaster, CA 93534
**(661) 974-7625  Office**
(661) 974-7046 Fax

**SENTINEL/-RIVERSIDE**
1627 S. Hardgrave
Banning, CA 92220             Alarcon, Matthew
**(951) 922-7632  Office**
(951) 922-7374 Fax

**SENTINEL/SAN BERNARDINO**
524 Mountian View
San Bernardino, CA 92415      Duenas, Margaret
**(909) 889-9914 Office**      Salazar, Maricela
909-889-0915 Fax

**SENTINEL/SAN BERNARDINO SHERIFF**
18000 Institution Rd
San Bernardino, CA 92407      Rosales, Ruben
**(909) 473-3612 Office**

**SENTINEL/SAN DIEGO**
7837 Convoy Ct. Ste 201/209
San Diego, CA 92111           Branch Manager - Akrawi, Jehan
**(858) 268-8009 Office**
(858) 268-8014 Fax

**SENTINEL/-SAN FRANCISCO SHERIFF**
444 6th St
San Francisco, CA 94103       Program Manager - Tangol, Ryan
**(408) 691-0877 Manager's Direct line**

**SENTINEL/SAN MATEO**
222 Paul Scannel Dr
San Mateo, CA 94402           Vasquez, Luis
**(650) 986-2542 Office**
(650) 638-1579 Fax

**SENTINEL/SONOMA COUNTY PROBATION**
2254 Ordonnece Rd
Santa Rosa, CA 95403          Program Manager - Hernandez, Joy
**(707) 565-1457 Office**
(707) 540-6013 Fax

**SENTINEL/-WALNUT**
20469 E. Valley Blvd
Walnut, CA 91789             Nelasco, Serena
**(909) 444-9131 Office**
(909) 444-9135 Back Line
**(909) 444-9171 Fax**
Walnut@vensnk.com

**CONNECTICUT BRANCH**
**SENTINEL/-CONNECTICUT PROBATION AND PAROLE**
95 First Main St. Ste D-13
Meriden, CT 06450            Program Manager - Kennedy, Mathew
**(203) 686-1415 Office**
(203) 440-3403 Fax

**FLORIDA BRANCHES**
**SENTINEL/-TAMPA (Hillsborough County)**
(Hillsborough) County Sheriff
1800 North Orient Road        Williams, Chad
Tampa, FL 33619
**(813) 621-9294 Office**

**SENTINEL/ TALLAHASSEE (Leon County)**
501-C Appleyard Dr
Tallahassee, FL 32304         Marinko, Stefanie
**(850) 210-0263 Office**
(850)-210-0298 Back line
(850)-210-0428 Fax

**GEORGIA BRANCHES**
**SENTINEL/-ATLANTA (Fulton County)**
2001 Martin Luther King Jr. Drive SW    Branch Manager - Bell, Michael
Suite 600                     Assistant Manager - Simmons, Roquelle
Atlanta, GA  30310
**(404) 752-9115 Office**
(404) 752-9135 Fax

**SENTINEL/-AUGUSTA (Richmond County)**
388 Walton Way               Branch Manager - Childs, Gina
Augusta, GA 30901            Assistant Manager - Moody, Bettina
**(706) 823-2195 Office**      Ocasio, Marian Kay
(706) 823-2196 Fax
Augusta@venvsnk.com

08/07/2012                                                    2

⟳SENTINEL   COMPANY DIRECTORY

**SENTINEL/-BLAIRSVILLE (Union County)**
P.O. Box 1809                     Branch Manager - Deyton, Angie
185 Welborne Street #7
Blairsville, GA 30514
**(706) 781-1882** Office
**(706) 745-1782** Fax

Blairsville@sentmk.com

**SENTINEL/-BRUNSWICK (Glynn County)**
402 G Street                      Branch Manager- Spaulding, Mark          x11
Suite B
Brunswick, GA 31520
**(912) 261-8007** Office
**(912) 261-0334** Fax
Brunswick@sentmk.com

**REGIONAL MANAGER**
**THOMAS WILLIAMS**
912-281-7283

**SENTINEL/-CLEVELAND (White County)**
1641 HWY 129 South Ste II         Branch Manager - McDowell-Black, Stacy
Cleveland, GA 30528
**(706) 865-4650** Office
**(706) 219-1811** Fax

**SENTINEL/-CORNELIA (Habersham County)**
465 Chattahoochee Street          Branch Manager - Queen, Lynne B.
Cornelia, GA 30531

P.O. Box 356   (mailing address)
Cornelia, GA 30531
**(706) 778-2773** Office
**(706) 776-6018** Fax
Cornelia@sentmk.com

**SENTINEL/-DOUGLASVILLE (Douglas County)**
5893 Stewart Parkway              Branch Manager - Sineny-Griffen, Yakleya    x32
Douglasville, GA 30135            Assistant Manager - Patton, Davina
**(678) 838-3227** Office
**(678) 838-3231** Fax
Douglasville@sentmk.com

**SENTINEL/-DUNWOODY (Dekalb County)**
1530 Dunwoody Village Pkwy Suite 206    Branch Manager - Wright, Katrina
Dunwoody, GA 30338                Black, Yamela
**(770) 673-8085** Office
**(770) 673-8087** Fax

**SENTINEL/-EVANS**
4403-B Washington Road            Branch Manager - Childs, Glen
Evans, GA 30809                   Kaprol, Christine
**(706) 863-0894** Office
**(706) 863-8498** Fax
Evans@sentmk.com

**SENTINEL/-GAINESVILLE (Hall County)**
731  Queen City Pkwy Ste 201      Branch Manager - Akoner, Christopher
Gainesville, GA 30501
**(770) 531-0770** Office
**(770) 531-0082** Fax
Gainesville@sentmk.com

**SENTINEL/-JEFFERSON (Jackson County)**
48 Professional Drive             Branch Manager - Maxwell, Tracy
Jefferson, GA 30549
**(706) 367-6391** Office
**(706) 367-6393** Fax
Jefferson@sentmk.com

**SENTINEL/-LAWRENCEVILLE (Gwinnett County)**
320 West Pike Street              Branch Manager - James, Ray
Ste 100                           Assistant Manager - Gholston, Seth
Lawrenceville, GA 30046
**(770) 339-5120** Office
**(770) 339-5141** Fax

**REGIONAL MANAGER**
**KATRINA WRIGHT**

**SENTINEL/-MCDONOUGH (Henry County)**
45 Keys Ferry St                  Branch Manager - Vaughn, William Andy
McDonough, GA 30253               Assistant Manager - Locke, Tricia
**770-914-6961** Office
**770-914-8808** fax
Cc. Services
**(770) 288-7703**

McUbonough@sentmk.com
**REGIONAL MANAGER**
**KATRINA WRIGHT**

08/07/2012                                   3

48

⊘SENTINEL   **COMPANY DIRECTORY**

**SENTINEL/-STATESBORO** (Bulloch County)
306 Myrtle Crossing Drive                Branch Manager - Warren, Cayel
Suite 300
Statesboro, GA 30458
(912) 489-4772  Office
(912) 489-4776  Fax
Statesboro@sentrak.com

REGIONAL MANAGER
THOMAS WILLIAMS

**SENTINEL/-VALDOSTA** (Lowndes County)
213 N. Ashley Street                Branch Manager - Spangler, Krista
Valdosta, GA 31602
(229) 253-9958  Office
(229) 253-9968  Fax
Valdosta@sentrak.com

REGIONAL MANAGER
THOMAS WILLIAMS

**SENTINEL/-WARNER ROBINS** (Houston County)
202 Carl Vinson Pkwy                Branch Manager - Carter, Shawn
Warner Robins, GA 31088           Assistant Manager - Tuggle, John
(478) 542-2883  Office
(478) 542-2072  Fax
WarnerRobins@sentrak.com

REGIONAL MANAGER
THOMAS WILLIAMS

**SENTINEL/-WINDER** (Barrow County)
377 Resource Parkway                Branch Manager - Williamson, Sonja
Winder, GA 30690
(770) 307-1820  Office
(770) 307-0921  Fax
Winder@sentrak.com

**INDIANA BRANCHES**
**TIPPECANOE DRUG**
117 N. 4th Street
Lafayette, IN 47901                Bray, Nick
(765) 423-2918  Office

**SENTINEL/-CLINTON COUNTY DRUG**

Office
Fax

**KANSAS BRANCHES**
**SENTINEL/-OLATHE**
804 N. Meadowbrook Dr. Ste 100    Program Manager - Zukel, Ed
Olathe, KS 66061
(913) 829 9207 Office
(913) 829 2138 Fax

**SENTINEL/-WICHITA**
212 S. Market St
Wichita, KS 67202                Venter, Terrell
(316) 262 6127 Office
(316) 262 0330 Fax

**MICHIGAN BRANCHES**
**SENTINEL/ LANSING**
630 North Cedar                Whipple, Christy
Mason, MI 48854
(517) 676-6283 Office
(517) 676-5783 Fax

**SENTINEL-OAKLAND COUNTY SHERIFF**
2305 Dixie Hwy
Waterford, MI 48328                Program Manager - Savalli, Adam
(866) 224-3066 Office
(248) 481-1222 Fax

**NEVADA BRANCHES**
**SENTINEL/-LAS VEGAS**
215 E. Bonanza Rd                Program Manager - Thomsen, Monique
Las Vegas, NV 09101
(866) 296-8236 Office
(702) 380-4012 Fax

**SENTINEL/-RENO**
475 Valley Rd
Reno, NV 89512                Program Manager - Johnson, Elliott
(775) 322 5945 Office
(775) 322 5952 Fax

**NEW HAMPSHIRE BRANCH**
**SENTINEL/-CONCORD**
298 "A" North State St                Program Manager - Gness, April
Concord, NH 03301
(603) 225-7408 Fax

**OREGON BRANCH**
1418 SW Morrison St                Branch Manager - Falgin, Stella
Portland, OR 37205
(503) 228-6751 Office
(503) 228-8694 Fax
Portland@sentrak.com

**SOUTH CAROLINA BRANCH**
**SENTINEL/-GREENVILLE**
600 E. Washington Street, Suite 600    Branch Manager - Shea, Stephen
Greenville, SC 29601
(864) 233-5111 Office
(864) 233-5222 Fax

**TEXAS BRANCHES**
**SENTINEL/-BEXAR COUNTY**
207 N. Comal Ste. 203                Perez, Bianca
San Antonio, TX 78207             Plemmons, Cherie
(210) 335-8989 Office
(210) 335-8901 Fax

08/07/2___                                4

49

| ⟶SENTINEL   COMPANY DIRECTORY | |
|---|---|
| **SENTINEL / DALLAS** <br> 809 N Stemmons Frwy #1175 <br> Dallas, TX 75207 <br> **(214) 943-9682 Office** <br> **(214) 653-8784 Fax** | |
| **SENTINEL / DALLAS COUNTY JUV** <br> 2600 Lonestar Dr <br> Dallas, TX 76212 | Bucio, Reney <br> Puga, Elizabeth |
| **SENTINEL / TARRANT COUNTY JU** <br> 2701 Kimbo RD <br> Fort Worth, TX 78111 | |
| **Seattle WA BRANCH** <br> **SENTINEL /SEATTLE** <br> 600 5th Ave. 8th Floor <br> Seattle, WA 98104 <br> **(206) 223-9681 Office** | Shakhnazdev, Lien |

08/07/2012                                              5

# EXHIBIT  B



### DARWIN SELECT INSURANCE COMPANY
(A member company of Allied World Assurance Company Holdings Ltd.)
9 Farms Spring Road, Farmington, CT 06032 ·Tel. (860) 284-1300 · Fax (860) 284-1301

## FORCEFIELD<sup>SM</sup>
## PRIVATE COMPANY
### MANAGEMENT LIABILITY PACKAGE POLICY

**POLICY NUMBER:**   0306-0173                **RENEWAL OF:**

### NOTICES

THE FOLLOWING NOTICES ARE APPLICABLE TO ALL COVERAGE SECTIONS, EXCEPT THE CRIME AND THE KIDNAP AND RANSOM/EXTORTION COVERAGE SECTIONS.

EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.

THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR DEFENSE COSTS. AMOUNTS INCURRED FOR DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

THE INSURER DOES NOT ASSUME THE DUTY TO DEFEND ANY CLAIM UNDER THIS POLICY; HOWEVER, IF THE INSURED TENDERS THE DEFENSE OF ANY CLAIM TO THE INSURER IN ACCORDANCE WITH THE TERMS HEREIN, THE INSURER SHALL ASSUME THE DEFENSE OF SUCH CLAIM.

*PLEASE READ THE ENTIRE POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE BROKER.*

## DECLARATIONS

**ITEM 1.   NAMED INSURED:** Sentinel Offender Services, LLC

> **ADDRESS:**   220 Technology Drive
> Suite 200
> Irvine, CA 92618

**ITEM 2.   POLICY PERIOD:**   Inception Date: October 11, 2010    Expiration Date: October 11, 2011
(12:01 a.m. Standard Time at the address stated in Item 1)

**This insurance is issued pursuant to the CA Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.**

PP 00002 00 (01/10)                Page 1 of 4

**ITEM 3.   COVERAGE SECTIONS AND PREMIUM**

This Policy provides coverage under a Coverage Section only if purchased by the **Insured** and indicated by an "X" below.

| Liability Coverage Section | Premium |
|---|---|
| ☒ Directors and Officers Liability Coverage Section | $2,945 |
| ☒ Employment Practices Liability Coverage Section | $15,131 |
| ☒ Fiduciary Liability Coverage Section | $1,541 |
| ☐ Employed Lawyers Coverage Section | N/A |
| ☐ Crime Coverage Section | N/A |
| ☐ Kidnap and Ransom/Extortion Coverage Section | N/A |
| **Total Policy Premium** | **$19,617** |

**ITEM 4.   LIMITS OF LIABILITY AND RETENTIONS OR DEDUCTIBLES**

**A.  LIMIT OF LIABILITY AND RETENTION FOR EACH COVERAGE SECTION**
   (Other than the Crime and Kidnap and Ransom/Extortion Coverage Sections.)

| Coverage Section | Separate Limit of Liability | Shared Limit of Liability | Retention* |
|---|---|---|---|
| Directors and Officers Liability Coverage Section | N/A | $1,000,000<br>Shared With: EPL | All Claims: $25,000 |
| Employment Practices Liability Coverage Section | N/A | $1,000,000<br><br>Shared With: D&O | All Claims: $75,000 |
| Third Party Liability Coverage Sublimit of Liability | N/A | $1,000,000 | |
| Fiduciary Liability Coverage Section | $1,000,000 | N/A<br>Shared With: | All Claims: $0 |
| Employed Lawyers Coverage Section | N/A | N/A<br>Shared With: | All Claims:  N/A |

*With respect to all Coverage Sections listed above, no Retention amount is applicable to Non-Indemnifiable Loss.*

**B.  AGGREGATE LIMIT OF LIABILITY**

| $2,000,000 |
|---|

*The Aggregate Limit of Liability set forth above is the maximum Limit of Liability of the Insurer for all Loss for which coverage is provided under all Coverage Sections listed in Item 4.A. above.  This Aggregate Limit of Liability does not apply to the Crime and Kidnap and Ransom/Extortion Coverage Sections.*

**C.  LIMITS OF LIABILITY AND DEDUCTIBLES FOR CRIME COVERAGE SECTION**

| Insuring Agreement | Limit of Liability for a Single Loss | Deductible, each Single Loss |
|---|---|---|
| Insuring Agreement A "Employee Theft" Coverage | N/A | N/A |
| Insuring Agreement B "Forgery or Alteration" Coverage | N/A | N/A |
| Insuring Agreement C "Inside the Premises" Coverage | N/A | N/A |
| Insuring Agreement D "In Transit" Coverage | N/A | N/A |
| Insuring Agreement E "Computer Fraud" Coverage | N/A | N/A |

PP 00002 00 (01/10)                        Page 2 of 4

| | | |
|---|---|---|
| Insuring Agreement F<br>"Funds Transfer Fraud" Coverage | N/A | N/A |
| Insuring Agreement G<br>"Money Orders and Counterfeit Currency Fraud"<br>Coverage | N/A | N/A |
| Insuring Agreement H<br>"Credit Card Fraud " Coverage | N/A | N/A |

### D.  CRIME COVERAGE SECTION AGGREGATE LIMIT OF LIABILITY

N/A

*This Aggregate Limit of Liability set forth above is the maximum Limit of Liability of the Insurer for all loss for which coverage is provided under the Crime Coverage Section.*

### E.  LIMITS OF INSURANCE AND RETENTIONS FOR KIDNAP AND RANSOM/EXTORTION COVERAGE SECTION

| Insuring Agreement | Limit of Insurance,<br>Per Insured Event | Annual Aggregate<br>Limit of Insurance | Retention,<br>Per Insured<br>Event |
|---|---|---|---|
| Insuring Agreement A<br>"Kidnap and Ransom/Extortion" | N/A | N/A | N/A |
| Insuring Agreement B<br>"In-Transit/Custody" | N/A | N/A | N/A |
| Insuring Agreement C<br>"Expenses" | N/A | N/A | N/A |
| Insuring Agreement D<br>"Personal Loss" | N/A<br>Per Insured Person;<br>N/A<br>Per Insured Event | N/A | N/A |
| Insuring Agreement E<br>"Legal Costs" | N/A | N/A | N/A |

### F.  OTHER COVERAGE LIMITS AND SUBLIMITS

| Coverage | Limit of Liability |
|---|---|
| Dedicated Excess Coverage for Insured Persons (D&O) | $500,000 |
| | |
| Sublimit of Liability for: | |
| Derivative Demand Coverage (D&O) | $100,000 |
| Strategic Response Costs Coverage (D&O) | $25,000 |
| Voluntary Compliance Program Coverage (Fiduciary) | $75,000 |
| HIPAA Claim Coverage (Fiduciary) | $75,000 |
| Restoration Expenses (Crime) | N/A |
| Authentication Expenses (Crime) | N/A |
| | |
| Punitive Damages Coverage Options for D&O and EPL Coverage<br>Sections:<br>☐　D&O Punitive Damages Sublimit of Liability:<br>☐　EPL Punitive Damages Sublimit of Liability:<br>☐　Shared Punitive Damages Sublimit of Liability for D&O and EPL<br>☒　No Punitive Damages Sublimit of Liability for D&O or EPL* | <br><br>N/A<br>N/A<br>N/A |

*\* With respect to Punitive Damages Coverage, if "No Punitive Damages Sublimit for D&O or EPL" is selected above, the Limit of Liability for Punitive Damages shall be equal to either the D&O or the EPL Coverage Section Limit of Liability, as applicable, set forth above in Item 4.A.*

PP 00002 00 (01/10)　　　　　　　　　Page 3 of 4

**ITEM 5.   COVERAGE DATES**

| Coverage Section | Date |
|---|---|
| Directors and Officers Liability Coverage Section | Pending or Prior Date: October 11, 2003 |
| Employment Practices Liability Coverage Section | Pending or Prior Date: October 11, 2003 |
| Fiduciary Liability Coverage Section | Pending or Prior Date: October 11, 2003 |
| Employed Lawyers Liability Coverage Section | Pending or Prior Date:  N/A |
| Crime Coverage Section | N/A |
| Kidnap and Ransom/Extortion Coverage Section | N/A |

**ITEM 6.    DISCOVERY PERIOD**

| 1 Year: | 100% |
|---|---|
| 2 Years: | 125% |
| 3 Years: | 150% |
| 4 Years: | 175% |
| 5 Years: | 200% |
| 6 Years: | 225% |

**ITEM 7.    ADDRESS OF INSURER FOR NOTICES UNDER THIS POLICY**

    **A.   <u>Claim-Related Notices:</u>**
        **DARWIN SELECT INSURANCE COMPANY**
        **ATTN: CLAIMS DEPARTMENT**
        **9 FARM SPRINGS ROAD**
        **FARMINGTON, CT 06032**
        **or**
        **noticeofloss@darwinpro.com**

    **B.   <u>All Other Notices:</u>**
        **DARWIN SELECT INSURANCE COMPANY**
        **ATTN: PROFESSIONAL LIABILITY UNDERWRITING**
        **199 WATER STREET**
        **NEW YORK, NY 10038**

In Witness Whereof, the **Insurer** has caused this Policy to be executed and attested. This Policy shall not be valid unless countersigned by a duly authorized representative of the **Insurer**.

        President                             Asst. Secretary

                                            **AUTHORIZED REPRESENTATIVE**

PP 00002 00 (01/10)             Page 4 of 4

# NOTICE

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA.  THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.
2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.
3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW.  THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.
4. CALIFORNIA MAINTAINS A LIST OF ELIGIBLE SURPLUS LINE INSURERS APPROVED BY THE INSURANCE COMMISSIONER.  ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE:  www.insurance.ca.gov.
5. FOR ADDITIONAL INFORMATION ABOUT THE INSURER YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE, AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER:   1-800-927-4357.
6. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE.  IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

D-2 Form (5/2009)

## CALIFORNIA – SUITS INVOLVING A SURPLUS LINES BROKER - REMEDIES

A.  A surplus lines insurer may be sued upon any cause of action arising in this state under any surplus lines insurance contract made by it, or any evidence of insurance issued or delivered by the surplus lines broker, pursuant to the procedure set forth in Sections 1610 to 1620, inclusive. Any policy or evidence of insurance issued by the surplus lines insurer or the surplus lines broker shall contain a provision stating the substance of this section, and designating the person to whom the Commissioner shall mail process.

B.  Every surplus lines insurer assuming a surplus lines insurance shall be deemed thereby to have subjected itself to this chapter.

C.  The remedies provided by this section shall be in addition to any other methods provided by law for service of process.

IL 00017 04 (11/08)

**ENDORSEMENT NO. 1**

**SERVICE OF SUIT**

This Endorsement, effective at 12:01 a.m. on October 11, 2010, forms part of

      Policy No.     0306-0173
      Issued to      Sentinel Offender Services, LLC
      Issued by     Darwin Select Insurance Company

Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the Statute, or his successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured(s) or any beneficiary hereunder arising out of this contract of insurance, and hereby designate the below named as the person whom the said officer is authorized to mail process or a true copy thereof.

It is further agreed that service of process in such suit may be made upon Timothy J. Curry, Secretary, or his nominee, at 9 Farm Springs Road, Farmington, CT 06032 and that in any suit instituted against any one of them upon this policy, the Company will abide by the final decision of such Court or any Appellate Court in the event of an appeal.

NOTHING HEREIN SHALL VARY, ALTER, WAIVE, OR EXTEND ANY OF THE TERMS, PROVISIONS, REPRESENTATIONS, CONDITIONS OR AGREEMENTS OF THE POLICY OTHER THAN AS STATED ABOVE.

FF 00038 00 (01/10)

Directors & Officers Liability ☒
Employed Lawyers Liability ☐
Employment Practices Liability ☐
Fiduciary Liability ☐

## ENDORSEMENT NO. 2

## ABSOLUTE BODILY INJURY/PROPERTY DAMAGE EXCLUSION

This Endorsement, effective at 12:01 a.m. on October 11, 2010, forms part of

> Policy No.    0306-0173
> Issued to    Sentinel Offender Services, LLC
> Issued by    Darwin Select Insurance Company

In consideration of the premium charged, in connection with the Coverage Sections(s) selected above, it is hereby agreed that:

Section III. EXCLUSIONS, is amended by deleting Exclusion M. in its entirety and replacing it with the following:

"M.    alleging, arising out of, based upon or attributable to bodily injury, sickness, mental anguish, emotional distress, disease or death of any person, or damage to or destruction of any tangible property; or for libel, slander, oral or written publication of defamatory or disparaging material or violation of any right of privacy; provided however, that this Exclusion shall not apply to a **Securities Claim**;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Page 1 of 1

PP 00033 00 (01/10)

58

Directors & Officers Liability ☒
Employed Lawyers Liability ☐
Employment Practices Liability ☒
Fiduciary Liability ☒

## ENDORSEMENT NO. 3

### BROAD PROFESSIONAL SERVICES EXCLUSION

This Endorsement, effective at 12:01 a.m. on October 11, 2010, forms part of

| | |
|---|---|
| Policy No. | 0306-0173 |
| Issued to | Sentinel Offender Services, LLC |
| Issued by | Darwin Select Insurance Company |

In consideration of the premium charged, in connection with the Coverage Section(s) selected above, it is hereby agreed that:

No coverage will be available for **Loss** from any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or failure to render, services to a third party, whether or not a fee for such services has been paid.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Page 1 of 1

PP 00077 00 (01/10)

59

| | |
|---|---|
| **Directors & Officers Liability** | ☒ |
| **Employed Lawyers Liability** | ☐ |
| **Employment Practices Liability** | ☒ |
| **Fiduciary Liability** | ☒ |

## ENDORSEMENT NO. 4

### SPECIFIC PERSONS OR ENTITIES EXCLUSION

This Endorsement, effective at 12:01 a.m. on October 11, 2010, forms part of

| | |
|---|---|
| Policy No. | 0306-0173 |
| Issued to | Sentinel Offender Services, LLC |
| Issued by | Darwin Select Insurance Company |

In consideration of the premium charged, in connection with the Coverage Section(s) selected above, it is hereby agreed that:

No person or entity listed below is an **Insured**. Accordingly, no coverage will be available for **Loss** from any **Claim** against, or based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving acts, errors or omissions of, the following persons or entities, or any related or affiliated entities or individuals:

BOB CONTESTABILE

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

Page 1 of 1

PP 00088 00 (01/10)

60

**ENDORSEMENT NO. 5**

**OFAC EXCLUSION**

This Endorsement, effective at 12:01 a.m. on October 11, 2010, forms part of

| | |
|---|---|
| Policy No. | 0306-0173 |
| Issued to | Sentinel Offender Services, LLC |
| Issued by | Darwin Select Insurance Company |

It is understood and agreed that the EXCLUSIONS section of all purchased Coverage Sections is amended by adding the following exclusion:

This Policy shall not cover any **Loss** in connection with any **Claim** in the event that such coverage would not be in compliance with any United States of America economic or trade sanctions, laws or regulations, including but not limited to the U.S. Treasury Department's Office of Foreign Assets Control, or any similar foreign, federal, state or statutory law or common law.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

PP 00132 00 (05/10)              Page 1 of 1

| Directors & Officers Liability | ☒ |
| Employed Lawyers Liability | ☐ |
| Employment Practices Liability | ☐ |
| Fiduciary Liability | ☐ |

## ENDORSEMENT NO. 6

### PRE-APPROVED CRISIS MANAGEMENT FIRM

This Endorsement, effective at 12:01 a.m. on October 11, 2010, forms part of

| | |
|---|---|
| Policy No. | 0306-0173 |
| Issued to | Sentinel Offender Services, LLC |
| Issued by | Darwin Select Insurance Company |

In consideration of the premium charged, in connection with the Coverage Section(s) selected above, it is hereby agreed that the following crisis management firms shall be deemed approved in advance by the **Insurer** pursuant to Section II.D. of the Coverage Section:

| Crisis Management Firm and Address | Contact Information |
|---|---|
| **Abernathy MacGregor Group** | |
| Los Angeles<br>707 Wilshire Boulevard<br>Suite 3950<br>Los Angeles, CA 90017<br>www.abmac.com | Ian Campbell<br>Managing Director<br>Office: 213-630-6550<br> x213-630-6550<br>Cell: 213-422-7958<br>Home: 818-957-5650<br>Office Fax: 213-489-3443<br>Home Fax: 818-541-0954<br>Email: idc@abmac.com |
| New York Office<br>501 Madison Avenue<br>New York, NY 10022<br>www.abmac.com | Rhonda Barnat<br>Managing Director<br>Office: 212-371-5999<br> x212-371-5999<br>Cell: 917-912-6378<br>Home: 646-478-8740<br>Office Fax: 212-752-0723<br>Email: rb@abmac.com |
| | Mike Pascale<br>Managing Director<br>Office: 212-371-5999<br> x212-371-5999<br>Cell: 917-860-2048<br>Home: 914-472-0810<br>Office Fax: 212-752-0723<br>Home Fax: 914-472-0559<br>Email: mmp@abmac.com |
| | Jim MacGregor<br>Vice Chairman |

PP 00133 00 (05/10)          Page 1 of 3

| | Office: 212-371-5999 |
| | x212-371-5999 |
| | Cell: 646-236-3271 |
| | Home: 212-343-0818 |
| | Office Fax: 212-752-0723 |
| | Home Fax: 646-613-7033 |
| | Email: jtm@abmac.com |
| **Singer Associates** | |
| | Jason Barnett |
| | Vice President |
| | Office: 415-227-9700 |
| | x415-227-9700 |
| | Cell: 415-999-0917 |
| | Home: 415-644-0800 |
| | Email: barnett@singersf.com |
| | Courtney Lodato |
| | Vice President |
| | Office: 415-227-9700 |
| | x415-227-9700 |
| | Cell: 415-378-4382 |
| | Home: 650-931-4694 |
| | Email: courtney@singersf.com |
| | Sam Singer |
| | President |
| | Office: 415-227-9700 |
| | x415-227-9700 |
| | Cell: 415-336-4949 |
| | Home: 510-644-3636 |
| | Email: singer@singersf.com |
| | Charles Goodyear |
| | Senior Account Supervisor |
| | Office: 415-227-9700 |
| | x415-227-9700 |
| | Cell: 415-637-8671 |
| | Home: 415-409-6909 |
| | Email: charlie@singersf.com |
| | Adam Alberti |
| | Executive Vice President |
| | Office: 415-227-9700 |
| | x415-227-9700 |
| | Cell: 415-225-2443 |
| | Home: 650-620-9120 |
| | Email: adam@singersf.com |
| **Zeno** | |
| Washington DC | Phil Armstrong |
| 3222 N Street, NW | Chief Operating Officer |
| Suite 500 | Office: 202-965-7801 |
| Washington, DC 20007 | x202-965-7801 |
| | Cell: 202-669-9926 |
| | Home: 202-333-0589 |

PP 00133 00 (05/10)                Page 2 of 3

| | Office Fax: 202-298-5611 |
| | Email: phil.armstrong@zenogroup.com |

The foregoing approval, and the **Insurer's** obligation to reimburse the **Named Insured** for **Crisis Management Expenses** paid to such firm pursuant to this Endorsement, is expressly conditioned on the following:

(a) The **Insurer** shall be reasonably satisfied that such firm is able and competent to provide those services outlined in Section II.D. of the Coverage Section;

(b) The **Insurer** shall pay such firm at an hourly or otherwise agreed upon rate which is equivalent to the rate that the **Insurer** customarily pays for such firms in the same, or in a comparable, geographic location, and fees of such firm in excess of the hourly or otherwise agreed upon rate customarily paid by the **Insurer** shall be uninsured; and

(c) Such firm shall in all respects adhere to any guidelines issued by the **Insurer** and updated from time to time.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

PP 00133 00 (05/10)                 Page 3 of 3

**64**

**POLICYHOLDER DISCLOSURE**
**NOTICE OF TERRORISM INSURANCE COVERAGE**

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you now have a right to purchase insurance coverage for losses resulting from acts of terrorism, *as defined in Section 102(1) of the Act:* The term "act of terrorism" means any act that is certified by the Secretary of the Treasury – in concurrence with the Secretary of State, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessel or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States government by coercion.

<u>SELECTION OR REJECTION OF TERRORISM INSURANCE COVERAGE</u>
You may accept or reject this offer of coverage. If you choose to accept this coverage, the premium for this coverage is payable according to the terms of your billing notice. You may reject this offer by completing and signing a statement and returning it to us. If you send us a signed rejection of coverage, your policy will exclude coverage for certified terrorism losses.

The portion of your annual premium that is attributable to coverage for acts of terrorism, as defined in the Act, is:
$ __0_____.


YOU SHOULD KNOW THAT COVERAGE PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW.   HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS.  UNDER THIS FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM SHOWN ABOVE DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION.  IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

PN 9001 (1/2008)

**DARWIN SELECT INSURANCE COMPANY**

# FORCEFIELD<sup>SM</sup>

## PRIVATE COMPANY
MANAGEMENT LIABILITY PACKAGE POLICY
### General Terms and Conditions

In consideration of the payment of the premium and in reliance upon the **Application**, which shall be deemed to be attached to, incorporated into, and made a part of this Policy, and subject to these General Terms and Conditions and any purchased Coverage Sections, as indicated in Item 3. of the Declarations, DARWIN SELECT INSURANCE COMPANY (the **"Insurer"**) and the **Named Insured**, on behalf of all **Insureds**, agree as follows:

**I.     TERMS AND CONDITIONS**

The terms and conditions set forth in these General Terms and Conditions shall apply to all purchased Coverage Sections of this Policy, except the Crime and the Kidnap and Ransom/Extortion Coverage Sections.  The terms appearing in these General Terms and Conditions, which are defined in a specific Coverage Section, shall have the meaning provided for such terms in such Coverage Section for purposes of determining coverage thereunder.  The terms and conditions of each Coverage Section apply only to that particular Coverage Section. If any of the terms or conditions in these General Terms and Conditions are inconsistent or in conflict with the terms and conditions of any specific Coverage Section, the terms and conditions of such Coverage Section shall control.

**II.    GENERAL DEFINITIONS**

A.     **"Application"** means all applications, including any attachments and other materials provided therewith or incorporated therein, submitted in connection with the underwriting of this Policy or for any other policy of which this Policy is a renewal, replacement or which it succeeds in time.

B.     **"Company"** means:

(1)     the **Named Insured**;

(2)     any **Subsidiary** of the **Named Insured**; and

(3)     the **Named Insured** or **Subsidiary** as a debtor, a debtor-in-possession or equivalent status.

C.     **"Management Control"** means:

(1)     owning interests representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of a majority of the Board of Directors of a corporation; the Management Committee members of a joint venture; or the members of the Management Board of a limited liability company; or

(2)     having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents, to elect, appoint or designate

PP 00005 00 (01/10)                    Page 1 of 9

a majority of: the Board of Directors of a corporation; the Management Committee of a joint venture; or the Management Board of a limited liability company.

D.     **"Named Insured"** means the entity named in Item 1. of the Declarations.

E.     **"Policy Period"** means the period from the Inception Date shown in Item 2. of the Declarations to the earlier of the Expiration Date shown in Item 2. of the Declarations or the effective date of cancellation of this Policy.

F.     **"Related Claims"** means all **Claims** for **Wrongful Acts** based upon, arising out of, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

G.     **"Subsidiary"** means:

(1)     any for-profit entity in which the **Named Insured** has **Management Control** ("Controlled Entity") before the Inception Date set forth in Item 2. of the Declarations, either directly or indirectly through one or more other Controlled Entities;

(2)     any for-profit entity, whose securities are not publicly traded, of which the **Named Insured** acquires **Management Control** during the **Policy Period**, either directly or indirectly through one or more other Controlled Entities; or

(3)     any not-for-profit organization sponsored exclusively by a **Company** prior to or during the **Policy Period**.

Coverage afforded under this Policy for a **Claim** made against any **Insured** relating to a **Wrongful Act** of a **Subsidiary**, shall only apply to **Wrongful Acts** committed or allegedly committed after the effective date such organization or entity becomes a **Subsidiary** and prior to the effective date that such organization or entity ceases to be a **Subsidiary**.

**III.     LIMITS OF LIABILITY**

A.     The Limits of Liability For Each Coverage Section, as set forth in Item 4.A. of the Declarations, are the maximum Limits of Liability of the **Insurer** for all **Loss** from all **Claims** first made during the **Policy Period** or Discovery Period, if applicable, for each respective Coverage Section.

B.     The Aggregate Limit of Liability, as set forth in Item 4.B. of the Declarations, is the maximum Limit of Liability of the **Insurer** for all **Loss** from all **Claims** first made during the **Policy Period**, or Discovery Period if applicable, for all purchased Coverage Sections listed under Item 4.A. of the Declarations and purchased by the **Insured**, regardless of whether or not the Limits of Liability for any such Coverage Sections are shared.

C.    Any Sublimit of Liability, whether set forth in Item 4.F. of the Declarations, or as otherwise provided under the terms of this Policy, shall be part of, and not in addition to, the applicable Limit of Liability set forth in Item 4.A. of the Declarations.  Each Sublimit of Liability is the maximum Limit of Liability of the **Insurer** for all **Loss** from all **Claims** first made during the **Policy Period** or Discovery Period if applicable, to which the Sublimit of Liability applies.

D.    If any Limit of Liability for an individual Coverage Section as set forth in Item 4.A. of the Declarations is exhausted by the payment of **Loss**, all obligations of the **Insurer** under this Policy with respect to the individual Coverage Section will be completely fulfilled, and the **Insurer** will have no further obligations under this Policy of any kind with respect to the individual Coverage Section.  In such event, the premium for the individual Coverage Section, as set forth in Item 3. of the Declarations, will be fully earned.

E.    Any payment of **Loss** under any Limit of Liability set forth in Items 4.A. or 4.F. of the Declarations shall reduce and may exhaust the Aggregate Limit of Liability set forth in Item 4.B. of the Declarations. If the Aggregate Limit of Liability is exhausted by the payment of **Loss**, the **Insurer** will have no further obligations of any kind with respect to this Policy, and the Total Policy Premium set forth in Item 3. of the Declarations will be fully earned.

F.    **Defense Costs** are part of, and not in addition to, the Limits of Liability set forth in Item 4. of the Declarations, and payment by the **Insurer** of **Defense Costs** shall reduce and may exhaust such Limits of Liability.

G.    The purchase of a Discovery Period pursuant to Section VI. of this General Terms and Conditions, shall neither increase nor reinstate any Limit of Liability.

## IV.    RETENTION

A.    Subject to all other terms and conditions of this Policy, the **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim**, which is in excess of the applicable Retention amount as set forth in Item 4.A. of the Declarations for each Coverage Section.  A single Retention amount shall apply to all **Loss** from all **Related Claims**.   The Retention amount shall be borne by the **Insureds** and remain uninsured.

B.    The application of the Retention to **Loss** under one Coverage Section shall not reduce the Retention that applies to **Loss** under any other Coverage Section.  If different Retention amounts apply to different parts of a **Claim**, the applicable Retentions shall be applied separately to each part of the **Claim**, and the sum of such Retention amounts shall not exceed the largest single Retention amount which applies to such **Claim**.

C.    If the **Company** is legally required or permitted to indemnify its **Insured Person** for any **Loss**, and does not do so for any reason, the **Insurer** shall not require payment of the applicable Retention by the **Insured Person**.  However, the **Company** hereby agrees to reimburse the **Insurer** for the full amount of such Retention immediately upon request, unless the **Company** is unable to do so solely by reason of **Financial Impairment**.

PP 00005 00 (01/10)                    Page 3 of 9

### V.   NOTICE OF CLAIM

A.   The **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this Policy, give written notice to the **Insurer**, at either the physical or email address indicated in Item 7. of the Declarations, of a **Claim** made against an **Insured** as soon as practicable after the **Company's** General Counsel or Risk Manager, or any individual with functionally equivalent responsibilities, becomes aware of the **Claim**.

B.   Notwithstanding the above, in no event shall notice of any **Claim** be provided to the **Insurer** later than ninety (90) days after the end of the **Policy Period** or Discovery Period if applicable.  If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

C.   If during the **Policy Period** an **Insured** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an **Insured** and shall, during the **Policy Period**, give written notice to the **Insurer** at either the physical or email address indicated in Item 7. of the Declarations, of the circumstances, including the **Wrongful Act**, allegations anticipated, and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, any **Claim** that is subsequently made against the **Insured** alleging, arising out of, based upon or attributable to such circumstances, shall be deemed to have been made at the time written notice of such circumstances was first given to the **Insurer**.

D.   All **Related Claims** shall be deemed to be a single **Claim** made on the date on which the earliest **Claim** within such **Related Claims** was first made, or when the earliest **Claim** within such **Related Claims** is treated as having been made in accordance with Section V.C. above, whichever is earlier.  In such event, only one Limit of Liability and one Retention shall apply.

### VI.   DISCOVERY PERIOD

A.   If this Policy, or one or more Coverage Sections of this Policy, is cancelled by either the **Named Insured** or the **Insurer** for any reason other than non-payment of premium, or the **Insurer** refuses to renew this Policy, the **Insured(s)** shall have the right to purchase a Discovery Period of up to six (6) years following the effective date of such cancellation or non-renewal.  In the event of cancellation or non-renewal of one or more Coverage Sections of this Policy, the **Insured** may purchase a Discovery Period only with respect to the Coverage Sections that have been cancelled or non-renewed.

B.   If an Organizational Change as defined in Section X. occurs, the **Insured(s)** shall have the right to purchase a Discovery Period of up to six (6) years following the effective date of such Organizational Change.

C.   The **Insured's** right to purchase a Discovery Period shall lapse unless written notice of its election to purchase such Discovery Period and the additional premium for such Discovery Period, is received by the **Insurer** within sixty (60) days after such cancellation, non-renewal or Organizational Change.

PP 00005 00 (01/10)                    Page 4 of 9

D.    The additional premium for a Discovery Period of one (1) to six (6) years shall be determined by multiplying the applicable percentage set forth in Item 6. of the Declarations by either: the Total Policy Premium, in the event that a Discovery Period is elected for the entire Policy; or by the premium amount(s) for the individual Coverage Section(s), in the event that a Discovery Period is elected only for individual Coverage Section(s).

E.    During the Discovery Period, the **Insured** may provide the **Insurer** with notice, pursuant to Section V. of this General Terms and Conditions, of **Claims** first made during the Discovery Period, for **Wrongful Acts** occurring prior to the effective date of the cancellation or nonrenewal, or the effective date of the Organizational Change, and otherwise covered by this Policy.

F.    The election of a Discovery Period does not increase or reinstate the Limits of Liability set forth in Item 4. of the Declarations.

G.    The premium for the Discovery Period shall be fully earned at inception of the Discovery Period, and the Discovery Period shall be non-cancellable.

## VII.   OTHER INSURANCE

A.    The insurance provided by this Policy, other than the Employment Practices Liability Coverage Section, shall apply only as excess over any other valid and collectible insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically as excess insurance over the applicable Limit of Liability provided by this Policy. This Policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this Policy may be obligated to pay **Loss**. This Policy shall not be subject to the terms and conditions of any other insurance policy.

B.    With respect to the insurance provided by the Employment Practices Liability Coverage Section, such insurance shall be primary, unless expressly written to be excess over other applicable insurance.

C.    With respect to the insurance provided by the Employed Lawyers Coverage Section, such insurance shall apply excess over any other Directors and Officers Liability insurance, whether available under this Policy or otherwise.

D.    In connection with any covered **Claim** made against an **Outside Entity Insured Person**, a leased employee, or an **Independent Contractor**, and subject to all other terms and conditions herein, this Policy shall apply specifically excess of any indemnification and any other insurance coverage available to the **Outside Entity Insured Person**, leased employee or **Independent Contractor**. In the event such other insurance coverage is also provided by the **Insurer** or any affiliate thereof (or would be provided except for the application of any retention, exhaustion of a limit of liability, or failure to submit notice of a claim) then the **Insurer's** maximum aggregate Limit of Liability for all **Loss** in connection with a **Claim** covered, in whole or in part, by this Policy and such other insurance policy, shall be the greater of: (1) the applicable Limit of Liability of this Policy; or (2) the applicable limit of liability of such other insurance policy.

**VIII.  COVERAGE EXTENSIONS**

A.  This Policy shall cover **Loss** arising from any **Claims** made against the estates, heirs, or legal representatives of any deceased person who was an **Insured Person** at the time the **Wrongful Acts** upon which such **Claims** are based were committed; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** by or on the part of any such estates, heirs, or legal representatives, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Insured Person**.

B.  This Policy shall also cover **Loss** arising from any **Claims** made against the legal representatives of any incompetent, insolvent or bankrupt person who was an **Insured Person** at the time the **Wrongful Acts** upon which such **Claims** are based were committed; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** by or on the part of any such legal representatives, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Insured Person**.

C.  This Policy shall also cover **Loss** arising from any **Claims** made against the lawful spouse or domestic partner (whether such status is derived by reason of the statutory law or common law of any applicable jurisdiction in the world, or by any formal program established by the **Company**) of an **Insured Person** for all **Claims** arising solely out of his or her status as the spouse or domestic partner of an **Insured Person**, including a **Claim** that seeks damages recoverable from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act** by or on the part of the spouse or domestic partner, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Acts** of an **Insured Person**.

D.  The coverage extensions set forth in this Section VIII. are subject to all other terms and conditions of this Policy.

**IX.  CANCELLATION AND NON RENEWAL**

A.  This Policy, or any individual Coverage Section, may be cancelled by the **Named Insured** by sending written prior notice to the **Insurer** stating when thereafter the cancellation of the Policy, or the individual Coverage Section, shall be effective. The Policy, or the individual Coverage Section, terminates at the date and hour specified in such notice. The **Insurer** shall retain the pro rata proportion of the premium for either the Policy, or the individual Coverage Section cancelled, as applicable.

B.  This Policy, or any individual Coverage Section, shall not be cancelled by the **Insurer** except by reason of non-payment of premium by the **Insured**. The **Insurer** may cancel the Policy by delivering or mailing to the **Named Insured**, by registered mail or by courier, at the address set forth in Item 1. of the Declarations, written notice stating when, not less than twenty (20) days thereafter, cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. In the event of such cancellation, the Policy

will be deemed terminated as of the date indicated in the **Insurer's** written notice of cancellation to the **Named Insured**.

C.   Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

D.   The **Insurer** shall have no obligation to renew this Policy or any individual Coverage Section.  In the event the **Insurer** decides to non-renew this Policy or any individual Coverage Section, it shall deliver or mail to the **Named Insured**, at the address set forth in Item 1. of the Declarations, written notice of such decision at least sixty (60) days prior to the expiration of the **Policy Period**.

**X.   ORGANIZATIONAL CHANGES**

A.   If, during the **Policy Period**:

(1)   the **Named Insured** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

(2)   any person or entity or group of persons or entities acting in concert shall acquire more than fifty percent (50%) of the assets or voting rights of the **Named Insured,**

(any event described in paragraphs (1) or (2) are referred to herein as an "Organizational Change") then this Policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective date of the Organizational Change.  However, there shall be no coverage afforded by this Policy for any actual or alleged **Wrongful Act** occurring after the effective date of the Organizational Change. This Policy shall be non-cancellable and the entire premium shall be deemed fully earned upon the effective date of the Organizational Change.

B.   The **Insured** shall have the right to purchase a Discovery Period described in Section VI. of this General Terms and Conditions, in the event of an Organizational Change.

C.   The **Named Insured** shall give the **Insurer** written notice of the Organizational Change as soon as practicable, but no later than thirty (30) days after the effective date of the Organizational Change.

**XI.   AUTHORIZATION AND NOTICES**

The **Named Insured** shall act on behalf of all **Insureds** with respect to all matters as respects this Policy including: (1) giving of notice of **Claim**; (2) the defense or settlement of a **Claim**; (3) giving and receiving of all correspondence and information; (4) giving and receiving notice of cancellation; (5) payment of premiums; (6) receiving of any return premiums; (7) receiving and accepting of any endorsements issued to form a part of this Policy; and (8) the exercising of any right to a Discovery Period.

**XII.   VALUATION AND CURRENCY**

All amounts stated in this Policy are expressed in United States dollars and all amounts payable under this Policy are payable in United States dollars. If a judgment rendered or settlement entered into under this Policy is stated in a currency other than United States dollars, then payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the final judgment is rendered or the settlement payment is established.

**XIII.   TERRITORY**

This Policy extends to **Wrongful Acts** occurring, or **Claims** made, anywhere in the world, to the extent permitted by law.

**XIV.   ASSIGNMENT AND CHANGES TO THE POLICY**

A.   This Policy and any and all rights hereunder are not assignable without the prior written consent of the **Insurer**.

B.   Notice to any agent or knowledge possessed by any agent or person acting on behalf of the **Insurer**, will not result in a waiver or change in any part of this Policy or prevent the **Insurer** from asserting any right under the terms and conditions of this Policy. The terms and conditions of this Policy may only be waived or changed by written endorsement signed by the **Insurer**.

**XV.   SUBROGATION**

In addition to any right of subrogation existing at law, in equity or otherwise, in the event of any payment by the **Insurer** under this Policy, the **Insurer** shall be subrogated to the extent of such payment to all of the **Insured(s)'** rights of recovery. The **Insured(s)** shall execute all papers required (including those documents necessary for the **Insurer** to bring suit or other form of proceeding in their name) and do everything that may be necessary to pursue and secure such rights.

**XVI.   ACTION AGAINST THE INSURER**

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all material terms of this Policy and the amount of the **Insured's** obligation has been fully determined either by judgment against the **Insured** after actual trial, or by written agreement of the **Insured**, the claimant and the **Insurer**.

**XVII.   CONFORMITY TO STATUTE**

A.   Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, including any endorsement to this Policy which is required by any state Department of Insurance or equivalent authority ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein shall be construed to restrict the terms of any State Amendatory Endorsement.

B.    In the event any portion of this Policy shall be declared or deemed invalid or unenforceable under applicable law, such invalidity or unenforceability shall not affect the validity or enforceability of any other portion of this Policy.

## XVIII. HEADINGS

The descriptions in the headings and any subheading of this Policy, including any titles given to any endorsement attached hereto, are inserted solely for convenience and do not constitute any part of this Policy's terms or conditions.

PP 00005 00 (01/10)                    Page 9 of 9

DARWIN SELECT INSURANCE COMPANY

# FORCEFIELD<sup>SM</sup>

## PRIVATE COMPANY
### MANAGEMENT LIABILITY PACKAGE POLICY
### Directors and Officers Liability Coverage Section

In consideration of the payment of the premium and in reliance upon the **Application**, which shall be deemed to be attached to, incorporated into, and made a part of this Policy, and subject to the General Terms and Conditions and this Coverage Section, DARWIN SELECT INSURANCE COMPANY (the "**Insurer**") and the **Named Insured**, on behalf of all **Insureds**, agree as follows:

### I.  INSURING AGREEMENTS

A.  **Claims Against Insured Persons – Non-indemnifiable Loss Coverage**

The **Insurer** shall pay on behalf of any **Insured Person** the **Loss** arising from a **Claim**, first made during the **Policy Period** (or Discovery Period, if applicable) against such **Insured Person** for any **Wrongful Act**, and reported to the **Insurer** in accordance with Section V. of the General Terms and Conditions, unless the **Company** is required or permitted to pay such **Loss** to or on behalf of the **Insured Person** as indemnification.

B.  **Claims Against Insured Persons – Indemnifiable Loss Coverage**

The **Insurer** shall pay on behalf of the **Company** the **Loss** arising from a **Claim**, first made during the **Policy Period** (or Discovery Period, if applicable) against any **Insured Person** for any **Wrongful Act**, and reported to the **Insurer** in accordance with Section V. of the General Terms and Conditions, if the **Company** pays such **Loss** to or on behalf of the **Insured Person** as indemnification.

C.  **Company Claims Coverage**

The **Insurer** shall pay on behalf of the **Company** the **Loss** arising from a **Claim**, first made during the **Policy Period** (or Discovery Period, if applicable) against the **Company** for any **Wrongful Act**, and reported to the **Insurer** in accordance with Section V. of the General Terms and Conditions.

D.  **Derivative Demand Coverage**

The **Insurer** shall pay on behalf of the **Company** the **Derivative Costs** incurred by the **Company** in response to a **Derivative Demand** first made during the **Policy Period** (or Discovery Period, if applicable) for any **Wrongful Act** of any **Executive**, and reported to the **Insurer** in accordance with Section V. of the General Terms and Conditions.  The Sublimit of Liability for **Derivative Costs** set forth in Item 4.F. of the Declarations is the **Insurer's** maximum Limit of Liability for all **Derivative Costs**.  The Sublimit of Liability shall be part of, and not in addition to, the Limit of Liability applicable to this Coverage Section, as

PP 00008 00 (01/10)                Page 1 of 15

set forth in Item 4.A. of the Declarations. This Insuring Agreement D. shall not provide coverage for any civil proceeding that is based upon or arises from a **Derivative Demand.**

E. **Crisis Event Coverage**

The **Insurer** shall reimburse the **Company** for **Response Costs** incurred by the **Company** in response to a **Crisis Event** which first takes place during the **Policy Period**, and reported to the **Insurer** in accordance with Section V. of the General Terms and Conditions. The Sublimit of Liability for **Response Costs** set forth in Item 4.F. of the Declarations is the **Insurer's** maximum Limit of Liability for all **Response Costs.** The Sublimit of Liability shall be part of, and not in addition to, the Limit of Liability applicable to this Coverage Section, as set forth in Item 4.A. of the Declarations. This Insuring Agreement E. shall not provide coverage for any **Claim** that arises from a **Crisis Event**.

F. **Dedicated Excess Coverage for Insured Persons**

The Limit of Liability set forth in Item 4.F. of the Declarations for Dedicated Excess Coverage for Insured Persons, shall apply excess of the **Insurer's** liability under Insuring Agreement A. of this Coverage Section only. Such Limit of Liability is in addition to the Policy Aggregate Limit of Liability stated in Item 4.B. of the Declarations.

(1) Such Limit of Liability shall apply only after:

(a) the full amount of the Directors and Officers Limit of Liability stated in Item 4.A. of the Declarations has been fully exhausted due to the payment of **Loss**; and

(b) the **Company** or the **Insured Persons** shall have paid the full amount of any applicable Retention; and

(c) any other valid and collectible insurance written as excess over the coverage provided by this Policy has been exhausted by reason of the payment of loss thereunder.

The coverage provided by this Insuring Agreement F. shall become primary and continue in force as primary insurance only in the event of F.(1)(a), (b) and (c) above, and shall not become primary insurance for any other reason.

II. **DEFINITIONS**

A. **"Affiliate"** means any person or entity that directly, or indirectly through one or more intermediaries:

(1) controls or is controlled by, or is in common control with, another person or entity; or

(2) is a successor-in-interest to another person or entity.

PP 00008 00 (01/10)          Page 2 of 15

B.   **"Claim"** means any:

(1)   written demand for monetary, non-monetary or injunctive relief made against an **Insured;**

(2)   judicial, administrative or regulatory proceeding, whether civil or criminal, for monetary, non-monetary or injunctive relief commenced against an **Insured,** including any appeal therefrom, which is commenced by:

(a)   service of a complaint or similar pleading;

(b)   return of an indictment, information or similar document (in the case of a criminal proceeding); or

(c)   receipt or filing of a notice of charges;

(3)   arbitration proceeding commenced against an **Insured** by service of a demand for arbitration;

(4)   formal civil, criminal, administrative or regulatory investigation of an **Insured Person,** which is commenced by the filing or issuance of a notice of charges, Wells Notice, formal investigative order or similar document identifying such **Insured Person** as a person against whom a proceeding identified in paragraphs (2) or (3) above may be commenced;

(5)   written request to toll or waive the applicable statute of limitations, or to waive any contractual time bar, relating to a potential **Claim** against an **Insured** for a **Wrongful Act;**

(6)   **Derivative Demand,** solely under Insuring Agreement D.; or

(7)   official request for **Extradition** of any **Insured Person,** or the execution of a warrant for the arrest of any **Insured Person** where such execution is an element of **Extradition.**

A **Claim** shall be deemed first made when any **Insured** first receives notice of the **Claim.**

C.   **"Crisis Event"** means an event that, in the absence of **Crisis Management Services** and in the good faith opinion of an **Executive** of the Named **Insured,** has resulted in or may result in:

(1)   **Loss** for which coverage would be provided under this Coverage Section; and

(2)   Significant adverse media coverage for the **Company.**

A **Crisis Event** will include the following, so long as the requirements set forth in paragraphs C.(1) and C.(2) above are met:

    (a)    Mass Tort:
The public announcement or accusation that the **Company** has caused the bodily injury, sickness, disease, death or emotional distress of a group of persons, or widespread damage to or destruction of property, including the loss of use thereof.

    (b)    Debt Default:
The public announcement that the **Company** has defaulted or intends to default on its debt, or intends to engage in a debt restructuring.

    (c)    Bankruptcy:
The public announcement that the **Company** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the **Company**; or the imminence of bankruptcy proceedings, whether voluntary or involuntary.

    (d)    Loss of Key **Executives**; Loss of **Employees**:
The public announcement of the death or resignation of one or more key **Executives** of the **Company**; or a substantial lay-off of **Employees** of the **Company** (i.e., the elimination of multiple jobs within the **Company** without regard to employee performance, when the **Company** is experiencing financial difficulties).

    (e)    Regulatory Crisis:
The public announcement of the commencement, or threat of commencement, of litigation, administrative or other proceedings against the **Company** by any federal, state or local governmental or regulatory body.

D.    **"Crisis Management Services"** means those services performed by a firm that is either listed in an Endorsement to this Policy, or which the **Insurer** at its sole discretion has provided prior written approval for the **Company** to retain, to advise the **Company** on minimizing potential harm to the **Company's** reputation or financial condition from a covered **Crisis Event**, by maintaining and restoring public confidence in the **Company**.

E.    **"Defense Costs"** means:

    (1)    reasonable and necessary fees, costs, charges or expenses resulting from the investigation, defense or appeal of a **Claim**;

    (2)    premium for an appeal, attachment or similar bond, but without any obligation to apply for and obtain such bond, in connection with a **Claim**; or

PP 00008 00 (01/10)           Page 4 of 15

(3)    any fees, costs, charges or expenses incurred by the **Insured** at the specific written request of the **Insurer** to assist the **Insurer** in the investigation, defense or appeal of a **Claim**.

"**Defense Costs**" does not include: (a) amounts incurred by the **Insured** prior to the date a **Claim** is first made and reported to the **Insurer**; or (b) compensation or benefits of any **Insured Person** or any overhead expenses of the **Company**.

F.    "**Derivative Costs**" means the reasonable and necessary fees, costs, charges, or expenses incurred by the **Company**, its board of directors or any committee of its board of directors, solely in response to a **Derivative Demand** and do not include any settlements, judgments or damages, nor any compensation or benefits of any **Insured Persons**, or any overhead expenses of the **Company**. **Derivative Costs** shall be reimbursed by the **Insurer** within sixty (60) days after the **Company** provides written notice to the **Insurer** of its final decision to bring, or not to bring, a civil proceeding against an **Executive**.

G.    "**Derivative Demand**" means a written demand by one or more shareholders of the **Company** upon the **Company's** Board of Directors, to bring a civil proceeding on behalf of the **Company** against an **Executive** for a **Wrongful Act**.

H.    "**Employee**" means any:

(1)    person who was, now is, or shall become a full-time, part-time, seasonal, or temporary employee of the **Company**, other than an **Executive**, but only while that person is acting in their capacity as such;

(2)    person leased to the **Company** or any **Independent Contractor**, so long as this person is working solely for the **Company** and only for conduct within his or her duties as such, if the **Company** indemnifies such leased person or **Independent Contractor** in the same manner as the **Company's** employees described in paragraph (1); and

(3)    volunteer whose labor and service is engaged and directed by the **Company**, but only while that person is acting in their capacity as such.

I.    "**Executive**" means any:

(1)    past, present or future duly elected or appointed director, officer, trustee, trustee emeritus, governor, management committee member or member of the board of managers of the **Company**;

(2)    with respect to any **Company** organized and operating in a foreign jurisdiction, any person in a position that is functionally equivalent to any executive position listed in paragraph (1) above; or

(3)    past, present or future General Counsel or Risk Manager of the **Company**, or any person in a position that is functionally equivalent within the **Company**.

J.    **"Extradition"** means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

K.    **"Financial Impairment"** means the **Company** becoming a debtor-in-possession; or the appointment of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Company**; or the filing of a petition under the bankruptcy laws of the United States of America or any equivalent event outside the United States of America.

L.    **"Independent Contractor"** means any natural person working in the capacity of an independent contractor pursuant to a written contract or agreement between the **Independent Contractor** and the **Company**, which specifies the terms of the **Company's** engagement of the **Independent Contractor**.

M.    **"Insured"** means the **Company** and any **Insured Person**.

N.    **"Insured Person"** means any:

    (1)    **Executive**;

    (2)    **Employee**; or

    (3)    **Outside Entity Insured Person**.

O.    **"Loss"** means:

    (1)    damages, settlements or judgments;

    (2)    pre-judgment or post-judgment interest;

    (3)    costs or fees awarded in favor of the claimant;

    (4)    punitive or exemplary damages, or the multiple portion of any multiplied damages award, subject to any applicable Sublimit of Liability, but only to the extent that such damages are insurable under the applicable law most favorable to the insurability of such damages;

    (5)    **Derivative Costs**, solely under Insuring Agreement D.;

    (6)    **Response Costs**, solely under Insuring Agreement E.; and

    (7)    **Defense Costs**.

    **"Loss"** does not include:

    (a)    amounts for which the **Insureds** are not legally liable;

    (b)    amounts which are without legal recourse to the **Insureds**;

    (c)    taxes;

    (d)    fines or penalties, except as provided for in Definition O.(4) above;

    (e)    amounts deemed uninsurable under applicable law;

    (f)    costs or liability incurred by any **Insured** to modify any building or property to make it more accessible or accommodating to any disabled person, or in connection with any educational, sensitivity or other corporate program, policy or seminar; or

    (g)    amounts paid or incurred by the **Company** to comply with a judgment or settlement for non-monetary or injunctive relief.

However, this Coverage Section shall provide coverage for **Defense Costs** incurred in a **Claim** seeking amounts specified in paragraphs (a) through (g) above, subject to all other terms, conditions and exclusions of this Policy.

P.    **"Outside Entity"** means:

    (1)    any not-for-profit entity; or

    (2)    any other entity listed as such by Endorsement attached to this Policy;

for which an **Executive** or **Employee** acts as a director, officer, trustee, trustee emeritus, governor, management committee member or member of the board of managers or the equivalent thereof, at the specific request of the **Company**. Any such person shall be referred to herein as an **"Outside Entity Insured Person,"** but only while that person is acting in their capacity as a director, officer, trustee, trustee emeritus or governor, or the equivalent thereof, of an **Outside Entity**.

Q.    **"Response Costs"** means the following amounts incurred by the **Company** solely as a result of a **Crisis Event**:

    (1)    amounts for the reasonable and necessary fees and expenses incurred by a firm described in Definition D. in the performance of **Crisis Management Services** for the **Company**; and

    (2)    amounts for reasonable and necessary printing, advertising, mailing of materials, or travel by directors, officers, employees or agents of the **Company** or a firm described in Definition D., incurred at the direction of such.

R.    **"Securities Claim"** means a **Claim** alleging a violation of any foreign, federal, state or local regulation, rule, statute or common law regulating securities, including, but not limited to, the purchase or sale, or offer or solicitation of an offer to purchase or sell securities which is:

    (1)    brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale, or offer or solicitation of an offer to purchase or sell, any securities of the **Company**;

PP 00008 00 (01/10)        Page 7 of 15

(2)     brought by a security holder of the **Company** with respect to such security holder's interest in securities of such **Company**; or

(3)     brought derivatively on behalf of the **Company** by a security holder of such **Company**.

The **Insurer** shall not assert that a **Loss** incurred in a **Securities Claim** alleging violations of Section 11 or 12 of the Securities Act of 1933, as amended, constitutes uninsurable loss.

S.     **"Wrongful Act"** means:

(1)     with respect to an **Insured Person**, any actual or alleged act, error, omission, neglect, breach of duty, breach of trust, misstatement, or misleading statement by an **Insured Person** in his or her capacity as such, or any matter claimed against an **Insured Person** by reason of his or her status as such;

(2)     with respect to an **Outside Entity Insured Person**, any actual or alleged act, error, omission, neglect, breach of duty, breach of trust, misstatement, or misleading statement by a person in his or her capacity as an **Outside Entity Insured Person** or any matter claimed against such **Outside Entity Insured Person** by reason of his or her status as such; or

(3)     with respect to the **Company,** any actual or alleged act, error, omission, neglect, breach of duty, misstatement or misleading statement by the **Company.**

## III.   EXCLUSIONS

This Coverage Section shall not cover any **Loss** in connection with any **Claim**:

A.     arising out of, based upon or attributable to the gaining of any profit or financial advantage or improper or illegal remuneration by an **Insured,** if a final judgment or adjudication establishes that such **Insured** was not legally entitled to such profit or advantage or that such remuneration was improper or illegal;

B.     arising out of, based upon or attributable to any deliberate criminal or deliberate fraudulent act or any wilful violation of law by an **Insured,** if a final judgment or adjudication establishes that such act or violation occurred;

C.     arising out of, based upon or attributable to the purchase or sale by an **Insured** of securities of the **Company** within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and any amendments thereto or similar provisions of any state statutory law if a final judgment or adjudication establishes that such violation occurred;

In determining the applicability of Exclusions A., B. and C., the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, any **Insured Person** shall not be imputed to any other **Insured Person**; however, the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, an **Insured Person** who is a past or current Chairman of the Board, Chief Executive Officer, President or Chief Financial Officer of the **Company** shall be imputed to the **Company**.

D.     based upon, arising from, or in consequence of any actual or alleged liability of any **Insured** under any express contract or agreement; provided however, that this Exclusion shall not apply: (1) to the extent that such **Insured** would have been liable in the absence of such contract or agreement; or (2) to the payment of **Defense Costs** in any such **Claim** against an **Insured Person**.

E.     alleging, arising out of, based upon or attributable to, as of the Pending or Prior Date set forth in Item 5. of the Declarations with respect to this Coverage Section, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation, of which an **Insured** had notice, including any **Claim** alleging or derived from the same or essentially the same facts, or the same or related **Wrongful Acts**, as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

F.     alleging, arising out of, based upon or attributable to the same or essentially the same facts alleged, or to the same or related **Wrongful Acts** alleged or contained, in any **Claim** which has been reported, or in any circumstances of which notice has been given, before the Inception Date of this Policy as set forth in Item 2. of the Declarations, under any policy, whether excess or underlying, of which this Policy is a renewal or replacement or which it may succeed in time;

G.     alleging, arising out of, based upon or attributable to any actual or alleged act or omission of any **Insured Person** serving in any capacity other than as an **Executive** or an **Employee** or as an **Outside Entity Insured Person;**

H.     brought by an **Outside Entity** or by any director, officer, trustee or governor thereof against an **Outside Entity Insured Person** serving for such **Outside Entity**; or which is brought by any security holder of the **Outside Entity**, whether directly or derivatively, unless such security holder's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the **Outside Entity**, any director, officer, trustee or governor thereof, an **Executive** or the **Company**; provided however, that this Exclusion shall not apply to:

(1)     any **Claim** brought by any director, officer, trustee or governor of an **Outside Entity** in the form of a cross-claim or third-party claim for contribution or indemnity which is part of, and results directly from, a **Claim** which is not otherwise excluded under the terms of this Coverage Section;

(2)     any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, receiver or similar official for the **Outside Entity** or any assignee of such trustee, examiner, receiver or similar official;

PP 00008 00 (01/10)                    Page 9 of 15

(3)    any **Claim** brought by any director, officer, trustee or governor of an **Outside Entity** who has not served in such capacity, nor acted as a consultant to the **Outside Entity**, for at least three (3) years prior to such **Claim** being first made;

(4)    any **Claim** brought by any director, officer, trustee or governor of an **Outside Entity** formed and operating in a foreign jurisdiction, against any **Outside Entity Insured Person** serving for such **Outside Entity**, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof); or

(5)    any **Claim** brought against an **Outside Entity Insured Person** arising out of or based upon the violation of any foreign, federal, state or local law providing protection for whistleblowers;

I.    brought by or on behalf of any **Insured**, other than an **Employee** of a **Company** provided however, that this Exclusion shall not apply to:

(1)    any **Claim** brought by an **Insured Person** that is in the form of a cross-claim or third-party claim for contribution or indemnity which is part of, and results directly from, a **Claim** which is not otherwise excluded under the terms of this Coverage Section;

(2)    a shareholder derivative action, but only if such action is brought and maintained without the solicitation, approval, assistance, active participation or intervention of any **Insured** or any **Affiliate** thereof;

(3)    any **Claim** brought by any **Executive** who has not served in such capacity, nor has acted as a consultant to the **Company**, for at least three (3) years prior to the **Claim** being first made;

(4)    any **Claim** brought against an **Insured Person** arising out of or based upon the violation of any foreign, federal, state or local law providing protection for whistleblowers;

(5)    any **Claim** brought by any **Executive** of a **Company** formed and operating in a foreign jurisdiction, against such **Company** or any **Insured Person** thereof, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof); or

(6)    any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, receiver or similar official for the **Company** or any assignee of such trustee, examiner, receiver or similar official;

J.  for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and any amendments thereto, or any similar foreign, federal or state statutory or common law;

K.  alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, any public offering of securities by the **Company** or an **Outside Entity**, or alleging a purchase or sale of such securities subsequent to such public offering; provided, however, that this Exclusion shall not apply to:

(1)  any purchase or sale of securities exempted pursuant to Section 3(b) of the Securities Act of 1933. Coverage for such purchase or sale transaction shall be conditioned solely upon the **Company** giving the **Insurer** written notice of any such public offering, including all details hereof, as soon as practicable, but not later than thirty (30) days after the effective date of such offering; or

(2)  any public offering of securities, other than an offering described in paragraph (1) above, as well as any purchase or sale of securities subsequent to such public offering. Coverage for such transaction shall be conditioned upon, within thirty (30) days prior to the effective time of such public offering, the **Company**:

(a)  giving the **Insurer** written notice of such offering, including all details thereof, and any underwriting information required by the **Insurer**; and

(b)  accepting such terms, conditions and additional premium required by the **Insurer** for such coverage.

Coverage provided pursuant to this paragraph (2) is also subject to the **Company** paying such additional premium when due. The **Insurer** shall provide the **Company** with a quote for such coverage if the **Company** gives written notice of the offering as required in this paragraph; or

(3)  any **Claim** for **Loss** alleging a **Wrongful Act** which occurred during the **Insured's** preparations to commence an initial public offering ("IPO") and which occurred at any time prior to 12:01 a.m. on the date the **IPO** commences ("**IPO Effective Time**"), including any **Claim** for **Loss** alleging a **Wrongful Act** which occurred during the road show; provided, however that the coverage otherwise afforded under this paragraph (3) shall be deemed to be void *ab initio* effective the **IPO Effective Time**; provided further, however, that coverage shall not be deemed void *ab initio* if (a) the **Claim** is first made and reported prior to the **IPO Effective Time**, and (b) a public company directors and officers liability policy is not applicable to such **Claim**;

L.   alleging, arising out of, based upon or attributable to, the adequacy or inadequacy of the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all of the ownership interest in or assets of any entity; provided however, that this Exclusion shall not apply to the payment of **Defense Costs** incurred in the defense of any such **Claim**;

M.   for bodily injury, sickness, mental anguish, emotional distress, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; or for libel, slander, oral or written publication of defamatory or disparaging material or violation of any right of privacy; provided however, that this Exclusion shall not apply to a **Securities Claim**;

N.   alleging, arising out of, based upon, or attributable to any actual or alleged discrimination, harassment, retaliation, wrongful discharge, termination or any other employment-related or employment practice claim, including but not limited to any wage-hour claim or any third-party discrimination or harassment claim; provided however, that this Exclusion shall not apply to any **Securities Claim**;

O.   alleging, arising out of, based upon or attributable to any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law;

P.   alleging, arising out of, based upon, or attributable to, or in consequence of any actual or alleged plagiarism, infringement or violation of any copyright, patent, trademark or service mark or the misappropriation of intellectual property, ideas or trade secrets; provided however, that this Exclusion shall apply only to a **Claim** against the **Company** under Insuring Agreement C.

## IV.   RETENTION

No Retention amount is applicable to **Claims** for which coverage is provided under Insuring Agreements A. or F. of this Coverage Section.

## V.   DEFENSE AND SETTLEMENT OF A CLAIM

A.   The **Insurer** does not assume any duty to defend any **Claim** under this Coverage Section.   However, the **Insurer** shall have the right to fully and effectively associate with the **Insured** in the control, investigation, defense and settlement of any **Claim**.

B.   The **Insured(s)** shall defend and contest any **Claim** made against them.   The **Insured** shall obtain the **Insurer's** written consent in the selection of defense counsel to represent the **Insured** with respect to any **Claim**, such consent shall not be unreasonably withheld.

C.    The **Insured(s)** shall not admit or assume any liability, incur any **Defense Costs**, make any settlement offer, enter into any settlement agreement or stipulate to any judgment without the prior written consent of the **Insurer**. Any **Loss** incurred by the **Insured(s)** and/or any settlements or judgments agreed to by the **Insured(s)** without such consent shall not be covered by this Policy. However, the **Insurer's** consent is not required for the **Insured** to settle a **Claim** for a **Loss** amount within the applicable Retention, provided that such settlement fully resolves the **Claim** with respect to all **Insureds** and the **Insurer**.

D.    At the request of the **Named Insured**, the **Insurer** shall reimburse **Defense Costs** prior to the final disposition of any **Claim**, subject to all other terms and conditions of this Policy. In the event and to the extent that the **Insureds** shall not be entitled to payment of such **Defense Costs** under the terms and conditions of this Coverage Section, such payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally and according to their respective interests.

E.    **Right to Tender Defense**

    (1)    Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of a **Claim** to the **Insurer**.

    (2)    This right shall be exercised by the **Named Insured** on behalf of all **Insureds** by providing written notice to the **Insurer**, except in the event that coverage is provided for a **Claim** exclusively against an **Insured Person**. Such **Insured Person** shall have the right to tender the defense of the **Claim** to the **Insurer** at his or her option. The **Insured's** right to tender the defense of a **Claim** shall terminate if it is not exercised within thirty (30) days of the date the **Claim** is first made against an **Insured**. Further, from the date the **Claim** is first made against an **Insured** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of any **Insured** or the **Insurer** with respect to such **Claim**. In the event the **Insureds** have complied with all of the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent.

    (3)    The **Insurer's** assumption of the defense of the **Claim** shall be effective upon the **Insurer** providing written confirmation thereof to the **Named Insured**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and the negotiation of any settlement of the **Claim**, subject to the provisions of this Section V. The **Insurer** shall not be obligated to defend or continue to defend a **Claim**, or to pay or reimburse **Defense Costs**, after the applicable Limit of Liability has been exhausted.

    (4)    When the **Insurer** has assumed the duty to defend, it shall have the right to investigate and conduct negotiations and, with the **Insured's** consent, which shall not be unreasonably withheld, enter into the settlement of any **Claim** that the **Insurer** deems appropriate.

(5)     When the **Insurer** has assumed the duty to defend, it shall pay **Defense Costs** excess of the applicable Retention, subject to all other terms and conditions of this Policy. In the event and to the extent that the **Insureds** shall not be entitled to payment of such **Defense Costs** under the terms and conditions of this Coverage Section, such payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally and according to their respective interests.

Coverage Section V. shall not apply to **Crisis Event Coverage.**

## VI.    COOPERATION

Each and every **Insured** shall give the **Insurer** full cooperation and such information as it may reasonably require relating to the defense and settlement of any **Claim** and the prosecution of any counterclaim, cross-claim or third-party claim, including without limitation the assertion of an **Insured's** indemnification or contribution rights.

## VII.    REPRESENTATIONS AND SEVERABILITY

A.     In granting coverage under this Policy, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application**. All such statements and representations shall be deemed to be the basis of this Policy and are to be considered as incorporated into this Policy.

B.     The **Insureds** agree that in the event that any such statement or representation which is material to the coverage provided hereunder is not accurate and complete, then no coverage shall be available under this Policy with respect to any of the following **Insureds**:

      (1)     an **Insured Person** who knew as of the Inception Date set forth in Item 2. of the Declarations, of the facts that were not accurately and completely disclosed in the **Application**;

      (2)     a **Company**, under Insuring Agreement B., to the extent it indemnifies an **Insured Person** referenced in paragraph (1) above; and

      (3)     a **Company**, under Insuring Agreement C., if any **Insured Person** who is a past or current Chief Executive Officer, Chief Financial Officer or President, knew as of the Inception Date set forth in Item 2. of the Declarations, of the facts that were not accurately and completely disclosed in the **Application**, whether or not such individual knew that such facts were not accurately and completely disclosed in the **Application.**

C.     Solely with respect to Insuring Agreement A. and B. of this Coverage Section, under no circumstances shall the coverage provided thereunder be deemed void, whether by rescission or otherwise, but such coverage will be subject to all other terms, conditions and exclusions of this Policy.

D.     It is understood and agreed that this Section VII. supercedes any inconsistent language contained in the **Application.**

PP 00008 00 (01/10)           Page 14 of 15

## VIII.  ORDER OF PAYMENTS

A.  In the event of **Loss** arising from any **Claim** for which payment is due under the provisions of this Coverage Section, but which **Loss**, in the aggregate, exceeds the remaining available Limit of Liability applicable to this Coverage Section, then the **Insurer** shall:

(1)  first, pay such **Loss** for which coverage is provided under Insuring Agreement A. of this Coverage Section;

(2)  then, with respect to whatever remaining amount of the applicable Policy Aggregate Limit of Liability is available after payment of such **Loss**, pay such **Loss** for which coverage is provided under Insuring Agreement B. of this Coverage Section, and

(3)  then, pay such **Loss** for which coverage is provided under Insuring Agreements C., D. or E. of this Coverage Section.

B.  In the event of **Loss** arising from a **Claim** for which payment is due under the provisions of this Coverage Section (including those circumstances described in paragraph A. of this Section VIII.), the **Insurer** shall, at the written request of the **Named Insured**:

(1)  first pay such **Loss** for which coverage is provided under Insuring Agreement A. of this Coverage Section;

(2)  then, either pay or hold payment for such **Loss** for which coverage is provided under Insuring Agreements B., C., D. or E. of this Coverage Section.

In the event that the **Insurer** withholds payment under Insuring Agreements B., C., D. or E. of this Coverage Section pursuant to the above request, then the **Insurer** shall at any time in the future, at the request of the **Named Insured**, release such **Loss** payment to the **Company**, or make such **Loss** payment directly to the **Insured Person** in the event of covered **Loss** under any **Claim** covered under Insuring Agreement A. of this Coverage Section.

C.  The **Financial Impairment** of any **Company** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this Coverage Section pursuant to this Section VIII.

**DARWIN SELECT INSURANCE COMPANY**

## FORCEFIELD<sup>SM</sup>

**PRIVATE COMPANY**
MANAGEMENT LIABILITY PACKAGE POLICY
**Employment Practices Liability Coverage Section**

In consideration of the payment of the premium and in reliance upon the **Application**, which shall be deemed to be attached to, incorporated into, and made a part of this Policy, and subject to the General Terms and Conditions and this Coverage Section, DARWIN SELECT INSURANCE COMPANY (the "**Insurer**") and the **Named Insured**, on behalf of all **Insureds**, agree as follows:

**I.**     **INSURING AGREEMENTS**

      **A.**     **Employment Practices Liability Coverage**

            The **Insurer** shall pay on behalf of any **Insured** the **Loss** arising from a **Claim**, first made during the **Policy Period** (or Discovery Period, if applicable) against such **Insured** for any **Wrongful Act**, and reported to the **Insurer** in accordance with Section V. of the General Terms and Conditions and Section IV. of this Coverage Section.

      **B.**     **Third Party Liability Coverage**

            The **Insurer** shall pay on behalf of any **Insured** the **Loss** arising from a **Claim** for a **Third Party Wrongful Act** first made during the **Policy Period** (or Discovery Period, if applicable) against such **Insured**, and reported to the **Insurer** in accordance with Section V. of the General Terms and Conditions and Section IV. of this Coverage Section.  The applicable Sublimit of Liability set forth in Item 4.A. of the Declarations is the **Insurer's** maximum Limit of Liability for all **Loss** arising from all **Claims** for **Third Party Wrongful Acts**. The Sublimit of Liability for **Claims** for **Third Party Wrongful Acts** shall be part of, and not in addition to, the Limit of Liability applicable to this Coverage Section, set forth in Item 4.A. of the Declarations.

**II.**     **DEFINITIONS**

      **A.**     "**Benefits**" means perquisites, fringe benefits, deferred compensation or payments (including insurance premiums) in connection with any employee-related plan.  **Benefits** shall not include salary, wages, bonuses or non-deferred cash incentive compensation.

      **B.**     "**Claim**" means any:

            (1)     written demand for monetary, non-monetary or injunctive relief made against an **Insured**;

PP 00011 00 (01/10)                    Page 1 of 11

(2)    judicial, administrative or regulatory proceeding, whether civil or criminal, for monetary, non-monetary or injunctive relief, commenced against an **Insured**, including any appeal therefrom, which is commenced by:

 (a)    service of a complaint or similar pleading;

 (b)    return of an indictment or similar document (in the case of a criminal proceeding); or

 (c)    receipt or filing of a notice of charges;

(3)    arbitration proceeding commenced against an **Insured** by service of a demand for arbitration;

(4)    notification of an investigation of an **Insured** by the Equal Employment Opportunity Commission ("EEOC") or similar governmental agency commenced by the filing of a notice of charges, formal investigative order or similar document;

(5)    audit of an **Insured** conducted by the United States of America Office of Federal Contract Compliance Programs ("OFCCP"), but only if commenced by the receipt of a notice of violation, order to show cause, or a written demand for monetary or non-monetary or injunctive relief; or

(6)    written request to toll or waive the applicable statute of limitations, or to waive any contractual time-bar, relating to a potential **Claim** against an **Insured** for a **Wrongful Act**.

**Claim** shall not include any labor grievance, arbitration or other proceeding pursuant to a collective bargaining agreement.

A **Claim** shall be deemed first made when any **Insured** first receives notice of the **Claim**.

C.    **"Defense Costs"** means:

(1)    reasonable and necessary fees, costs, charges or expenses resulting from the investigation, defense or appeal of a **Claim**;

(2)    premium for an appeal, attachment or similar bond in connection with a **Claim**, but without any obligation to apply for and obtain such bond, or

(3)    any fees, costs, charges or expenses incurred by the **Insured** at the specific written request and direction of the **Insurer**, to assist the **Insurer** in the investigation, defense or appeal of a **Claim**.

**"Defense Costs"** do not include: (a) amounts incurred prior to the date a **Claim** is first made and reported to the **Insurer**; or (b) compensation or benefits of any **Insured Person** or any overhead expenses of the **Company**.

PP 00011 00 (01/10)    Page 2 of 11

D.    **"Discrimination"** means any violation of employment discrimination laws, including but not limited to any actual, alleged or constructive employment termination, dismissal, or discharge, employment demotion, denial of tenure, modification of any term or condition of employment, any failure or refusal to hire or promote, or any limitation or segregation of any **Employee** or applicant for employment by the **Company** in any way that would deprive any person of employment opportunities based on such person's race, color, religion, creed, age, sex, disability, marital status, national origin, pregnancy, HIV status, sexual orientation or preference, veteran status or any other status that is protected pursuant to any foreign, federal, state, or local statutory law or common law.

E.    **"Employee"** means any:

    (1)    person who was, now is, or shall become a full-time, part-time, seasonal, or temporary employee of the **Company,** but only while that person is acting in their capacity as such;

    (2)    person leased to the **Company** or any **Independent Contractor** so long as this person is working solely for the **Company** and only for conduct within his or her duties as such, but only if the **Company** indemnifies such leased person or **Independent Contractor** in the same manner as the **Company's** employees; and

    (3)    volunteer whose labor and service is engaged and directed by the **Company**, but only while that person is acting in the capacity as such.

F.    **"Executive"** means any:

    (1)    past, present or future duly elected or appointed director, officer, trustee, trustee emeritus, governor, management committee member or member of the board of managers of the **Company;** or

    (2)    past, present or future person in a duly elected or appointed position in an entity which is organized and operated in a foreign jurisdiction that is functionally equivalent to an executive position listed in paragraph (1) above.

G.    **"Harassment"** means:

    (1)    sexual harassment, including unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature that is made a condition of employment with, used as a basis for employment decisions by, interferes with performance or creates an intimidating, hostile or offensive working environment within the **Company** or **Outside Entity;** or

    (2)    workplace harassment, including work-related harassment of a non-sexual nature that interferes with performance or creates an intimidating, hostile or offensive working environment within the **Company** or **Outside Entity.**

PP 00011 00 (01/10)        Page 3 of 11

H.  **"Independent Contractor"** means any natural person working in the capacity of an independent contractor pursuant to a written contract or agreement between the **Independent Contractor** and the **Company** which specifies the terms of the **Company's** engagement of the **Independent Contractor**.

I.  **"Insured"** means the **Company** and any **Insured Person**.

J.  **"Insured Person"** means any:

(1)  **Executive**;

(2)  **Employee**; or

(3)  **Outside Entity Insured Person**.

K.  **"Loss"** means:

(1)  damages (including back pay and front pay), settlements or judgments;

(2)  pre-judgment or post-judgment interest;

(3)  costs or fees awarded in favor of the claimant;

(4)  punitive or exemplary damages, or the multiple portion of any multiplied damages award, subject to any applicable Sublimit of Liability (including the multiple or liquidated damages awarded pursuant to the Age Discrimination in Employment Act or Equal Pay Act), but only to the extent such damages are insurable under the applicable law most favorable to the insurability of such damages; and

(5)  **Defense Costs**.

**"Loss"** does not include:

(a)  amounts for which the **Insureds** are not legally liable;

(b)  amounts which are without legal recourse to the **Insureds**;

(c)  taxes;

(d)  fines or penalties, except as provided for in Definition K.(4) above;

(e)  amounts deemed uninsurable under applicable law;

(f)  any costs or liability incurred by any **Insured** to modify any building or property to make it more accessible or accommodating to any disabled person, or in connection with any educational, sensitivity or other corporate program, policy or seminar;

PP 00011 00 (01/10)                    Page 4 of 11

(g)     **Stock Benefits** due or to become due or the equivalent value of such **Stock Benefits**; or

(h)     any future compensation, including any **Benefits**, for any person hired, promoted or reinstated pursuant to a judgment, settlement, order or other resolution of a **Claim**.

However, this Coverage Section shall provide coverage for **Defense Costs** incurred in a **Claim** seeking amounts specified in paragraphs (a) through (h) above, subject to all other terms, conditions and exclusions of this Policy.

L.     **"Outside Entity"** means:

(1)     any not-for-profit entity; or

(2)     any other entity listed as such by Endorsement attached to this Policy;

for which an **Executive** or **Employee** of the **Company** acts as a director, officer, trustee, trustee emeritus, governor, management committee member or member of the board of managers or the equivalent thereof, at the specific request of the **Company**. Any such person shall be referred to herein as an **"Outside Entity Insured Person,"** but only while that person is acting in the capacity as a director, officer, trustee or governor, or the equivalent thereof, of an **Outside Entity**.

M.     **"Retaliation"** means retaliatory treatment of an **Employee** or an employee of an **Outside Entity** alleged to be on account of such individual:

(1)     exercising his or her rights under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights;

(2)     refusing to violate any law or opposing any unlawful practice;

(3)     having assisted or testified in or cooperated with any legal proceeding or formal governmental investigation regarding alleged violations of law by any **Insured**;

(4)     disclosing or expressing an intent to disclose to a superior or to any governmental agency any alleged violations of law; or

(5)     filing or expressing an intent to file any claim against the **Company** or **Outside Entity** under the Federal False Claims Act or any other similar foreign, federal, state, or local "whistle blower" law.

N.     **"Stock Benefits"** means any offering, plan or agreement between the **Company** and any **Insured Person** thereof, which grants stock or stock options or stock appreciation rights to such individual, including but not limited to stock options, restricted stock or any other stock grant, but not including employee stock ownership plans or employee stock purchase plans.

O.    **"Third Party"** means any natural person who is a customer, vendor, service provider or other business invitee of the **Company**. **Third Party** shall not include any **Insured Person** or any applicant for employment with the **Company** or an **Outside Entity**.

P.    **"Third Party Wrongful Act"** means any actual or alleged:

(1)    discrimination against a **Third Party** based upon such **Third Party's** race, color, religion, creed, age, sex, disability, marital status, national origin, pregnancy, HIV status, sexual orientation or preference, veteran status or any other status that is protected pursuant to any foreign, federal, state, or local statutory law or common law; or

(2)    harassment directed against a **Third Party**, including sexual harassment, unwelcome sexual advances, requests for sexual favors or other misconduct of a sexual nature.

Q.    **"Workplace Tort"** means any employment-related:

(1)    misrepresentation, defamation (including libel and slander), false arrest, detention, imprisonment, invasion of privacy, negligent evaluation, wrongful discipline or wrongful deprivation of a career opportunity; or

(2)    negligent retention, supervision, hiring or training, wrongful infliction of emotional distress, mental anguish or humiliation or failure to provide or enforce consistent employment-related corporate policies and procedures;

when alleged as part of a **Claim** for actual or alleged **Wrongful Employment Decision, Discrimination, Harassment, or Retaliation**.

R.    **"Wrongful Act"** means any actual or alleged:

(1)    **Discrimination;**
(2)    **Harassment;**
(3)    **Retaliation;**
(4)    **Workplace Tort;** or
(5)    **Wrongful Employment Decision;**

committed by an **Insured** but only if alleged by or on behalf of an **Employee** or an applicant for employment with the **Company** or an **Outside Entity**.

**Wrongful Act** shall also include a **Third Party Wrongful Act** committed by an **Insured**, but solely with respect to the coverage provided under Insuring Agreement B. of this Coverage Section.

S.    **"Wrongful Employment Decision"** means any actual or alleged:

(1)    wrongful termination, dismissal, or discharge of employment, demotion, denial of tenure, or failure or refusal to hire or promote; or

PP 00011 00 (01/10)                    Page 6 of 11

       (2)    breach of any implied employment contract or obligation, including but not limited to any such obligation arising out of any personnel manual, employee handbook or policy.

**III.**    **EXCLUSIONS**

This Coverage Section shall not cover any **Loss** in connection with any **Claim**:

A.    alleging, arising out of, based upon or attributable to any deliberate criminal or deliberate fraudulent act or any wilful violation of law by an **Insured** if a final judgment or adjudication establishes that such act or violation occurred;

In determining the applicability of Exclusion A., the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, any **Insured Person** shall not be imputed to any other **Insured Person**; however, the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, an **Insured Person** who is a past or current Chairman of the Board, Chief Executive Officer, President or Chief Financial Officer of the **Company** shall be imputed to the **Company**;

B.    alleging, arising out of, based upon or attributable to any actual or alleged liability of any **Insured** under any express contract or agreement; provided however, that this Exclusion shall not apply: (1) to the extent such liability which would have attached in the absence of such express contract or agreement; or (2) to the payment of **Defense Costs** in any such **Claim** against an **Insured Person**;

C.    alleging, arising out of, based upon or attributable to, as of the Pending or Prior Date set forth in Item 5. of the Declarations with respect to this Coverage Section, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation, of which an **Insured** had notice, including any **Claim** alleging or derived from the same or essentially the same facts, or the same or related **Wrongful Acts**, as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

D.    alleging, arising out of, based upon or attributable to the same facts or essentially the same facts alleged, or to the same or related **Wrongful Act(s)** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, before the Inception Date of this Policy as set forth in Item 2. of the Declarations, under any policy, whether excess or underlying, of which this Policy is a renewal or replacement or which it may succeed in time;

E.    for any **Wrongful Act** arising out of any **Insured Person** serving as a director, officer, trustee or governor of an **Outside Entity** if such **Claim** is brought by the **Outside Entity** or by any director, officer, trustee or governor thereof;

F.    for bodily injury, sickness, mental anguish, emotional distress, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided however, that this Exclusion shall not apply to that portion of a **Claim** seeking damages for emotional distress or mental anguish when resulting from a **Wrongful Act** of an **Insured**;

PP 00011 00 (01/10)          Page 7 of 11

G.   alleging, arising out of, based upon, attributable to or in any way relating to the refusal, failure or inability to pay wages or overtime pay for services rendered, improper classification of any **Employee**, improper payroll deductions taken from any **Employee** or purported **Employee**, or failure to provide or enforce legally required meal or rest break periods; provided however, that this Exclusion shall not apply to any **Claim** for **Retaliation**;

H.   for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and any amendments thereto, or any similar foreign, federal, state or statutory law or common law; provided however, that this Exclusion shall not apply to any **Claim** for **Retaliation**;

I.   alleging, arising out of, based upon or attributable to any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided however, that this Exclusion shall not apply to any **Claim** for **Retaliation**;

J.   alleging, arising out of, based upon or attributable to any **Claim** brought by a securities holder of a **Company** or an **Outside Entity**, in their capacity as such;

K.   alleging, arising out of, based upon or attributable to any lockout, strike, picket line, hiring of replacement workers, or other similar actions in connection with labor disputes or labor negotiations; provided however, that this Exclusion shall not apply to any **Claim** for **Retaliation**;

L.   alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Insured Person** serving in any capacity, other than as an **Insured Person**.

**IV.   NOTICE OF A CLAIM**

The following provision shall apply in lieu of Section V.A. of the General Terms and Conditions:

A.   The **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this Policy, give written notice to the **Insurer** at either the physical or email address indicated in Item 7. of the Declarations, of a **Claim** made against an **Insured** as soon as practicable after the **Company's** General Counsel, Director of Human Resources or Risk Manager, or any individual with functionally equivalent responsibilities, becomes aware of the **Claim**.

**V.   DEFENSE AND SETTLEMENT OF A CLAIM**

A.   The **Insurer** does not assume any duty to defend any **Claim** under this Coverage Section. However, the **Insurer** shall have the right to fully and effectively

PP 00011 00 (01/10)              Page 8 of 11

associate with the **Insured** in the control, investigation, defense and settlement of any **Claim**.

B.    The **Insured(s)** shall defend and contest any **Claim** made against them. The **Insured** shall obtain the **Insurer's** written consent in the selection of defense counsel to represent the **Insured** as respects any **Claim**, such consent shall not be unreasonably withheld.

C.    The **Insured(s)** shall not admit or assume any liability, incur any **Defense Costs**, make any settlement offer, enter into any settlement agreement or stipulate to any judgment, without the prior written consent of the **Insurer**. Any **Loss** incurred by the **Insured(s)** and/or any settlements or judgments agreed to by the **Insured(s)** without such consent shall not be covered by this Policy. However, the **Insurer's** consent is not required for the **Insured** to settle a **Claim** for a **Loss** amount within the applicable Retention, provided that such settlement fully resolves the **Claim** with respect to all **Insureds** and the **Insurer**.

D.    The **Insurer** shall have the right to associate with the **Insured** in the defense of any **Claim** that can reasonably be expected to require any payment by the **Insurer**, including but not limited to the right to investigate, conduct negotiations, and enter into the settlement of any **Claim** that the **Insurer** deems appropriate, subject to the consent of the **Insured** which shall not be unreasonably withheld. In the event the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendation, the **Insurer's** liability for **Loss** on account of such **Claim** shall not exceed:

    (a)    the amount for which the **Insurer** could have settled the **Claim**; plus;

    (b)    any **Defense Costs** incurred up to the date the **Insured** refused to settle such **Claim**; plus

    (c)    eighty percent (80%) of covered **Loss**, other than **Defense Costs**, in excess of the amount for which the **Insurer** could have settled the **Claim**. The remaining amount of any **Loss**, including any **Defense Costs** incurred after the date the **Insured** refused to settle such **Claim**, shall be carried by the **Insured** at its own risk and be uninsured.

However, in no event shall the **Insurer's** liability exceed the applicable Limit of Liability for this Coverage Section, as set forth in Item 4.A. of the Declarations.

E.    At the request of the **Named Insured**, the **Insurer** shall reimburse **Defense Costs** prior to the final disposition of any **Claim**, subject to all other terms and conditions of this Policy. In the event and to the extent that the **Insureds** shall not be entitled to payment of such **Defense Costs** under the terms and conditions of this Coverage Section, such payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally, according to their respective interests.

F.    **Right to Tender Defense**

PP 00011 00 (01/10)            Page 9 of 11

(1)     Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of a **Claim** to the **Insurer**.

(2)     This right shall be exercised by the **Named Insured** on behalf of all **Insureds** by providing written notice to the **Insurer**. The **Insured's** right to tender the defense of a **Claim** shall terminate if it is not exercised within fifteen (15) days of the date the **Claim** is first made against an **Insured**. Further, from the date the **Claim** is first made against an **Insured** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of any **Insured** or the **Insurer** with respect to such **Claim**. In the event the **Insureds** have complied with all of the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent.

(3)     The **Insurer's** assumption of the defense of the **Claim** shall be effective upon the **Insurer** providing written confirmation thereof to the **Named Insured**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and the negotiation of any settlement of any **Claim**, subject to the provisions of this Section V. The **Insurer** shall not be obligated to defend or continue to defend a **Claim**, or to pay or reimburse **Defense Costs**, after the applicable Limit of Liability has been exhausted.

(4)     When the **Insurer** has assumed the duty to defend, it shall pay **Defense Costs** excess of the applicable Retention, subject to all other terms and conditions of this Policy. In the event and to the extent that the **Insureds** shall not be entitled to payment of such **Defense Costs** under the terms and conditions of this Coverage Section, such payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally, according to their respective interests.

## VI.     COOPERATION

Each and every **Insured** shall give the **Insurer** full cooperation and such information as it may reasonably require relating to the defense and settlement of any **Claim** and the prosecution of any counterclaim, cross-claim or third-party claim, including without limitation the assertion of an **Insured's** indemnification or contribution rights.

## VII.    REPRESENTATIONS AND SEVERABILITY

A.      In granting coverage under this Policy, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application**. All such statements and representations shall be deemed to be the basis of this Policy and are to be considered as incorporated into this Policy.

B.      With respect to the statements and representations contained in the **Application**, no knowledge of any **Insured Person** shall be imputed to any other **Insured Person** for the purpose of determining whether coverage is available under this Policy for any **Claim** made against such **Insured Person**. However, the

PP 00011 00 (01/10)              Page 10 of 11

knowledge possessed by any **Insured Person** who is a past or current Chief Executive Officer, President or Chief Financial Officer of the **Company** shall be imputed to the **Company** for the purpose of determining whether coverage is available under this Policy for any **Claim** made against the **Company**.

PP 00011 00 (01/10)                    Page 11 of 11

100

## DARWIN SELECT INSURANCE COMPANY

# FORCEFIELD$^{SM}$
## PRIVATE COMPANY
### MANAGEMENT LIABILITY PACKAGE POLICY
### Fiduciary Liability Coverage Section

In consideration of the payment of the premium and in reliance upon the **Application**, which shall be deemed to be attached to, incorporated into, and made a part of this Policy, and subject to the General Terms and Conditions and this Coverage Section, DARWIN SELECT INSURANCE COMPANY (the "**Insurer**") and the **Named Insured**, on behalf of all **Insureds**, agree as follows:

**I.    INSURING AGREEMENTS**

**A.    Fiduciary Liability Coverage**

The **Insurer** shall pay on behalf of any **Insured** the **Loss** arising from a **Claim** first made during the **Policy Period** (or Discovery Period, if applicable) against such **Insured** for any **Wrongful Act**, and reported to the **Insurer** in accordance with Section V. of the General Terms and Conditions.

**B.    HIPAA Claim Coverage**

The **Insurer** shall also pay on behalf of any **Insured** the **Loss** arising from a **HIPAA Claim** first made during the **Policy Period** (or Discovery Period, if applicable) against such **Insured** and reported to the **Insurer** in accordance with Section V. of the General Terms and Conditions. The applicable Sublimit of Liability set forth in Item 4.F. of the Declarations is the **Insurer's** maximum limit of liability for all **Loss** arising from all **HIPAA Claims.** The Sublimit of Liability for **HIPAA Claims** shall be part of, and not in addition to, the Limit of Liability applicable to this Coverage Section.

**C.    Voluntary Compliance Program Coverage**

The **Insurer** shall reimburse the **Insured** the **Voluntary Compliance Program Loss** incurred by the **Insured**, and reported to the **Insurer** in accordance with Section VII. of this Coverage Section.

The applicable Sublimit of Liability set forth in Item 4.F. of the Declarations is the **Insurer's** maximum Limit of Liability for all **Voluntary Compliance Program Loss**. The Sublimit of Liability for **Voluntary Compliance Program Loss** shall be part of, and not in addition to, the Limit of Liability applicable to this Coverage Section.

The reimbursement by the **Insurer** to the **Insured** of any **Voluntary Compliance Program Loss** shall not waive any of the **Insurer's** rights under this Policy or at law, including in the event that such **Loss** results in a **Claim** under Insuring Agreements A. or B. of this Coverage Section.

PP 00014 00 (01/10)                    Page 1 of 13

II.     **DEFINITIONS**

    A.     **"Administration"** means:

        (1)     advising, counseling or giving notice to **Employees**, participants or beneficiaries with respect to any **Plan**;

        (2)     providing interpretations to **Employees**, participants or beneficiaries with respect to any **Plan**; or

        (3)     handling of records or effecting enrollment, termination or cancellation of **Employees**, participants or beneficiaries, under any **Plan**.

    B.     **"Application"** means: (1) the signed application submitted for this Policy and any attachments to such application, and for any other policy issued by the **Insurer**, or any affiliate thereof, of which this Policy is a direct renewal or replacement, including any attachments and other materials submitted with or incorporated into such applications; and (2) any publicly available documents filed by the **Named Insured** with any federal, state, local or foreign regulatory agency, including the U.S. Securities and Exchange Commission ("SEC"), during the twelve (12) months prior to the inception of the **Policy Period**.

    C.     **"Benefits"** means any obligation under a **Plan** to a participant or beneficiary of such **Plan**, which is a payment of money or property, or the grant of a privilege, right, option or perquisite.

    D.     **"Claim"** means any:

        (1)     written demand for monetary, non-monetary or injunctive relief made against an **Insured**;

        (2)     judicial, administrative or regulatory proceeding, whether civil or criminal, for monetary, non-monetary or injunctive relief commenced against an **Insured**, including any appeal therefrom, which is commenced by:

            (a)     service of a complaint or similar pleading;
            (b)     return of an indictment, information or similar document (in the case of a criminal proceeding); or
            (c)     receipt or filing of a notice of charges;

        (3)     written notice of commencement of a fact-finding investigation by the U.S. Department of Labor ("DOL"), the U.S. Pension Benefit Guaranty Corporation, or any similar governmental authority located outside the United States, including but not limited to, the Pensions Ombudsman appointed by the United Kingdom Pensions Regulator or any successor body thereto;

        (4)     written request to toll or waive the applicable statute of limitations, or to waive any contractual time bar, relating to a potential **Claim** against an **Insured** for a **Wrongful Act**.

A **Claim** shall be deemed first made when any **Insured** first receives notice of the **Claim**.

E.  **"Cleanup Costs"** means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

F.  **"Defense Costs"** means:

    (1)  reasonable and necessary fees, costs, charges or expenses resulting from the investigation, defense or appeal of a **Claim**;

    (2)  premium for an appeal, attachment or similar bond, but without any obligation to apply for and obtain such bond, in connection with a **Claim**; or

    (3)  any fees, costs, charges or expenses incurred by the **Insured** at the specific request of the **Insurer** to assist the **Insurer** in the investigation, defense or appeal of a **Claim**.

**"Defense Costs"** does not include: (a) amounts incurred by the **Insured** prior to the date a **Claim** is first made and reported to the **Insurer**; or (b) compensation or benefits of any **Insured Person** or any overhead expenses of the **Company**.

G.  **"Employee"** means any natural person whose labor or service is engaged or directed by the **Company** or any **Plan** including any part-time, seasonal, leased or temporary employee or volunteer.  **Employee** shall not include any **Independent Contractor**.

H.  **"Employee Benefits Law"** means the Employee Retirement Income Security Act of 1974, or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law of the United States ("ERISA"), or any similar common or statutory law of any other jurisdiction anywhere in the world, to which a **Plan** is subject.

I.  **"ESOP"** means: (1) any employee stock ownership plan as defined in ERISA, or; (2) any other **Plan** under which investments are made in securities of, or issued by, the **Company**, if scheduled in an Endorsement to this Policy.

J.  **"Financial Impairment"** means the **Company** becoming a debtor-in-possession; or the appointment of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Company**; or the filing of a petition under the bankruptcy laws of the United States of America or any equivalent event outside the United States of America.

K.  **"HIPAA Claim"** means a **Claim** alleging, arising out of, based upon or attributable to a violation of the Health Insurance Portability and Accountability Act of 1996 and any amendments thereto ("HIPAA").

L.    **"HIPAA Penalties"** means civil money penalties imposed upon an **Insured** for violation of HIPAA's Privacy Rule.

M.    **"Independent Contractor"** means any person working in the capacity of an independent contractor pursuant to a written contract or agreement between the **Independent Contractor** and the **Company**, which specifies the terms of the **Company's** engagement of the **Independent Contractor**.

N.    **"Insured"** means:

    (1)    the **Company**;

    (2)    any **Plan**;

    (3)    any **Insured Person**; and

    (4)    any other person or entity in his, her or its capacity as a fiduciary, administrator or trustee of a **Plan** and included in the Definition of **Insured** by specific written endorsement attached to this Policy.

O.    **"Insured Person"** means any:

    (1)    past, present or future natural person director, officer, trustee, general partner, management committee member, member of board of managers, governor (or any foreign equivalent) of the **Company**; or

    (2)    **Employee**.

P.    **"Loss"** means:

    (1)    damages, settlements or judgments;

    (2)    pre-judgment or post-judgment interest;

    (3)    costs or fees awarded in favor of the claimant;

    (4)    punitive and exemplary damages or the multiple portion of any multiplied damages award, but only to the extent that such damages are insurable under the applicable law most favorable to the insurability of such damages;

    (5)    **Voluntary Compliance Program Loss**, solely under Insuring Agreement C.; and

    (6)    **Defense Costs**.

    **"Loss"** does not include:

    (a)    amounts for which the **Insureds** are not legally liable;

    (b)    amounts which are without legal recourse to the **Insureds**;

PP 00014 00 (01/10)             Page 4 of 13

(c)    taxes;

(d)    fines or penalties, except:

    (i)    as provided for in Definition P(4) above;

    (ii)    the five percent (5%) or less civil penalty imposed upon an **Insured** under Section 502(i) of ERISA;

    (iii)    the twenty percent (20%) or less civil penalty imposed upon an **Insured** under Section 502(l) of ERISA;

    (iv)    any civil fines and penalties imposed by either the Pension Ombudsman appointed by the United Kingdom Secretary of State for Social Services, by the United Kingdom Occupational Pensions Regulatory Authority, by the United Kingdom Pensions Regulator or any successor body thereto; provided however, that any coverage for such fines and penalties applies only if the funds or assets of the subject **Plan** are not used to fund, pay or reimburse the premium for this Coverage Section;

    (v)    fines and penalties which are part of **Voluntary Compliance Program Loss**, solely under Insuring Agreement C.; or

    (vi)    **HIPAA Penalties**, solely under Insuring Agreement B.;

(e)    the return or reversion to an employer of any contribution or asset of a **Plan**;

(f)    **Benefits**, or that portion of any settlement or award in an amount equal to such **Benefits**, unless and to the extent that recovery of such **Benefits** is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Insured Person**;

(g)    amounts deemed uninsurable under applicable law; or

(h)    amounts paid or incurred by the **Company** to comply with a judgment or settlement for non-monetary or injunctive relief.

However, this Coverage Section shall provide coverage for **Defense Costs** incurred in a **Claim** seeking amounts specified in paragraphs (a) through (h) above, subject to all other terms, conditions and exclusions of this Policy.

Q.    **"Non-Indemnifiable Loss"** means **Loss** for which the **Company** is permitted or required to indemnify any **Insured Person**, but has not indemnified due to **Financial Impairment**.

R.    **"Non-Qualified Plan"** means any of the following plans for a select group of management or highly compensated directors, officers or employees: deferred

PP 00014 00 (01/10)               Page 5 of 13

compensation plan, supplemental executive retirement plan, top-hat plan, or excess benefit plan. **Non-Qualified Plan** shall not include any **ESOP** or stock option plan.

S.   **"Plan"** means any plan, fund, trust, program or **Non-Qualified Plan** regardless of whether or not it is subject to regulation under Title I of ERISA or any part thereof, or meets the requirements for qualification under Section 401 of the Internal Revenue Code of 1986, as amended, and which is:

(1)   a welfare plan, as defined in ERISA, sponsored solely by the **Company**, or sponsored jointly by the **Company** and a labor organization, solely for the benefit of **Employees**;

(2)   a pension plan, as defined in ERISA (other than an **ESOP**), sponsored solely by the **Company**, or sponsored jointly by the **Company** and a labor organization, solely for the benefit of **Employees**, provided that, prior to the Inception Date of this Policy, such plan has been reported in writing to the **Insurer** pursuant to the terms of the **Application** for this Policy or pursuant to the terms of any prior Policy issued by the **Insurer** or the **Application** for such Policy, and the **Company** shall have paid the premium required for such plan;

(3)   a pension plan, as defined in ERISA (other than an **ESOP**), which, during the **Policy Period** becomes sponsored solely by the **Company**, or sponsored jointly by the **Company** and a labor organization, solely for the benefit of **Employees**, subject to the following:

(a)   if the assets of such pension plan total twenty five percent (25%) or less of the total consolidated assets of the **Plans** covered by this Coverage Section as of the Inception Date of this Policy, this Coverage Section shall provide coverage with respect to **Wrongful Acts** that occurred after the date of such sponsorship. As a condition precedent to such coverage, the **Company** shall give written notice of such sponsorship to the **Insurer** prior to the end of the **Policy Period**; and

(b)   if the assets of such pension plan total more than twenty five percent (25%) of the total consolidated assets of the **Plans** covered by this Coverage Section as of the Inception Date of this Policy, this Coverage Section shall provide coverage with respect to **Wrongful Acts** that occurred after the date of such sponsorship.  As a condition precedent to such coverage, the **Company** shall give written notice of such sponsorship to the **Insurer** within ninety (90) days after the date of such sponsorship, with full particulars regarding such pension plan, and the **Company** shall have paid the premium required for such pension plan.

(4)   a plan which is both a welfare plan and a pension plan as defined in ERISA (other than an **ESOP**);

PP 00014 00 (01/10)                    Page 6 of 13

(5)     a   government-mandated   program   for   workers   compensation, unemployment, social security or disability benefits for **Employees**, solely with respect to a **Wrongful Act** as defined in Definition V.(2), by an **Insured Person**;

(6)     an **ESOP** that is included in the definition of **Plan** by written Endorsement attached to this Policy; or

(7)     any other plan, fund, trust or program, including a multi-employer plan, solely with respect to a **Wrongful Act** by an **Insured Person** acting at the specific request of the **Company**, that is included in the definition of **Plan** by written Endorsement attached to this Policy.

With respect to paragraphs (1) and (2) of this Definition, coverage under this Coverage Section shall apply to any pension or welfare plan that was divested by merger, sold, spun-off or terminated prior to the **Policy Period** with respect to **Wrongful Acts** that occurred prior to the date of such merger, sale or spin-off or prior to the final date of asset distribution of such plan. As a condition precedent to such coverage, the **Company** shall give written notice of such transaction to the **Insurer** prior to the Inception Date of this Policy and the **Company** shall have paid the additional premium required for such **Plan**, as determined by the **Insurer**.

With respect to paragraphs (1) and (2) of this Definition, coverage under this Coverage Section shall apply to any pension or welfare plan that was merged, sold, spun-off or terminated during the **Policy Period** with respect to **Wrongful Acts** that occurred prior to the date of such merger, sale or spin-off or prior to the final date of asset distribution of such plan. As a condition precedent to such coverage, the **Company** shall give written notice of such transaction to the **Insurer** prior to the end of the **Policy Period**.

T.     "**Pollutants**" means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on, any list of hazardous substances issued by the United States Environmental Protection Agency or any foreign, state, county, municipality, or locality counterpart thereof.   Such substances shall include, without limitation, nuclear material or waste, any solid, liquid, gaseous or thermal irritant or contaminant, or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products and any noise.

U.     "**Voluntary Compliance Program Loss**" means:

(1)     fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees imposed upon or collected from an **Insured** by the Internal Revenue Service ("IRS") under the Employee Plans Compliance Resolution System pursuant to a written agreement with the IRS, but only in the event that the **Insured** first becomes aware during the **Policy Period** that a **Plan** must be corrected;

PP 00014 00 (01/10)                    Page 7 of 13

(2)    penalties imposed upon an **Insured** by the IRS or the DOL under a Delinquent Filer Voluntary Compliance Program, but only in the event that the failure to timely file Form 5500 occurs during the **Policy Period**; and

(3)    damages incurred by an **Insured** in connection with the DOL's Voluntary Fiduciary Correction Program, but only in the event that the **Insured's** compliance with such program results in the **Insured** obtaining a "No Action" letter from the DOL and that the breach of fiduciary duty occurs during the **Policy Period**; provided, however, that **Voluntary Compliance Program Loss** under this Definition U.(3) shall not include fines, penalties or sanctions.

**Voluntary Compliance Program Loss** shall not include any costs to correct the **Insured's** non-compliance.

V.    **"Wrongful Act"** means any actual or alleged:

(1)    breach of the responsibilities, obligations or duties imposed upon fiduciaries of a **Plan** by an **Employee Benefits Law**; by an **Insured**;

(2)    negligent act, error or omission by an **Insured** in the **Administration** of a **Plan**;

(3)    matter claimed against an **Insured Person** solely by reason of his or her service as a fiduciary of a **Plan**; or

(4)    negligent hiring of either a third-party administer of a **Plan** or a third-party administrator of **Benefits** provided under a **Plan**, by an **Insured**.

## III.    EXCLUSIONS

This Coverage Section shall not cover any **Loss** in connection with any **Claim**:

A.    arising out of, based upon or attributable to the gaining of any profit or advantage or improper or illegal remuneration by an **Insured** if a final judgment or adjudication establishes that such **Insured** was not legally entitled to such profit or advantage or that such remuneration was improper or illegal;

B.    arising out of, based upon or attributable to any deliberate fraud or any wilful violation of law by an **Insured** if a final judgment or adjudication establishes that such fraud or violation occurred;

In determining the applicability of Exclusions A. and B., the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, any **Insured Person** shall not be imputed to any other **Insured Person**; however, the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, an **Insured Person** who is a past or current Chairman of the Board, Chief Executive Officer, President or Chief Financial Officer of the **Company** shall be imputed to the **Company**.

PP 00014 00 (01/10)           Page 8 of 13

C.    for failure to fund a **Plan** in accordance with ERISA or the **Plan** instrument or to collect an employer's contributions owed to a **Plan**; provided however, that this Exclusion shall not apply to: (1) the portion of **Loss** resulting from such **Claim** that is payable as a personal obligation of an **Insured Person**; or (2) the payment of **Defense Costs**;

D.    alleging, arising out of, based upon or attributable to the liability of others assumed by any **Insured** under any express contract or agreement, either oral or written; provided however, that this Exclusion shall not apply: (1) to the extent that an **Insured** would have been liable in the absence of such contract or agreement; (2) if the liability was assumed in accordance with or under the agreement or declaration of trust pursuant to which a **Plan** was established; or (3) to the payment of **Defense Costs** in any such **Claim** against an **Insured Person**;

E.    alleging, arising out of, based upon or attributable to, as of the Pending or Prior Date set forth in Item 5. of the Declarations as respects this Coverage Section, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, including any **Claim** alleging or derived from the same or essentially the same facts, or the same or related **Wrongful Acts**, as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

F.    alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Acts** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, before the Inception Date of this Policy as set forth in Item 2. of the Declarations, under any policy, whether excess or underlying, of which this Policy is a renewal or replacement or which it may succeed in time;

G.    alleging, arising out of, based upon, attributable to, directly or indirectly resulting from, or in consequence of, or in any way involving, actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of **Pollutants** into or on real or personal property, water or the atmosphere; or seeking any **Cleanup Costs**; provided however, that this Exclusion shall not apply to any **Non-Indemnifiable Loss** constituting damages to a **Plan**, except for **Non-Indemnifiable Loss** constituting **Cleanup Costs**;

H.    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided however, that this Exclusion shall not apply to **Defense Costs** incurred in defending a **Claim** alleging a violation of the responsibilities, obligations or duties imposed by ERISA;

I.    for any actual or alleged violation of any law governing workers' compensation, unemployment insurance, social security or disability benefits, or any similar law, anywhere in the world; except the Consolidated Omnibus Budget Reconciliation Act of 1985, HIPAA, or any amendments thereto or any rules or regulations promulgated thereunder;

J.    alleging, arising out of, based upon, or attributable to any actual or alleged discrimination, harassment, retaliation, wrongful discharge, termination or any other employment-related or employment practice claim; provided, however, that this Exclusion shall not apply to any **Claim** asserted under Section 510 of ERISA;

K.    alleging, arising out of, based upon or attributable to any **Wrongful Act** with respect to a **Plan**, taking place at any time when the **Company** did not sponsor such **Plan** or when the **Insured Person** was not a fiduciary, administrator, trustee, director, officer, governor, management committee member, member of the board of managers, general partner or employee of the **Company** or, if applicable, the **Plan**;

L.    alleging, arising out of, based upon or attributable to any act or omission of an **Insured** in his, her or its capacity as a fiduciary or administrator of any plan, fund or program, other than a **Plan** as defined in this Coverage Section, or by reason of his, her or its status as a fiduciary or administrator of such other plan, fund or program.

## IV.   RETENTION

No Retention is applicable to **HIPAA Claims** or **Voluntary Compliance Program Loss**.

## V.   DEFENSE AND SETTLEMENT OF A CLAIM

A.    The **Insurer** does not assume any duty to defend any **Claim** under this Coverage Section. However, the **Insurer** shall have the right to fully and effectively associate with the **Insured** in the control, investigation, defense and settlement of any **Claim**.

B.    The **Insured(s)** shall defend and contest any **Claim** made against them.  The **Insured** shall obtain the **Insurer's** written consent in the selection of defense counsel to represent the **Insured** as respects any **Claim**, such consent shall not be unreasonably withheld.

C.    The **Insured(s)** shall not admit or assume any liability, incur any **Defense Costs**, make any settlement offer, enter into any settlement agreement or stipulate to any judgment without the prior written consent of the **Insurer**. Any **Loss** incurred by the **Insured(s)** and/or any settlements or judgments agreed to by the **Insured(s)** without such consent shall not be covered by this Policy. However, the **Insurer's** consent is not required for the **Insured** to settle a **Claim** for a **Loss** amount within the applicable Retention, provided that such settlement fully resolves such **Claim** with respect to all **Insureds** and the **Insurer**.

D.    At the request of the **Named Insured**, the **Insurer** shall reimburse **Defense Costs** prior to the final disposition of any **Claim**, subject to all other terms and conditions of this Policy. In the event and to the extent that the **Insureds** shall not be entitled to payment of such **Defense Costs** under the terms and conditions of this Coverage Section, such payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally according to their respective interests.

PP 00014 00 (01/10)                 Page 10 of 13

E.    **Right to Tender Defense**

    (1)    Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of a **Claim** to the **Insurer**; however, the **Insureds** shall not have the right to tender the defense of any matter under Insuring Agreement C. Voluntary Compliance Program Coverage, of this Coverage Section.

    (2)    This right shall be exercised by the **Named Insured** on behalf of all **Insureds** by providing written notice to the **Insurer**. The right to tender the defense of a **Claim** shall terminate if it is not exercised within thirty (30) days of the date the **Claim** is first made against an **Insured**. Further, from the date the **Claim** is first made against an **Insured** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of any **Insured** or the **Insurer** with respect to such **Claim**. In the event the **Insureds** have complied with all of the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent.

    (3)    The **Insurer's** assumption of the defense of the **Claim** shall be effective upon the **Insurer** providing written confirmation thereof to the **Named Insured**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and the negotiation of any settlement of any **Claim**, subject to the provisions of this Section V. The **Insurer** shall not be obligated to defend or continue to defend a **Claim**, or to pay or reimburse **Defense Costs**, after the applicable Limit of Liability has been exhausted.

    (4)    When the **Insurer** has assumed the duty to defend, it shall have the right to investigate and conduct negotiations and, with the **Insured's** consent, which shall not be unreasonably withheld, enter into the settlement of any **Claim** that the **Insurer** deems appropriate.

    (5)    When the **Insurer** has assumed the duty to defend, it shall pay **Defense Costs** excess of the applicable Retention, subject to all other terms and conditions of this Policy. In the event and to the extent that the **Insureds** shall not be entitled to payment of such **Defense Costs** under the terms and conditions of this Coverage Section, such payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally according to their respective interests.

F.    **Voluntary Compliance Program Loss Coverage**

    (1)    With respect to Insuring Agreement C. Voluntary Compliance Program Coverage the **Company**, and not the **Insurer**, has the duty to investigate, evaluate, negotiate and settle any matter which may result in **Voluntary Compliance Program Loss**.

PP 00014 00 (01/10)           Page 11 of 13

      (2)    The **Insurer** shall have the right to effectively associate with the **Company** in such process, including the negotiation of any settlement of any matter which results in **Voluntary Compliance Program Loss**.

## VI.    COOPERATION

Each and every **Insured** shall give the **Insurer** full cooperation and such information as it may reasonably require relating to the defense and settlement of any **Claim** or the settlement of any matter resulting in **Voluntary Compliance Program Loss**, and the prosecution of any counterclaim, cross-claim or third-party claim, including without limitation the assertion of an **Insured's** indemnification or contribution rights.

## VII.    NOTICE OF VOLUNTARY COMPLIANCE PROGRAM LOSS

The **Insureds** shall, as a condition precedent to the obligations of the **Insurer** under this Policy to reimburse **Voluntary Compliance Program Loss**, give written notice to the **Insurer** at either the physical or email address indicated in Item 7. of the Declarations, of any matter which any **Insured** reasonably believes may result in **Voluntary Compliance Program Loss** within thirty (30) days after the **Insureds** become aware of such matter, but in no event later than thirty (30) days after the Expiration Date set forth in Item 2. of the Declarations.

## VIII.    RIGHT OF RECOURSE

If this Policy is purchased with plan assets, the **Insurer** shall have a right of recourse against any fiduciary whose breach of a fiduciary obligation, as imposed by ERISA, results in a **Loss** under this Policy paid by the **Insurer**. If, however, it is confirmed on the **Application** that all or a portion of the premium for this Policy is paid by or on behalf of the fiduciaries with non-plan assets, the **Insurer** shall have no right of recourse against any fiduciary with respect to any **Claim**, including but not limited to, rights of contribution and subrogation.

## IX.    REPRESENTATIONS AND SEVERABILITY

A.    In granting coverage under this Policy, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application**. All such statements and representations shall be deemed to be the basis of this Policy and are to be considered as incorporated into this Policy.

B.    With respect to the statements and representations contained in the **Application**, no knowledge of any **Insured Person** shall be imputed to any other **Insured Person** for the purpose of determining whether coverage is available under this Policy for any **Claim** made against such **Insured Person**. However, the knowledge possessed by any **Insured Person** who is a past or current Chairman of the Board, Chief Executive Officer, President or Chief Financial Officer of the **Company** shall be imputed to the **Company** for the purpose of determining whether coverage is available under this Policy for any **Claim** made against the **Company**.

PP 00014 00 (01/10)           Page 12 of 13

**X.    ORDER OF PAYMENTS**

A.    In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this Coverage Section, the **Insurer** shall in all events:

(1)    first, pay **Loss** for which coverage is provided under this Coverage Section for any **Insured Person**;

(2)    second, only after payment of **Loss** has been made pursuant to paragraph (1) above, with respect to whatever remaining amount of any Limit of Liability applicable to this Coverage Section is available, pay the **Loss** for which coverage is provided under this Coverage Section for any covered **Plan**; and

(3)    third, only after payment of **Loss** has been made pursuant to paragraph (1) and (2) above, with respect to whatever remaining amount of any Limit of Liability applicable to this Coverage Section is available, pay the **Loss** for which coverage is provided under this Coverage Section for the **Company**.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA



### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV13- 889 CJC (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

---

CV-18 (03/06)    NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS   (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| ALLIED WORLD ASSURANCE COMPANY (U.S.) INC. | SENTINEL OFFENDER SERVICES, LLC, a California limited liability partnership; and DOES 1-20 |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Gilbert D. Jensen (SBN 061620)<br>Cheryl A. Orr (SBN 132379)<br>Musick, Peeler & Garrett LLP<br>One Wilshire Blvd., Suite 2000<br>Los Angeles, CA  90017-3383<br>(213) 629-7768 | |

**II.  BASIS OF JURISDICTION** (Place an X in box only.)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

**III.  CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  ORIGIN** (Place an X in one box only.)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify): | ☐ 6 Multi-District Litigation | ☐ 7 Appeal to District Judge from Magistrate Judge |

**V.  REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No     ☒ **MONEY DEMANDED IN COMPLAINT:** $ 200,000 +  interest

**VI.  CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. 1332.  This is a complaint for declaratory relief and reimbursement, seeking a declaration that a series of related lawsuits against Defendant Sentinel are not covered under an insurance policy issued by Plaintiff AWAC, and reimbursement of defense fees.

**VII.  NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☒ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | IMMIGRATION | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | |
| | ☐ 290 All Other Real Property | | | | |

FOR OFFICE USE ONLY:   Case Number:   SACV13- 889

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).   IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  [X] No   [ ] Yes
If yes, list case number(s): _____

**VIII(b).   RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  [X] No   [ ] Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   [ ] A. Arise from the same or closely related transactions, happenings, or events; or
                               [ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or
                               [ ] C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                               [ ] D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX.  VENUE:** (When completing the following information, use an additional sheet if necessary.)
(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
   [ ]  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | New York, NY / Delaware |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
   [ ]  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X.  SIGNATURE OF ATTORNEY (OR PRO PER):** _Cheryl A. Orr_                    Date June 10, 2013

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |